ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
550 South Hope Street, Suite 1645
Los Angeles, CA 90071
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

CONAL DOYLE, # 227554
STEPHEN BEKE, # 290972
DOYLE LAW
9401 Wilshire Blvd., Suite 608
Beverly Hills, CA 90212
Tel: (310) 385-0567; Fax (310) 943-1780
conal@conaldoylelaw.com
sbeke@conaldoylelaw.com

Attorneys for Plaintiffs
LACY ATZIN and MARK ANDERSEN,
on behalf of themselves and all others
similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACY ATZIN; MARK ANDERSEN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHEM, INC.; ANTHEM UM SERVICES, INC., <br><br> Defendants. | Case No.: 2:17-cv-6816 ODW (PLAx) <br> Assigned to Hon.: OTIS D. WRIGHT, II <br><br> **DECLARATION OF ROBERT S. GIANELLI IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT** <br><br> **Date: November 22, 2021** <br> **Time: 1:30 p.m.** <br> **Place: Courtroom 5D** |

I, Robert S. Gianelli, declare:

1.     I am an attorney licensed in California and duly admitted to practice law before this Court. I am lead counsel for Plaintiffs Lacy Atzin and Mark Andersen ("Plaintiffs") and Class Counsel in this case. I have been involved in all aspects of litigating this action and I have first-hand knowledge of all matters stated in this declaration. If called upon to testify, I could competently do so.

2.     The law firm of Gianelli & Morris has specialized in representing aggrieved consumers in complex insurance class action and unfair business practices (Business & Professions Code section 17200) litigation for over 30 years. I have been a practicing attorney for over forty (40) years. During this time, I have handled the investigation, preparation, trial, and appeals of numerous consumer class actions, in both state and federal courts.

3.     Gianelli & Morris has been appointed class counsel in a number of significant consumer class actions, including: *Bradford v. Anthem, Inc., et al.* (C.D. Cal.) Case No. 2:17-CV-5098-AB (KSx); *Trujillo v. UnitedHealth Group, Inc.* (C.D. Cal.) Case No. 5:17-CV-2547-JFW (KKx)*; Hill, et al. v. UnitedHealthcare Insurance Company, et al.* (C.D. Cal.) Case No. SACV15-00526 DOC (RNBx); *Escalante v. California Physicians Service dba Blue Shield of California* (C.D. Cal.) Case No. 2:14-CV-3021-DDP; *Gallimore v. Kaiser Foundation Health Plan, Inc.*, Alameda Superior Court, Case No. RG12616206; *Vaccarino v. Midland National Life Ins. Co.* (C.D. Cal.) Case No. 11 CV-5858-CAS; *Arce v. Kaiser Foundation Health Plan, Inc.*, Los Angeles Superior Court, Case No. BC388689; *Bath v. Blue Shield of California*, San Luis Obispo Superior Court, Case No. CV070360; *Ticconi v. Blue Shield Life & Health Ins. Co.*, Los Angeles Superior Court, Case No. BC330989; *Peterman v. North American Co. for Life and Health*, Los Angeles Superior Court, Case No. BC357194; *Stephens v. American Equity Investment Life Insurance Company*, San Luis Obispo Superior Court, Case No. CV040965; *Iorio v. Allianz Life Ins. Co. of North America* (S.D. Cal.) Case No. 05-CV-0633-IEG;

*Chastain v. Union Security Life Insurance Company* (C.D. Cal.) Case No. 06-CV-5885-ABC; and *Kavruck v. Blue Cross of California*, Los Angeles Superior Court, Case No. BC160180.

4. Gianelli & Morris has represented the insureds in a number of significant, published consumer law decisions, including: *Escalante v. California Physicians Service dba Blue Shield of California* (C.D. Cal. 2015) 309 F.R.D. 612; *Myers v. State Board of Equalization* (2015) 240 Cal.App.4th 722; *Broberg v. The Guardian Life Insurance Co.* (2009) 171 Cal.App.4th 912; *Rodriguez v. Blue Cross of California* (2008) 162 Cal.App.4th 330; *Kavruck v. Blue Cross of California* (2003) 108 Cal.App.4th 773; *State Farm Mutual Auto. Ins. Co. v. Superior Court* (*Hill*) (2003) 114 Cal.App.4th 434; *IT Corp. v General American* (9th Cir. 1997) 107 F.3d 1415; *American States Ins. Co. v. Borbor* (9th Cir. 1987) 826 F.2d 888; *Hansen v. Blue Cross* (9th Cir. 1989) 891 F.2d 1384; and *Allstate v. Overton* (1984) 160 Cal.App.3d 84.

5. I have served as an Adjunct Professor of Insurance Law at Whittier Law School and La Verne University College of Law and as a Contributing Editor to The Rutter Group publication, *California Practice Guide: Insurance Litigation*. On numerous occasions, I have lectured, and continue to lecture, on insurance-related topics and insurance class actions, including programs and lectures sponsored by The Rutter Group and ABA/ALI. I have also lectured on numerous occasions to the Consumer Attorneys of California on insurance class actions and insurance bad faith.

6. This case was brought due to Defendants Anthem, Inc. and Anthem UM Services, Inc. (jointly, "Anthem" or "Defendants") practice to deny coverage for microprocessor controlled lower limb prosthesis for persons with lower limb loss pursuant to internal coverage guideline, the Anthem Medical Policy on Microprocessor Controlled limb Prosthesis, Policy No. OR-PR.00003 ("OR-PR.00003").

7.     With respect to microprocessor-controlled knee prostheses, Anthem used erroneous criteria to deny most requests as not "medically necessary." More specifically, Anthem deemed requests for these procedures not "medically necessary and not covered unless all of the following criteria were met:

> 1. Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology and to allow for faster than normal walking speed; **and**
>
> 2. Individual has demonstrated the ability to ambulate faster than their baseline rate using a standard swing and stance lower extremity prosthesis; **and**
>
> 3. Individual has a documented need for daily long distance ambulation (for example, greater than 400 yards) at variable rates. (In other words, use within the home or for basic community ambulation is not sufficient to justify the computerized limb over standard limb applications)**; and**
>
> 4. Individual has a demonstrated need for regular ambulation on uneven terrain or regular use on stairs. Use of limb for limited stair climbing in the home or place of employment is not sufficient to justify the computerized limb over standard limb applications.

(Dkt. 1, ¶ 21.) Plaintiffs alleged these criteria were erroneous because criteria 1 and 2 were predicated on a person with a prosthetic leg demonstrating the ability to master "a faster than normal walking speed" and doing it with a "standard swing and stance" device.  (*Id*., ¶ 22.)  While a microprocessor-controlled knee prosthesis may allow a person to walk faster, Plaintiffs alleged this was only one of the benefits of the device, and failed to recognize that they also allowed people to accomplish "normal" activities of daily living. (*Id*.) For instance, a microprocessor controlled knee creates better stability and therefore reduces the incidence of stumbles and falls in everyday settings, including their homes. (*Id*.) Plaintiffs alleged that criteria 3 and 4 imposed unreasonable distance requirements and demands regarding "regular" use of uneven terrain or stairs while excluding the use of home or workplace stairs.  (*Id*.)

8.     In regard to microprocessor-controlled foot-ankle prostheses, Anthem denied coverage for all such devices as investigational and not "medically necessary."

4

9.     Plaintiffs and Anthem have agreed to settle this case on the terms set forth in the Settlement Agreement ("the Settlement")[1] attached hereto as Exhibit 1.

10.     The following documents are attached as Exhibits to the Settlement Agreement: Notice of Proposed Settlement of Class Action and Final Approval Hearing" ("Notice") – Exhibit A; Claim Form – Exhibit B; Proposed Preliminary Approval Order – Exhibit C; Proposed Final Order Approving Class Action Settlement and Judgment – Exhibit D; Anthem's Revised Former Medical Policy, OR-PR. 0004 – Exhibit E, effective from August 29, 2019 until May 20, 2021 ; Current Medical Policy, OR-PR.00004, effective May 20, 2021 – Exhibit F.

11.     Attached hereto as Exhibit 2 is a true and correct copy of Anthem's Policy No. OR-PR.0003, with an Effective Date of January 1, 2013 ("Former Medical Policy").

12.     The Settlement follows major policy changes from Anthem directly resulting from this litigation. About two years after action was first filed, on October 3, 2019, the parties reached a settlement of the knee portion of the case. With input from Plaintiffs' experts, Anthem adopted the Revised Former Medical Policy that contained revised medical necessity criteria such that it would now cover microprocessor knees if the member demonstrated through their provider a reasonable likelihood of better mobility or stability. The parties, however, were unable to reach a settlement of the foot-ankle portion of the lawsuit at that time.

13.     In regard to the portion of the case addressing microprocessor-controlled foot-ankle prosthesis, on May 6, 2020, the Court granted class certification of the following foot-ankle class: "All persons covered under Anthem plans governed by ERISA, self-funded or fully-insure, whose requests for microprocessor controlled foot-ankle prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Medical Policy on

---

[1] Unless otherwise indicated, all defined terms will have the same definitions as those set forth in the Settlement.

1    Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR.PR.00003."

2    (Dkt. 63 at 9.) The Court appointed Gianelli & Morris and Doyle Law, APC as Class

3    Counsel, and Mark Andersen as Class Representative. (*Id*.)

4        14.    Finally, about four years after this action was filed, Anthem agreed to

5    change its "investigational" coverage position with respect to microprocessor-

6    controlled foot-ankle prosthetic devices. Effective May 20, 2021, Anthem adopted a

7    new  revised OR-PR.00004 ("Current Medical Policy"), under which Anthem agreed

8    to cover microprocessor-controlled foot-ankle prostheses using the same medical

9    necessity criteria it uses for microprocessor-controlled knee prostheses. The Current

10   Medical Policy provides in pertinent part that use of microprocessor controlled knee,

11   foot and ankle prosthesis is medically necessary when the following criteria are met:

12   (1) Individual has adequate cardiovascular reserve and cognitive learning ability to

13   master the higher level technology; (2) Individual has a functional K-Level 3 or

14   above; (3) The provider has documented that there is a reasonable likelihood of better

15   mobility or stability with the device instead of a mechanical knee, foot or ankle

16   prosthesis; and (4) There is documented need for ambulation in situations where the

17   device will provide benefit.

18       15.    Anthem's post-litigation reversal of its coverage positions are built into

19   the Settlement. Anthem has agreed not to change its revised position on

20   microprocessor controlled lower limb prostheses unless such change is warranted by

21   a change in the medical literature and medical community's views. (Ex. 1, ¶ 17.)

22       16.    Class Counsel reviewed Anthem's new medical necessity criteria with

23   John Michael, C.P.O., a nationally-renowned prosthetist and Plaintiffs' expert in this

24   case. As set forth in the concurrently filed Declaration of John Michael, his opinion is

25   that the criteria in the Current Medical Policy is reasonable to determine the medical

26   necessity of microprocessor lower limb prostheses. There is no speed requirement,

27   and a person can qualify by simply having their provider document there is a

28

6

reasonable likelihood of better mobility or stability than a standard mechanical device, and the device will provide benefit.

17.     Class members who paid out of pocket for microprocessor-controlled knees and foot-ankle prostheses can make claims for reimbursement to the extent those out-of-pocket payments have not been paid by other insurance, Medicare, or other reimbursement sources for which the class member owes no reimbursement obligation. (Ex. 1, ¶¶ 18-19.) The claims will be reviewed under the Current Medical Policy. (*Id.*, ¶ 20.)

18.     Class Members who have not paid out-of-pocket for microprocessor controlled knee or foot-ankle prosthesis and are currently coved by Anthem can submit a new request for coverage. Anthem will review those requests according to the provisions of the Current Medical Policy and the terms of each person's existing health plan. (Ex. 1,  ¶ 21.) Class members who have not paid out of pocket for the prosthesis and are no longer covered by Anthem cannot submit a new request for the microprocessor controlled knee or foot-ankle prosthesis but release no claims and the statute of limitations applicable to their claim denials is tolled from the date of the filing of this action until the Effective Date of the Settlement. (Ex. 1, ¶ 22.)

19.     The proposed settlement also provides that Plaintiffs will apply to the Court for attorneys fees and costs, in amounts not to exceed $850,000 in attorney fees and $36,833.99 in litigation costs. (Ex. 1, ¶ 16.) Lacy Atzin and Mark Andersen will also apply for an incentive awards not to exceed $15,000 each for their work as class representatives in this case. (*Id.*)

20.     As part of the proposed settlement, Plaintiffs seek certification of a settlement Class, which includes the persons in the "Atzin *(*Knee) class" and the "Andersen (Foot-Ankle) Class." The Atzin (Knee) Class is defined as:

>  "[A]ll persons covered under Anthem plans governed by ERISA, self-funded or fully insured, whose request(s) for microprocessor controlled knee prostheses have been denied during the applicable statute of

limitations period pursuant to Anthem's Former Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the [Notice of the Proposed Settlement of Class Action and Final Approval Hearing], and who do not properly exclude themselves from the Atzin knee Class under Paragraphs 34-38 [of the Settlement Agreement]."

The Andersen (Foot-ankle) Class is defined as:

"[A]ll persons covered under Anthem plans governed by ERISA, self-funded or fully insured, whose request(s) for microprocessor controlled foot-ankle prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Former Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the [Notice of the Proposed Settlement of Class Action and Final Approval Hearing] and who do not properly exclude themselves from the Andersen (Knee) Class under Paragraphs 34-38 [of the Settlement Agreement]."

21.     Anthem has advised Class Counsel that it has identified at least 101 Atzin (Knee) Class members and 84 Andersen (foot-ankle) Class members.

22.     As set forth in the concurrently-filed Motion for Preliminary Approval, the proposed Class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure.

23.     The parties' settlement occurred over nearly 4 years after this action was filed and was well informed by the discovery and investigation completed up to that point. At the time of settlement, Anthem had produced over 2,282 pages of information concerning the class and merits issues in the case. For their part, Plaintiffs produced nearly 1,000 pages of information supportive of their position that Anthem's policies and practices are amenable to class treatment, regarding proper

criteria for microprocessor-controlled knee prosthesis, and that microprocessor foot-ankle prosthetics are safe and effective.

24.     All told, Plaintiffs served and Anthem responded to 34 document requests, 25 interrogatories, and numerous requests for admission. Discovery was hard fought and contested. Plaintiff brought three motions to compel, which were granted in part on January 13, 2021.

25.     Plaintiffs also took the deposition of Anthem's corporate designee ("Person Most Knowledgeable") to address merits issues relating to the safety and effectiveness of foot-ankle prostheses.

26.     Class Counsel supplemented formal discovery with their own investigation and research. Class Counsel engaged in extensive investigation and research regarding appropriate medical necessity criteria for microprocessor-controlled lower limb prostheses, and the safety and effectiveness of microprocessor-controlled foot-ankle prostheses. Class Counsel also retained and worked with experts on microprocessor-controlled prostheses and the pertinent body of medical literature.

27.     The parties' attempts to settle this case began in short order after this case was filed, entailed the robust exchange of information (including expert information), and spanned the four-years length of the case. As indicated above, the parties reached a settlement of the knee portion of this case on October 3, 2019, but were unable to reach a settlement of foot-ankle portion. Plaintiffs subsequently filed an unopposed motion for class certification, which was granted by this Court in regard to the foot-ankle class. The parties then proceeded to merits discovery before restarting their settlement efforts in March 2021. The parties engaged in extensive and vigorous settlement negotiations over the next six months until they reached a settlement in principle on August 5, 2021. The remaining outstanding issues, and the long form settlement agreement, have now been finalized.

28.     It is my informed view that the proposed settlement is fair, reasonable, and adequate and easily meets the criteria for preliminary approval. The Settlement achieves substantially all of the relief requested in the Complaint, and trial would afford no further benefit.

29.     Co-counsel Conal Doyle of Doyle Law has successfully prosecuted a number of individual cases over wrongful denials of prosthetic devices and recently acted as co-counsel with Gianelli & Morris in *Trujillo, et al. v. UnitedHealth Group Inc., et al.* (C.D. Cal.), No. 5:17-cv-2547-JFW (KKx), where the court certified a class of persons who were denied prosthetic devices.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed this 19th day of October 2021 at Los Angeles, California.


ROBERT S. GIANELLI

# [EXHIBIT 01]

## SETTLEMENT AGREEMENT

This Settlement Agreement and Release ("Agreement") IS HEREBY STIPULATED AND AGREED TO by and between Plaintiffs Lacy Atzin ("Atzin") and Mark Andersen ("Andersen"), on behalf of themselves and the Class (collectively "Plaintiffs" or "Class"), and Defendants Anthem, Inc. and Anthem UM Services, Inc. and their Affiliates[1] (collectively, "Anthem") (Plaintiffs and Anthem are hereinafter referred to as the "Parties"), by and through their respective counsel. The proceedings in the United States District Court for the Central District of California, *Lacy Atzin and Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx) (the "Litigation") and matters raised by and related to the Litigation, are settled fully and finally and compromised on the terms and conditions set forth in this Agreement and the attached exhibits.

### RECITALS

1.      On September 15, 2017, Plaintiffs filed the Class Action Complaint in this case against Anthem.

2.      Plaintiffs alleged in the Complaint that Anthem engaged in the following wrongful practices in denying coverage for microprocessor controlled lower limb prostheses for persons with lower limb loss: (a) with respect to microprocessor controlled knee prostheses, Anthem used erroneous criteria in its coverage guideline, the Anthem Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.0003 (hereinafter "OR-PR.00003"); (b) With respect to microprocessor controlled foot-ankle prostheses, Anthem has

---

[1] For purposes of this Agreement, an Affiliate of Anthem, Inc. and/or Anthem UM Services, Inc. is any corporation or other legal entity owned or controlled, either directly or indirectly through parent or subsidiary corporations, by Anthem, Inc. and/or Anthem UM Services, Inc., or under common control with Anthem, Inc. and/or Anthem UM Services, Inc.  Affiliates shall also mean Blue Cross of California dba Anthem Blue Cross and Anthem Blue Cross Life and Health Insurance Company, as well as any corporation or other legal entity owned or controlled, directly or indirectly, by WellPoint Health Networks, Inc. or any of its predecessors or successors-in-interest.

denied coverage for all such devices under OR-PR.00003 on the bases they are "investigational and not medically necessary for all indications."

3.     On October 3, 2019, the Parties entered into a stipulated settlement of that part of the case addressing Anthem's criteria for approving claims for microprocessor controlled knee prostheses, subject to a long-form agreement and approval of the Court. (Dkt. 53.)

4.     In regards to the portion of the case addressing microprocessor controlled foot-ankle prosthesis, on May 6, 2020, the Court certified the following class and appointed Mark Andersen as Class Representative:

"All persons covered under Anthem plans governed by ERISA, self-funded or

fully-insure, whose requests for microprocessor controlled foot-ankle prostheses

have been denied during the applicable statute of limitations period pursuant to

Anthem's Medical Policy on Microprocessor Controlled Lower Limb Prosthesis,

Policy No. OR-PR.00003."  (Dkt. 63.)

5.     The Court appointed Gianelli & Morris and Doyle Law, APC as Class Counsel.

6.     Through this Agreement, the parties request that the Court designate Atzin as a class representative for purposes of this settlement class.

7.     Atzin and Andersen, through Class Counsel, have investigated the allegations asserted in the Litigation and have closely analyzed the merits of the alleged claims and the alleged damages suffered by the Class. Class Counsel have considered the facts, law, and potential defenses regarding the claims alleged against Anthem. Class Counsel's investigation has been adequate, and this Settlement is fully informed.

8.     After investigation, discovery, and litigation, the Parties have agreed to settle the Litigation. The Parties have conducted discussions and arm's length negotiations with each other

regarding the claims asserted in the Litigation.

## Anthem's Denials of Wrongdoing and Liability

9.      Anthem denies each and every claim and contention alleged or otherwise made or pursued against it by Plaintiffs in the Litigation. Anthem denies all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts, or omissions alleged, or that could have been alleged, in the Litigation.

10.     Anthem denies any and all liability. Nonetheless, Anthem has concluded that further litigation would be protracted and expensive, and that this Settlement is desirable solely for the purpose of avoiding the burden, expense, risk, and uncertainty of continuing the proceedings.

## Benefits of the Settlement to the Class

11.     Class Representative and Class Counsel believe that the Settlement provides fair, reasonable and adequate recovery for the Class based on the claims asserted and the evidence developed and what might be proven by Class Representative and the Class in the Litigation.

12.     Class Representative and Class Counsel further recognize and acknowledge the expense and time of prosecuting the Litigation through trial and appeal. Class Representative and Class Counsel also have considered the uncertain outcome and the risk of any litigation, including the risk that the Class might obtain no relief, especially in a complex action such as this one, as well as the difficulties and delays inherent in any complex litigation.

**THEREFORE**, it is stipulated and agreed by and among the Parties to this Agreement, through their respective attorneys, in consideration of the benefits to the Parties from the Settlement, the adequacy of which is acknowledged by the Parties, and subject to (1) approval of the Court, and (2) the other conditions set forth in this Agreement, that the Released Claims against the Released Parties will be finally and fully compromised, settled, and released.

3

## DEFINITIONS

13.     In addition to the definitions set forth elsewhere in this Agreement, the following terms used in this Agreement will have the meanings specified below.

a.     "Anthem's Counsel" means the law firm of Reed Smith LLP and its shareholders, members, partners, associates, paralegals, and employees, and its successors and assigns.

b.     "Class" or "Class Members" means persons who are in the Atzin (Knee) Class or the Andersen (Foot-Ankle) Class.

c.     "Atzin (Knee) Class" means all persons covered under Anthem plans governed by ERISA, self-funded or fully insured, whose request(s) for microprocessor controlled knee prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Former Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the Notice referenced herein, and who do not properly exclude themselves from the Atzin (Knee) Class under Paragraphs 35-39 below.

d.     "Andersen (Foot-Ankle) Class" means all persons covered under Anthem plans governed by ERISA, self-funded or fully insures, whose request(s) for microprocessor controlled foot-ankle prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Former Medical Policy and/or Revised Former Medical Policy (Knee Change) on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the Notice referenced herein, and who do not properly exclude themselves from the Andersen (Foot-Ankle) Class under Paragraphs 35-39 below.

c.     "Class Counsel" means the law firms of Gianelli & Morris, A Law Corporation and Doyle Law, APC, and their respective shareholders, members, partners, associates, paralegals, and employees, and their successors and assigns.

4

d.      "Class Representative" means, collectively, Atzin and Anderson, and their respective successors and assigns.

e.      "Complaint" refers to Plaintiffs' Complaint on file in this Litigation.

f.      "Current Medical Policy (Foot-Ankle Change)" refers to Anthem's current Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, attached hereto as **Exhibit F**.

g.      "Effective Date" means the first day following the date all of the following events have occurred:

i.      entry of the Preliminary Approval Order;

ii.      no option to terminate, as set forth in Paragraph 47, has been exercised, and the deadline for doing so has expired;

iii.      approval by the Court of the Settlement following class notice and a hearing and entry of Judgment; and

iv.      Final Approval.

h.      "Final Approval" means the expiration of the time for appeal or review of the Judgment or any part of the Judgment, including any form of further review or appeal, has been finally disposed and the time for any further appeal or review has expired. If there are no objections filed by a Class Member, Final Approval will be the date the Court grants final approval of the Settlement.

i.      "Final Approval Hearing" means the final hearing held by the Court to approve this Settlement.

j.      "Former Medical Policy" refers to versions of Medical Policy OR-PR.00003 that were in effect prior to August 29, 2019.

k.      "Revised Former Medical Policy (Knee Change)" refers to versions of

Medical Policy OR-PR.00003 that were in effect from August 29, 2019 until the Current Medical

Policy took effect on May 20, 2021, attached hereto as **Exhibit E**.

        l.     "Judgment" means the order and final judgment, in the form attached here

as **Exhibit D**, which provides, among other terms, for approval of the Settlement; or such other

form agreed to by the Parties in writing.

        m.     "Notice" means the "Notice of Proposed Settlement of Class Action and

Final Approval Hearing" substantially in the form attached as **Exhibit A**.

        n.     "Person" and "Persons" means any individual, corporation, partnership,

limited liability partnership, limited liability company, association, affiliate, joint stock company,

estate, trust, trustee, unincorporated association, entity, government and any political

subdivision, or any other type of business or legal entity, any legal representative, and their

spouses, heirs, predecessors, successors, representatives, agents, members, managers, or

assignees.

        o.     "Preliminary Approval Order" means the Order Preliminarily Approving

Settlement and Providing for Notice that the Class Representative and Anthem will seek from the

Court, substantially in the form attached as **Exhibit C**.

        p.     "Related Parties" means a party's current, former, and future spouses,

heirs, beneficiaries, executors, administrators, successors, predecessors, parent organizations,

subsidiaries, affiliates, partners, joint venturers, officers, directors, shareholders, of counsel,

employees, members, managers, trustees, agents, representatives, attorneys, insurers, and

assigns.

        q.     "Released Claims" means any and all claims and causes of action, whether

direct, representative, class, or individual in nature regarding (1) any denial of microprocessor-

controlled knee prostheses under ERISA-governed plans, either fully insured or self-funded,

issued or administered by Anthem, including as a de-facto administrator, that occurred at any time from September 15, 2013 pursuant to the Former Medical Policy; (2) any denial of microprocessor-controlled foot-ankle prostheses under ERISA-governed plans, either fully insured or self-funded, issued or administered by Anthem, including as a de-facto administrator, that occurred at any time from September 15, 2013 pursuant to the Former Medical Policy or the Revised Former Medical Policy (Knee Change); and/or (3) the appropriateness of the Former Medical Policy, the Revised Former Medical Policy and/or the Current Medical Policy including, but not limited to, the criteria in those policies. Released Claims do not include any claims for reimbursement or claims for re-review, as described below, that are denied after Final Approval for failure to meet the criteria of the Current Medical Policy. Released Claims also do not include any claim by a Class Member who did not pay out of pocket for a microprocessor controlled knee or foot-ankle prosthesis as of the date of the filing of the Motion for Preliminary Approval of Class Settlement, and is not currently covered by Anthem.

r.      "Released Parties" means Anthem and its Related Parties.

s.      "Settlement" means the collective settlement terms set forth in the Agreement.

t.      "Settlement Administrator" means the firm that the Parties agree upon and request be appointed by the Court to disseminate notice of the pendency of the Litigation and the proposed Settlement to the Class and to otherwise administer the Settlement as set forth in this Agreement following entry of the Preliminary Approval Order and Final Approval by the Court.

## ENTRY OF THE JUDGMENT

14.     If this Settlement is approved by the Court at or after the Final Approval Hearing, Class Counsel and Anthem's Counsel will request that the Court enter the Judgment substantially in the form attached here as **Exhibit D**.

## THE SETTLEMENT

15.     Effective August 29, 2019, Anthem adopted the Revised Former Medical Policy (Knee Change), attached as **Exhibit E**, that contained revised criteria to determine coverage for microprocessor controlled knee prostheses.

16.     Effective May 20, 2021, Anthem further revised PR-PR.00003 to remove its conclusion that microprocessor controlled foot-ankle prosthesis are "investigational and not medically necessary for all indications," and to set forth medical necessity criteria, as set forth in the Current Medical Policy (Foot-Ankle Change), attached as **Exhibit F**.

17.     Changes to Anthem's Current Medical Policy (Foot-Ankle Change) will adhere to Anthem's established process, whereby Anthem's Medical Policy and Technology Assessment Committee (MPTAC) periodically reviews the medical policy and considers generally accepted standards of medical practice that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, national physician specialty society recommendations and the views of medical practitioners practicing in relevant clinical areas and any other relevant factors (such as FDA approval status) to determine whether the medical policy should be modified based on these considerations.

18.     Atzin Knee Class Members who (1) do not submit a written request for exclusion from the Class under Paragraphs 35-39, and (2) paid out-of-pocket for a microprocessor controlled knee prosthesis as of the date of the filing of the Motion for Preliminary Approval of Class Settlement Date, can make claims for reimbursement to the extent those out-of-pocket payments have not been paid by other insurance, Medicare, or other reimbursement sources, for which the Atzin Knee Class Members owe no reimbursement obligation.

19.     Andersen Foot-Ankle Class Members who (1) do not submit a written request for exclusion from the Class under Paragraphs 35-39, and (2) paid out-of-pocket for a

8

microprocessor controlled foot-ankle prosthesis as of the date of the filing of the Motion for Preliminary Approval Date, can make claims for reimbursement to the extent those out-of-pocket payments have not been paid by other insurance, Medicare, or other reimbursement sources, for which the Andersen Foot-Ankle Class Members owe no reimbursement obligation.

20.     The Class Members requesting reimbursement must provide Anthem proof of payment, in the form of the invoice for the prosthetic and a copy of the check and/or credit card payment, for any microprocessor controlled knee or foot-ankle prosthesis, and medical records to show that their claims for microprocessor controlled knee or foot-ankle prothesis satisfy the criteria of the Current Medical Policy. A decision as to whether a Class Member satisfies the criteria in the Current Medical Policy will be determined by Anthem.  If Anthem determines that the claim for reimbursement for the microprocessor controlled knee or foot-ankle prosthesis satisfies the criteria set forth in the Current Medical Policy, Anthem will reimburse the Class Member for the microprocessor controlled knee or foot-ankle prosthesis out-of-pocket costs, subject to  a reduction only for the cost-share the Class Member would have paid under the Class Member's contract with Anthem had that claim been initially approved as an in-network service. A claim form substantially in the form of **Exhibit B**, attached hereto, will be used for the submission of these claims. Anthem will make and communicate a decision about whether any claim for reimbursement shall be reimbursed within 90 days of receiving such a claim. Any claim for reimbursement that Anthem denies, in whole or in part, will comply with the adverse benefit determination provisions of 29 C.F.R. 2560.503-1 and will be subject to the appeal procedures provided by ERISA. If Anthem denies a claim on the basis the Class Member has not supplied a required piece of documentation, e.g., a medical bill or medical record, the Class Member will be advised of the deficiency and will be given sixty (60) days to cure it. Within sixty (60) days of the completion of Anthem's review of the reimbursement claims,

9

including the time for any appeals, Anthem will provide Class Counsel with a summary of its decisions. Class Counsel will have the right to sample any reimbursement decisions for compliance with the criteria of the Current Medical Policy.

21.     Class Members who (1) do not submit a written request for exclusion from the Class under Paragraphs 35-39, (2) are currently covered by Anthem and (3) did not pay out of pocket for the microprocessor controlled knee or foot-ankle prosthesis as of the date of the filing of the Motion for Preliminary Approval can submit a new request for coverage for the microprocessor controlled knee or foot-ankle prosthesis. Anthem will review those requests according to the provisions of the Current Medical Policy and the terms of each person's existing health plan.   Any request made by a Class Member currently covered under a plan governed by ERISA that Anthem denies, in whole or in part, will comply with the adverse benefit determination provisions of 29 C.F.R. 2560.503-1 and will be subject to the appeal procedures provided by ERISA.

22.     Class Members who (1) do not submit a written request for exclusion from the Class under Paragraphs 35-39, (2) are not currently covered by Anthem and (3) did not pay out of pocket for the microprocessor controlled knee or foot-ankle prosthesis as of the date of the filing of the Motion for Preliminary Approval of Class Settlement cannot submit a new request for the microprocessor controlled knee or foot-ankle prosthesis but release no claims.   The parties agree that for those class members who satisfy the three requirements in the preceding sentence, the statute of limitations applicable to their individual (i.e., non-class) ERISA claims against Anthem for denial of the microprocessor controlled knee or the microprocessor controlled foot-ankle that were the subject of this lawsuit shall be tolled from September 15, 2017, until the Effective Date.

**RELEASE OF CLAIMS**

23.     The obligations incurred under this Settlement will be in full and final disposition of the Litigation against the Released Parties and will fully, finally, and forever compromise, settle, release, resolve, relinquish, waive, discharge any and all Released Claims against the Released Parties.

24.     Class Representative will have, and each of the Class Members will be deemed to have, and by operation of law and of the Judgment will have, on behalf of themselves and their Related Parties, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged the Released Parties from the Released Claims without costs to any party (except as set forth in this Settlement), except for claims to enforce the Settlement.

**ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARD**

25.     Class Counsel will apply to the Court for an award of total attorneys' fees and costs in an amount not to exceed $850,000 in attorneys fees and $36,833.99 in costs, which includes any fees and costs incurred through Final Approval. Class Counsel will seek Court approval of an incentive award for the Class Representatives, based on the time and effort they devoted to the Litigation, in an amount not to exceed $15,000 for Plaintiff Lacy Atin and $15,000 for Plaintiff Mark Andersen.

26.     Anthem and the other Released Parties will not oppose any application for payment of attorneys' fees or reimbursement of litigation costs to Class Counsel, or payment of any incentive award to the Class Representative, up to the amounts listed in Paragraph 25.

27.     The attorneys' fees, litigation costs, and incentive award approved by the Court will be paid by wire transfer to Class Counsel within 30 days of the Final Approval and Anthem's receipt of an IRS W-9 tax form in the name of the payee.

28.     Anthem agrees to pay the Settlement Administrator's reasonable expenses incurred in administering the Settlement in accordance with the terms of this Agreement.

**NOTICE OF PENDENCY AND PROPOSED SETTLEMENT**

29.     Anthem will provide to the Settlement Administrator a list of the last known addresses of each person in the Class available from its records no later than thirty (30) after the entry of the Preliminary Approval Order. No more than forty five (45) days after the entry of the Preliminary Approval Order, the Settlement Administrator will mail the Notice.

30.     The Settlement Administrator will send notice using the Court-approved Notice, sent by first-class mail.

31.     The Settlement Administrator will perform an "NCOA" scrub on the mailing list before mailing the Notice. The Settlement Administrator will perform a skip-trace search for persons whose notices are returned as undeliverable, and must re-send returned mail to new addresses found for those persons.

32.     Each Class Member will be deemed to have submitted to the jurisdiction of the Court regarding his or her participation in the Settlement.

33.     Anthem will pay the cost of administering the settlement, including the cost of providing notice to Class Members and to State and Federal officials as required by 28 U.S.C. § 1715.

34.     All controversies and proceedings regarding the administration of the Settlement and distribution of attorneys' fees and costs to Class Counsel are subject to the jurisdiction of the Court.

**REQUESTS FOR EXCLUSION FROM THE CLASS**

35.     Each Class Member will be bound by all determinations and judgments in the Litigation concerning the Settlement unless the member sends to the Settlement Administrator,

by first class mail, a written request for exclusion from the Class. To be valid, the request for exclusion must: (1) be postmarked no later than thirty-five (35) days from the date the Class Notice was sent to the Class, and (2) state all of the following: (a) the name, address, and telephone number of the person requesting exclusion; and (b) a clear and unequivocal statement that the person wishes to be excluded from the Class.

36.     All persons who submit valid and timely requests for exclusion in the manner described in Paragraph 35 will have no rights under this Agreement, will not share in the Settlement, and will not be bound by the Agreement or the Judgment, unless the request for exclusion is validly retracted under Paragraph 38.

37.     The Settlement Administrator will scan and email copies of each request for exclusion in PDF format (or any other agreed format) to Anthem's Counsel and to Class Counsel not more than five (5) days after the Settlement Administrator receives such a request. As part of the motion papers in support of Final Approval of the Settlement, the Settlement Administrator or Class Counsel will provide a list of all the persons who have requested exclusion from the Class.

38.     Any putative Class Member may retract a prior request for exclusion by providing to Class Counsel and to Anthem's Counsel a written notice stating his or her desire to retract the request for exclusion from the Class by 12:00 p.m., Pacific Standard Time, five (5) calendar days before the Final Approval Hearing. Any written notice retracting the request for exclusion also must include a statement that the putative Class Member makes the retraction freely and of his or her own volition, without coercion by anyone. Any putative Class Member who validly retracts a request for exclusion under this Paragraph will not be excluded from the Class Members, will be deemed to be a Class Member, and will be bound by the Settlement.

13

39.     If more than 10  Class Members submit a timely request for exclusion, Anthem may, in its sole discretion, nullify this settlement agreement; provided that the Class Member has not validly retracted the request as of the time Anthem exercises this option. If Anthem exercises this option, the Settlement and this Agreement will become null and void and have no further force and effect, and the terms of Paragraph 47 will apply.

### OBJECTIONS TO SETTLEMENT

40.     Any Class Member who wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement must deliver to Class Counsel and to Anthem's Counsel, and file with the Court, no later than thirty-five (35) calendar days from the date Notice was sent to the Class Members or as the Court otherwise may direct, a written statement of the objections, as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence or other information the Class Member wishes to introduce in support of the objections. Class Members may object either on their own or through an attorney retained at their own expense. The written objection must also contain the Class Member's name, address, signature, and telephone number.

41.     Any Class Member who files and serves a written objection, as described in Paragraph 40, may appear at the Final Approval Hearing, either in person or through counsel hired at the Class Member's expense, to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement. Class Members or their attorneys who intend to make an appearance at the Final Approval Hearing must deliver a notice of intention to appear to Class Counsel and to Anthem's Counsel, and file that notice with the Court, no later than forty-five (45) calendar days from the date Notice was sent to the Class Members, or as the Court may otherwise direct.

42.     Any Class Member who fails to comply with the provisions of this Section will waive and forfeit any and all rights he or she may have to appear separately and object, and will be bound by all the terms of this Agreement and by all proceedings, orders, and judgments, including but not limited to the Release, in the Litigation.

43.     Any Class Member who objects to the Settlement will be entitled to all of the benefits of the Settlement if it is approved, as long as the objecting Class Member complies with all requirements of this Agreement.

## CLASS ACTION FAIRNESS NOTICE

44.     Anthem will comply with 28 U.S.C. § 1715 by serving or arranging to serve, not later than 10 days after the proposed settlement of a class action is filed in court, notice of the proposed settlement upon the appropriate state officials of each state in which a class member resides and the appropriate federal official.

## PRELIMINARY APPROVAL ORDER

45.     Class Counsel will promptly file the Agreement and its exhibits with the Court and apply for entry of the Preliminary Approval Order substantially in the form attached here as **Exhibit C**.

## SETTLEMENT PROCESS SCHEDULE

46.     The dates for the events contemplated by this Settlement Agreement are as follows:

| Event | Event Date |
|---|---|
| Anthem provides the notice required under the Class Action Fairness Act pursuant to 28 U.S.C. § 1715. | Not more than 10 days after Plaintiff files a motion for preliminary approval |
| Anthem provides mailing data for Class Members to the Settlement Administrator | 30 days from the date of the Preliminary Approval Order |

| Class Counsel files a motion for an award of attorneys' fees and costs and class representative incentive award | 30 days from the date of the Preliminary Approval Order |
| The Administrator mails the Notice of Proposed Settlement | 45 days from the date of the Preliminary Approval Order |
| Deadline for postmarking of exclusions, objections | 80 days from the date of the Preliminary Approval Order |
| Deadline for postmarking and filing requests to be heard at the Final Approval Hearing | 90 days from the date of the Preliminary Approval Order |
| Class Counsel to file a motion for final approval | 28 days prior to the Final Approval Hearing |
| Final Approval Hearing | To be set by the Court, no earlier than 120 days from the date of the Preliminary Approval Order |

## TERMINATION OF THE SETTLEMENT

47.    Either Party will have the option to terminate this Agreement on ten (10) calendar days' notice to the other if any of the following occurs:

a.    The Court enters any order that is materially inconsistent with the terms of this Agreement;

b.    The Court does not enter the Preliminary Approval Order;

c.    The Court does not approve the Settlement or any material part of it as reflected in this Agreement (though the Parties do not concede that every term of the Settlement or of this Agreement is material for these purposes).

d.    The Court does not enter the Judgment;

e.    The Judgment is vacated, modified, or reversed in any material respect by an appellate court of competent jurisdiction; or

f.    The Effective Date does not occur for any reason.

16

48.     If this Agreement is terminated, the Settlement and this Agreement will become null and void and have no further force and effect.

49.     If this Agreement is terminated, the Parties to this Agreement will be deemed to have reverted *nunc pro tunc* to their respective status in the Litigation as of the date and time immediately before the execution of this Agreement; except as otherwise expressly provided, the Parties will proceed in all respects as if this Agreement and any related orders had not been entered and without any prejudice in any way from the negotiation, fact, or terms of the Settlement or this Agreement; and this Agreement may not be used in the Litigation or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Agreement will be treated as vacated, *nunc pro tunc*.

## NO ADMISSION OF WRONGDOING

50.     Whether or not the Settlement is approved by the Court, and whether or not it is consummated, the fact and terms of this Agreement, including Exhibits, all negotiations, discussions, drafts, and proceedings in connection with the Settlement, and any act performed or document signed in connection with the Settlement:

a.     may not be construed, offered, or received against Anthem or any other Released Party as a presumption, concession, or admission about the truth of any fact alleged by Plaintiffs, the validity of any claim that had been or could have been asserted in the Litigation or in any litigation, that the class should have been certified, or the deficiency of any defense that has been or could have been asserted in the Litigation or in any litigation; and

b.     may not be construed, offered, or received against Plaintiffs or the Class or any of them as a presumption, concession, or admission that any of their claims are or were without merit or that any damages recoverable under the Complaint would not have exceeded any benefits provided under this Settlement.

17

51.     Once approved by the Court, the Settlement reflected in this Agreement may be pleaded as a full and complete defense by any of the Released Parties to any action, suit, or other proceeding that may be instituted, prosecuted or attempted regarding any of the Released Claims. The Released Parties may offer the Agreement or the Judgment from the Litigation in any other action that may be brought against them by any identified Class Member in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any similar defense or counterclaim.

## MISCELLANEOUS PROVISIONS

52.     The Parties agree to work together in good faith to accomplish, as soon as reasonably practical, all of the prerequisites for the Effective Date, including the Preliminary Approval Order, approval by the Court of the Settlement, and the Judgment.

53.     The headings in this Agreement are used for the purpose of convenience only and are not meant to have legal effect.

54.     All of the Exhibits attached to the Agreement are incorporated by reference. If there is a conflict or inconsistency between the terms of this Agreement and the terms of any exhibit, the terms of this Agreement will prevail.

55.     This Agreement may not be modified or amended, nor may any of its provisions be waived, except by a writing signed by all Parties or their successors-in-interest.

56.     The Parties to this Agreement intend the Settlement to be a final and complete resolution of all disputes asserted or which could be asserted by Plaintiffs and the Class Members against any of the Released Parties with respect to the Released Claims.

57.     The Parties to this Agreement agree that the terms of the Settlement were negotiated at arm's length in good faith by the Parties, and reflect a settlement that was reached voluntarily based on adequate information and after consultation with experienced legal counsel.

58.     The waiver by one Party of any breach of this Agreement by any other Party will not be deemed a waiver of any other prior or subsequent breach of this Agreement.

59.     This Agreement and its Exhibits constitute the entire agreement among the Parties regarding the Settlement and supersede all prior and contemporaneous arrangements, oral and written agreements, and discussions or negotiations between or among the Parties or their agents or attorneys. No promise, representation, or warranty by any Party, or attorney or agent of any Party, regarding the Settlement that is not expressly contained or referred to in this Agreement or its exhibits will be valid or binding on that Party. The Parties have included this Paragraph to preclude the introduction of parole evidence to vary, interpret, supplement, or contradict the terms of this Agreement.

60.     This Agreement may be executed by electronic signature (as indicated by an "s/"), and in one or more counterparts, including by signature transmitted by facsimile, or by a .pdf/.tiff image of the signature transmitted by email. All executed counterparts and each of them will be deemed to be one and the same instrument.

61.     The Parties and their respective counsel agree that they will use their best efforts to obtain all necessary approvals of the Court required for the Settlement by this Agreement.

62.     Each person signing this Agreement represents he/she has all necessary authority to sign this Agreement.

63.     This Agreement will be binding on the Parties, including any and all Released Parties and any corporation, partnership, or other entity into or with which any Party may merge, consolidate, or reorganize. No assignment will relieve any Party of any obligation under this Settlement.

64.     Notices required by this Agreement will be submitted both (1) by email and (2) either by (a) any form of overnight mail or (b) in person to:

19

Robert S. Gianelli
GIANELLI & MORRIS, A Law Corporation
550 South Hope Street, Suite 1645
Los Angeles, CA 90071
rob.gianelli@gmlawyers.com
*Attorneys for Plaintiffs*

and

Kenneth N. Smersfelt
REED SMITH LLP
355 South Grand Avenue, Suite 2800
Los Angeles, CA 90071
ksmersfelt@reedsmith.com
*Attorneys for Defendants*

Notice will be deemed effective on sending the notice as described in this Paragraph.

65.     The administration, consummation, and enforcement of the Settlement in this Agreement will be under the authority of the Court, and the Parties intend that the Court retain jurisdiction for the purpose of entering orders, providing for approval of attorneys' fees and costs to Class Counsel, and enforcing the terms of the Settlement and this Agreement.

66.     The construction, interpretation, operation, effect, and validity of this Agreement, and all documents necessary to effectuate it, will be governed by the internal laws of the State of California without regard to conflicts of laws.

67.     This Agreement will not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties. This Agreement is the result of arm's length negotiations between the Parties and all Parties have contributed substantially and materially to the preparation of this Agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement on the dates written below.

ACCEPTED AND AGREED:

**DEFENDANTS ANTHEM, INC. AND ANTHEM UM SERVICES, INC.**

Dated: _10.19.21_

By: _____

   Name:

   Its:


**PLAINTIFF LACY ATZIN**

Dated: _10/15/2021_

_____


**PLAINTIFF MARK ANDERSEN**

Dated: _____

_____


Approved as to Form:


**GIANELLI & MORRIS, A Law Corporation**

Dated: _____

_____

Robert S. Gianelli
Counsel for Plaintiff


21

**DEFENDANTS ANTHEM, INC. AND ANTHEM UM SERVICES, INC.**

Dated: _____

By: _____
    Name:
    Its:

**PLAINTIFF LACY ATZIN**

Dated: _____

_____

**PLAINTIFF MARK ANDERSEN**

Dated: *10/15/2021*

_____

Approved as to Form:

**GIANELLI & MORRIS, A Law Corporation**

Dated: _____

_____
Robert S. Gianelli
Counsel for Plaintiff

**DEFENDANTS ANTHEM, INC. AND ANTHEM UM SERVICES, INC.**

Dated: _____        By: _____
                                  Name:
                                  Its:

**PLAINTIFF LACY ATZIN**

Dated: _____        _____

**PLAINTIFF MARK ANDERSEN**

Dated: _____        _____

Approved as to Form:

**GIANELLI & MORRIS, A Law Corporation**

Dated: 10/19/21        _____
                        Robert S. Gianelli
                        Counsel for Plaintiff

21

**DOYLE LAW**

Dated:   10/20/21

Conal F. Doyle
Counsel for Plaintiffs

**REED SMITH LLP**

Dated:

Kenneth N. Smersfelt
Counsel for Defendants
Anthem, Inc. and Anthem UM Services, Inc.

**DOYLE LAW**

Dated: _____

_____

Conal F. Doyle
Counsel for Plaintiffs

**REED SMITH LLP**

Dated: _10/19/21_____

_____

Kenneth N. Smersfelt
Counsel for Defendants
Anthem, Inc. and Anthem UM Services, Inc.

# [EXHIBIT A]

<u>UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA</u>

# If you had a pre-authorization request or post-service claim for a microprocessor-controlled knee or foot-ankle prostheses denied at any time from September 17, 2013 through present, you could receive benefits from a class action settlement.

*A court authorized this notice. You are not being sued. This is not a solicitation from a lawyer.*

- Anthem has changed its medical policy regarding lower limb microprocessor-controlled prostheses.

- Effective August 29, 2019, Anthem adopted revised medical necessity criteria for microprocessor-controlled knees prostheses, under which a member qualifies for coverage if the member demonstrates through their provider that they meet the selection and documentation criteria including, but not limited to, a reasonable likelihood of better mobility or stability.

- Effective May 20, 2021, Anthem changes its "investigational" coverage position with respect to microprocessor-controlled foot-ankle prostheses. Anthem now covers microprocessor-controlled foot-ankle prostheses if the member demonstrates through their provider that they meet the selection and documentation criteria including, but not limited to, a reasonable likelihood of better mobility or stability.

- Persons who paid out-of-pocket for microprocessor knees or foot-ankle prostheses after a denial pursuant to the older medical policies can submit a claim for reimbursement under the criteria in the new medical policy.

- Persons who were denied microprocessor-controlled knees or foot-ankle prostheses under the older policies, but have not yet paid out of pocket for the devices as of [insert date of preliminary approval motion filing], are hereby notified that they can submit their requests for approval for microprocessor-controlled prostheses pursuant to the terms of their existing Anthem contracts. Anthem will review those requests in accordance with criteria in the new medical policy.

- Court-appointed lawyers for the class of Anthem members will ask the Court for up to $850,000 for fees and $36,833.99 in expenses for investigating the facts, litigating the case, and negotiating the settlement, to be paid separately by Anthem.

- Your legal rights are affected whether you act or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **DO NOTHING** | If you do nothing, you will remain a Class Member and you will be able to seek reimbursement for out-of-pocket expenses incurred for microprocessor-controlled knee or foot-ankle prosthesis. |
| **EXCLUDE YOURSELF** | If you choose to exclude yourself, you will lose the ability to seek coverage for the prior microprocessor-controlled knee or foot-ankle prosthesis under the terms of the settlement, but you can bring your own lawsuit. |
| **OBJECT** | Write to the Court about why you don't like the settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the settlement. |
| **APPEAR THROUGH AN ATTORNEY** | If you desire, you may enter an appearance in this case through an attorney at your own expense. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement. Benefits under the settlement will be provided if the Court approves the settlement, if any appeals relating to the settlement are resolved, and after claim forms and supporting documentation are provided.  Please be patient.

## WHAT THIS NOTICE CONTAINS

**PAGE**

**BASIC INFORMATION** ...........................................................................................................**1**
    1.    Why did I get this notice package? .......................................................1
    2.    What is this lawsuit about? ...................................................................1
    3.    Why is this a class action? ...................................................................1
    4.    Why is there a settlement? ...................................................................1

**WHO IS IN THE SETTLEMENT?** .........................................................................................**2**
    5.    How do I know if I am part of the settlement? ....................................2
    6.    I'm still not sure if I'm included .........................................................2

**THE SETTLEMENT BENEFITS—WHAT YOU GET** ........................................................**2**
    7.    What does the settlement provide? ......................................................2

**HOW YOU GET AUTHORIZATION FOR A FUTURE MICROPROCESSOR-CONTROLLED LOWER LIMB PROSTHESIS OR SEEK REIMBURSEMENT FOR A PRIOR MICROPROCESSOR LOWER LIMB PROSTHESIS** ...............................**2**
    8.    How do I seek reimbursement for a prior lower limb prosthesis? .......2
    9.    How can I get authorization for a future lower limb prosthesis? .........2
    10.   What am I giving up to stay in the Class? ...........................................3

**EXCLUDING YOURSELF FROM THE SETTLEMENT** .....................................................**3**
    11.   How do I get out of the settlement? ....................................................3
    12.   If I do not exclude myself, can I sue Anthem for the same thing later? ..................3
    13.   If I exclude myself, can I get benefits from this settlement? .................3

**THE LAWYERS REPRESENTING YOU** ...........................................................................**4**
    14.   Do I have a lawyer in this case? .........................................................4
    15.   How will the lawyers get paid? ...........................................................4

**OBJECTING TO THE SETTLEMENT** ...............................................................................**5**
    16.   How do I tell the Court I don't like the settlement? ...........................5
    17.   What is the difference between objecting and excluding? ....................5

**THE COURT'S FAIRNESS HEARING** ............................................................................**5**
    18.   When and where will the Court decide whether to approve the settlement? ...........5
    19.   Do I have to come to the hearing? .......................................................6
    20.   May I speak at the hearing? .................................................................6

**GETTING MORE INFORMATION** ....................................................................................**6**
    21.   Are there more details about the settlement? .......................................6

**IMPORTANT DATES** .........................................................................................................**6**
    22.   What are the important dates and deadlines relating to this settlement? .................6

# BASIC INFORMATION

## 1.    Why did I get this notice package?

You are or were covered under a health plan issued or administered by Defendants Anthem, Inc., one of its subsidiaries or Anthem UM Services, Inc. ("Anthem"), and you may have previously submitted a pre-authorization request or post-service claim for a microprocessor-controlled knee prosthesis that was denied by Anthem pursuant to version of its Medical Policy OR-PR.00003 that were in effect prior to August 29, 2019 (the "Former Medical Policy").

You are or were covered under a health plan issued or administered by Anthem, and you may have previously submitted a pre-authorization request or post-service claim for a microprocessor-controlled foot-ankle prosthesis that was denied by Anthem pursuant to the Former Medical Policy or a version of its Medical Policy OR-PR.00003 that was in effect from August 29, 2019 to May 20, 2021 (the "Revised Former Medical Policy").

The Court sent you this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about all your options, before the Court decides whether to approve the settlement.  This package explains the lawsuit, the settlement, your legal rights, what benefits may be available to you, who is eligible for them, and how to get them.

The Court in charge of this case is the United States District Court for the Central District of California, and the case is known as *Lacy Atzin; Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx).

## 2.    What is this lawsuit about?

This case concerns Anthem's alleged practice to deny coverage for microprocessor controlled lower limb prosthesis for persons with lower limb loss. With respect to microprocessor-controlled knee prostheses, this lawsuit concerns whether Anthem used erroneous criteria to deny requests as not "medically necessary." In regard to microprocessor-controlled foot-ankle prostheses, the lawsuit concerned whether Anthem improperly denied coverage for all such devices as investigational and not "medically necessary."

## 3.    Why is this a class action?

In a class action lawsuit, one or more people, called the "Class Representative" (in this case, Lacy Atzin and Mark Andersen), sues on behalf of other people who allegedly have a similar claim. The people together are a "Class" or "Class Members."  Ms. Atzin and Mr. Andersen —and all the Class Members like them— are called the Plaintiffs. The companies they sued (in this case, Anthem UM Services, Inc. and Anthem Inc.) are called the Defendants. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.  The Honorable Otis D. Wright  is the judge in charge of this class action.

| **4.** | **Why is there a settlement?** |
|---|---|

The Court did not decide in favor of Plaintiffs or Defendants.  Instead, both sides agreed to a settlement.  That way, they avoid the cost of a trial, and Class Members may be entitled to reimbursement.  The Class Representative and the attorneys think the settlement is best for everyone whose claims for microprocessor-controlled knee or foot-ankle prostheses have been denied.

# WHO IS IN THE SETTLEMENT?

To see if you will get relief from the settlement, including potential monetary benefits, you first have to decide if you are a Class Member.

| 5. | How do I know if I am part of the settlement? |
|----|-----------------------------------------------|

The Court decided that everyone who fits either of the below descriptions is a Class Member under this settlement:

All persons covered under Anthem plans governed by ERISA, self-funded or fully insured, whose request(s) for microprocessor-controlled knee prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Former Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the Notice referenced herein, and who do not properly exclude themselves.

All persons covered under Anthem plans governed by ERISA, self-funded or fully insures, whose request(s) for microprocessor-controlled foot-ankle prostheses have been denied during the applicable statute of limitations period pursuant to Anthem's Former Medical Policy and/or Revised Former Medical Policy (Knee Change) on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.00003, who are mailed the Notice referenced herein, and who do not properly exclude themselves.

| 6. | I'm still not sure if I'm included |
|----|------------------------------------|

If you are still not sure whether you are included, you can ask for free help. You can call _____ and ask the Settlement Administrator for further information to help you determine whether you are a Class Member.

# THE SETTLEMENT BENEFITS—WHAT YOU GET

| 7. | What does the settlement provide? |
|----|-----------------------------------|

Effective August 29, 2019, Anthem adopted revised medical necessity criteria for microprocessor-controlled knee prostheses, under which the member qualifies for coverage if the member demonstrates through their provider that they meet the selection and documentation criteria including, but not limited to, a reasonable likelihood of better mobility or stability.

Effective May 20, 2021, Anthem changed its "investigational" coverage position with respect to microprocessor-controlled foot-ankle prosthetic devices. Anthem now covers both microprocessor-controlled knee and foot-ankle prosthetic devices if the member demonstrates they meet certain selection and documentation criteria, including:

(1) Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology; **and**

(2) Individual has a functional K-Level 3 or above; **and**

(3) The provider has documented that there is a reasonable likelihood of better mobility or stability with the device instead of a mechanical knee, foot or ankle prosthesis; **and**

(4) There is documented need for ambulation in situations where the device will provide benefit (for example, regular need to ascend/descend stairs, traverse uneven surfaces or ambulate for long distances [generally 400 yards or greater cumulatively]).

This is only a summary of the selection and documentation criteria. If you want to know more, you can review the Current Medical Policy, which can be viewed on the website at www._____ or requested from the Settlement Administrator.

Anthem members whose post-service claims or pre-authorization requests for (1) microprocessor-controlled knee prostheses were denied pursuant to Anthem's Former Medical Policy or (2) microprocessor-controlled foot-ankle prostheses were denied pursuant to Anthem's Former Medical or Revised Former Medical Policy, and who paid out-of-pocket for the device may make a claim for reimbursement.

Current Anthem members who had their (1) microprocessor-controlled knee prostheses denied pursuant to Anthem's Former Medical Policy or (2) microprocessor-controlled foot-ankle prostheses denied pursuant to Anthem's Former Medical or Revised Former Medical Policy, but have yet to pay for the device out-of-pocket as of [insert date of motion for preliminary approve filing], may submit a new request for the microprocessor-controlled lower limb device, which Anthem will review under the updated criteria in the Current Medical Policy.  Persons who have not paid out of pocket for the microprocessor-controlled knee or foot-ankle prostheses, and are no longer covered by Anthem, cannot make a request for the surgery, but they release no claims.

| | |
|---|---|
| **8.** | **How do I seek reimbursement for microprocessor-controlled knee or foot-ankle prostheses that I paid for?** |

If you paid out-of-pocket for a microprocessor-controlled knee or foot-ankle prostheses, and had a post-service claim or pre-authorization request denied by Anthem during the relevant time period, you can make a claim for reimbursement by submitting the enclosed claim form and providing the information requested therein.  If it is determined that your claim is subject to reimbursement, you will be reimbursed for the claim, subject to a reduction only for the cost-share you would have paid under the terms of your health plan with Anthem had that claim been initially approved as an in-network service.

| 9. | How can I get approval for a future microprocessor-controlled knee or foot-ankle prostheses? |

To receive approval for a microprocessor-controlled knee or foot-ankle prosthesis, you must request the authorization from or submit a claim to Anthem under the procedures outlined in your current Anthem contract. Anthem will review the request or claim using the Medical Policy in effect at the time the request is made.

| 10. | What am I giving up to stay in the Class? |

Unless you exclude yourself, you will be releasing Anthem from the following claims: Any and all claims and causes of action, whether direct, representative, class, or individual in nature regarding (1) any denial of microprocessor-controlled knee prostheses under ERISA-governed plans, either fully insured or self-funded, issued or administered by Anthem, including as a de-facto administrator, that occurred at any time from September 15, 2013 pursuant to the Former Medical Policy; (2)  any denial of microprocessor-controlled foot-ankle prostheses under ERISA-governed plans, either fully insured or self-funded, issued or administered by Anthem, including as a de-facto administrator, that occurred at any time from September 15, 2013 pursuant to the Former Medical Policy or the Revised Former Medical Policy (Knee Change); and/or (3) the appropriateness of the Former Medical Policy, the Revised Former Medical Policy and/or the Current Medical Policy including, but not limited to, the criteria in those policies. Released Claims do not include any claims for reimbursement or claims for re-review, as described below, that are denied after Final Approval for failure to meet the criteria of the Current Medical Policy. Released Claims also do not include any claim by a Class Member who did not pay out of pocket for a microprocessor-controlled knee or foot-ankle prosthesis as of the date of the filing of the Motion for Preliminary Approval of Class Settlement, and is not currently covered by Anthem.

It also means that all of the Court's orders will apply to you and legally bind you. Staying in the Class does not prevent you from suing on your own for any denial of coverage for a microprocessor-controlled knee or foot-ankle prosthesis made in the future for failure to meet the criteria of the Current Medical Policy issued on May 20, 2021.

If you want to know more about this release of claims, you should review the Settlement Agreement which can be viewed on the website www. _____ or requested from the Administrator as set forth in Question and Answer 21.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want to be included in this settlement but you want to keep the right to sue or continue to sue Anthem on your own about the legal issues in this case, then you must take steps to get out of this case.  This is called excluding yourself ("opting out") of the Class.

## 11.     How do I get out of the settlement?

To exclude yourself from the settlement, you must send a letter by mail clearly stating that you want to be excluded *Lacy Atzin; Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx). Be sure to include your name, address, telephone number, and your signature. You must mail your exclusion request, postmarked no later than _____ __, 2022, to:

Settlement Administrator
P.O. Box _____
_____, CA _____

If you ask to be excluded, you cannot get any benefits under the settlement, and you cannot object to the settlement.  You will not be legally bound by anything that happens in this lawsuit.

## 12.     If I do not exclude myself, can I sue Anthem for the same thing later?

No.  Unless you exclude yourself, you give up any right to sue Anthem for a previous denial of a request for authorization or claim for reimbursement for a microprocessor-controlled knee or foot-ankle prosthesis.  If you have a pending lawsuit, speak to your lawyer in that case immediately. You must exclude yourself from *this* Class to continue your own lawsuit. Remember, the exclusion deadline is _____, 2022.  This lawsuit, however, does not resolve any disputes you may have with Anthem over any denial of coverage for a microprocessor-controlled knee or foot-ankle prosthesis in the future for failure to meet the criteria of the Current Medical Policy.

## 13.     If I exclude myself, can I get benefits from this settlement?

No.  If you exclude yourself, you will not be able to seek coverage or reimbursement for expenses incurred for a prior microprocessor-controlled knee or foot-ankle prosthesis through the settlement.  But, you may sue, continue to sue, or be part of a different lawsuit against Anthem.  If you are still an Anthem member, you may also seek coverage for a future microprocessor-controlled prosthetic as explained above in Section 9.

# THE LAWYERS REPRESENTING YOU

## 14.     Do I have a lawyer in this case?

Yes.  The court appointed the following attorneys as Class Counsel: Gianelli & Morris and Doyle Law APC. You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

| 15. | How will the lawyers get paid? |
|-----|-------------------------------|

Class Counsel will ask the Court for attorneys' fees up to $850,000.00 and expenses up to $36,833.99, and an incentive payment of $15,000 each to the Class Representatives, Lacy Atzin and Mark Andersen  The fees would pay Class Counsel for their fees and expenses in investigating the facts, litigating the case, and negotiating the settlement.  The Court may award less than these amounts.  Anthem will pay the fees, expenses, and incentive awards. These amounts will not reduce the relief available to Class Members. Anthem has agreed not to oppose these fees, expenses and incentive awards. Anthem will also separately pay the costs to administer the settlement.

# OBJECTING TO THE SETTLEMENT

You can tell the Court that you don't agree with the settlement or some part of it.

| **16.** | **How do I tell the Court I don't like the settlement?** |
|---|---|

If you are a Class Member, you can object to the settlement if you don't like any part of it.  The Court will consider your views.  To object, you must send a letter saying that you object to the settlement in *Lacy Atzin; Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx). The letter must include your name, address, telephone number, your signature, and the specific reasons (if any) for each objection, including any legal support you wish to bring to the Court's attention, and any evidence or other information you wish to submit. If you intend to appear at the fairness hearing, either in person or through counsel hired at your expense, your objection must state that as well.

You must mail the objection, postmarked no later than _____, 2022, to the Settlement Administrator, as follows:

Settlement Administrator
P.O. Box _____
_____, CA _____

If your objection does not comply with the above requirements, your objection may be deemed waived and you may be barred from raising your objection in this lawsuit or any other proceeding.

| **17.** | **What is the difference between objecting and excluding?** |
|---|---|

Objecting is simply telling the Court that you do not like something about the settlement.  You can object only if you stay in the Class.  Excluding yourself is telling the Court that you don't want to be part of the Class.  If you exclude yourself, you have no basis to object because the case no longer affects you.

# THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement.  You may attend and you may ask to speak, but you don't have to.

| **18.** | **When and where will the Court decide whether to approve the settlement?** |
|---|---|

The Court will hold a fairness hearing at _____ on _____, _____, 2022 in Courtroom 5D of the United States District Court, located at 350 West 1st Street, Los Angeles, California, 90012.  At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them.  The Court will listen to people who have asked to speak at the hearing.  After the hearing, the Court will decide

whether to approve the settlement.  The Court will also decide how much to award to Class
Counsel and the Class Representatives.  We do not know how long these decisions will take.

| **19.** | **Do I have to come to the hearing?** |
|---|---|

No.  Class Counsel will answer questions the Court may have.  But you are welcome to come, at
your own expense.  If you send an objection, you don't have to come to Court to talk about it.  As
long as you mailed your written objection on time, the Court will consider it.  You may also pay
your own lawyer to attend, but it is not necessary.

| **20.** | **May I speak at the hearing?** |
|---|---|

You may ask the Court for permission to speak at the fairness hearing.  To do so, you must send a
letter stating that it is your "Notice of Intention to Appear in *Lacy Atzin; Mark Andersen v.
Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx)."  Be sure to
include your name, address, telephone number, and signature.  Your Notice of Intention to Appear
must be postmarked no later than _____, 2022 and be sent to the Settlement
Administrator at the address stated above in response to question 16.  You cannot speak at the
hearing if you have excluded yourself from the Class.

## GETTING MORE INFORMATION

| **21.** | **Are there more details about the settlement?** |
|---|---|

This Notice summarizes the proposed settlement.  More details are in the settlement agreement.
You can get a copy of the settlement agreement through the website at _____, or by
requesting a copy from the Settlement Administrator at the address stated above in response to
question 16.

## IMPORTANT DATES

| **22.** | **What are the important dates and deadlines relating to this settlement?** |
|---|---|

| Deadline | Event |
|---|---|
| _____, 2022 | Class Counsel will file a motion for approval of attorneys' fees and costs and request for a service award for the Class Representative. |
| _____, 2022 | Last day to submit a request for exclusion from the proposed Settlement. |

| Deadline | Event |
|---|---|
| _____, 2022 | Last day to serve Class Counsel and Anthem's Counsel with objections to the proposed settlement. |
| _____, 2022 | Last day to file Notice of Intent to Appear. |
| _____, 2022 | Final Approval Hearing |

Dated: _____       _____

                                             Honorable Otis D. Wright
                                             United States District Court Judge

# [EXHIBIT B]

## ANTHEM MICROPROCESSOR CONTROLLED LOWER LIMB FORM

You are receiving this Claim Form because you are a Class Member in the case captioned *Lacy Atzin; Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc., Case No. 2:17-cv-6816 ODW (PLAx.*

If you paid out of pocket for a microprocessor-controlled knee or foot-ankle prosthesis as of October 20, 2021, you may use this Claim Form to request reimbursement under the current Medical Policy on Microprocessor Controlled Lower Limb Prosthesis, Policy No. OR-PR.0003, which became effective on May 20, 2021 ("Current Medical Policy"), which provides coverage for microprocessor-controlled knee and foot-ankle prostheses when certain criteria are met.  If you have not paid out of pocket for a microprocessor-controlled knee or foot-ankle prosthesis, do not submit this form.

If, on review, Anthem determines that your microprocessor-controlled knee or foot-ankle prosthesis would have qualified for coverage under the terms of the Current Medical Policy, Anthem will reimburse you upon valid proof of payment in accordance with the terms of your health plan in effect at the time of the procedure. You will not be entitled to reimbursement if any portion of the payment was covered by another health care plan, insurer, Medicare, or any other third-party payor.

If you have any questions about this form, or need an additional form, please contact the Settlement Administrator at XXX-XXX-XXXX.  Submitting this Claim Form does not guarantee that you will receive benefits.

**Instructions:**

Please read all of the instructions and complete the Claim Form as indicated below.

For your protection, California law requires the following to appear on this form:  Any person who knowingly presents a false or fraudulent reimbursement for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

When you have completed this Claim Form, please mail it—along with supporting documentation—directly to the Settlement Administrator at the address listed below:

Settlement Administrator
XXX
City, State

| ANTHEM MEMBER INFORMATION | | | |
|---|---|---|---|
| Member Name Last | First | | Middle |
| Home Address | | Date of Birth (Mo / Day / Yr) | Primary Phone Number |
| City | State | Zip | Patient Sex | Is this a new address? YES ☐     NO ☐ |

Anthem Member ID No.

CONTINUED ON NEXT PAGE

| OTHER COVERAGE OR BENEFITS INFORMATION | |
|---|---|
| Have you received coverage or benefits from any other health plan or health insurance company for your microprocessor-controlled knee or foot-ankle prosthesis?<br><br>YES ☐        NO ☐ | If you were enrolled in Medicare when you paid out of pocket for your microprocessor-controlled knee or foot-ankle prosthesis, indicate the parts you were enrolled in at the time of coverage:<br><br>PART A ☐      PART B ☐ |
| If the answer is "Yes" to the above, what date did you receive coverage or benefits?<br><br>Date: | If you were enrolled in Medicare when you paid out of pocket for your microprocessor-controlled knee or foot-ankle prosthesis, what dates were you enrolled?<br><br>Effective Date:              End Date: |

| Name of other health plan or insurance company | | Policy No. / Subscriber No. | |
|---|---|---|---|
| Health Plan or Insurance company address | City | State | Zip |
| Name of policyholder | | Social Security No. | Date of Birth |
| Employer Name | Employer Address | City | State | Zip |

| AUTHORIZATION TO OBTAIN AND RELEASE MEDICAL INFORMATION |
|---|
| I hereby authorize any physician, health care practitioner, hospital, clinic, or other medically-related facility to furnish to Anthem, its agents, designees, or representatives, any and all information pertaining to medical treatment for purposes of reviewing, investigating, or evaluating this claim.  I also authorize Anthem, its agents, designees, or representatives to disclose to a hospital or health care service plan, insurer, or self-insurer any such medical information obtained if such disclosure is necessary to allow the processing of any claim.<br><br>This authorization becomes effective immediately and will remain in effect until _____.<br><br>A photocopy or scan of this authorization will be considered as effective and valid as the original.<br><br>I certify that the above statements are correct. |

ANTHEM MEMBER, OR                                          PRINT NAME                                          DATE
PARENT OR LEGAL GUARDIAN'S
SIGNATURE (if Member is under 18 years old)


_____

CONTINUED ON NEXT PAGE

INFORMATION RELATED TO YOUR MICROPROCESSOR-CONTROLLED KNEE OR FOOT-ANKLE PROSTHESIS

Instructions:  Please complete this section to the best of your ability. In addition, please enclose ( 1 )  documentation related to proof of payment of your you paid out of pocket for your microprocessor-controlled knee or foot-ankle prosthesis and (2) medical records in your possession as well as reasonably available to you (e.g., your prosthetic clinician's records available upon your request) related to your microprocessor-controlled knee or foot-ankle prosthesis and prior medical condition(s) that the microprocessor-controlled knee or foot-ankle prosthesis was intended to address.

Please submit the following documentation that demonstrates that you incurred and paid out-of-pocket for a microprocessor-controlled knee or foot-ankle prosthesis:

(i)     a bill from the health care provider and/or medical facility (which includes the date of service and a description of the service provided); and

(ii)     one of the following:

(a)  cancelled checks that correspond to the bill for the microprocessor-controlled knee or foot-ankle prosthesis; or

(b)  receipts from your health care provider(s) and/or medical facility(ies) showing that you paid the bill; or

(c)  credit card receipts reflecting your payment to the health care provider(s) and/or medical facility(ies).

You can request a copy of your bill showing both your payment and the date of services received from your provider if you have not kept a copy.  You must include both a copy of the bill, as well as proof that you paid the bill, with your claim form.

Anthem cannot process your reimbursement without adequate proof of payment.

| Dates Of Service | Place Of Service | Health Care Provider | Service Received | Total Charge For Service | Amount You Paid For Service |
|---|---|---|---|---|---|
| Example June 17, 2015 | Santa Rosa Prosthetics | John Smith | microprocessor-controlled knee or foot-ankle | $25,000 | $15,000 |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

4 of 5

I AFFIRM THAT I HAVE PROVIDED TRUE AND ACCURATE INFORMATION ON THIS CLAIM FORM AND ACCOMPANYING CLAIM FORM DOCUMENTATION PAGE(S) TO THE BEST OF MY ABILITY.  I UNDERSTAND THIS CLAIM IS SUBJECT TO REVIEW AND VERIFICATION, AND THAT ANTHEM MAY REQUEST THAT I SUBMIT ADDITIONAL INFORMATION AND/OR DOCUMENTS TO SUPPORT MY CLAIM FOR REIMBURSEMENT,

| | DATE |
|---|---|
| ANTHEM MEMBER, OR<br>PARENT OR LEGAL GUARDIAN'S SIGNATURE (if Member is under 18 years old | |

# [EXHIBIT C]

ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
550 South Hope Street, Suite 1645
Los Angeles, CA 90071
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

CONAL DOYLE, # 227554
STEPHEN BEKE, # 290972
DOYLE LAW
9401 Wilshire Blvd., Suite 608
Beverly Hills, CA 90212
Tel: (310) 385-0567; Fax (310) 943-1780
conal@conaldoylelaw.com
sbeke@conaldoylelaw.com

Attorneys for Plaintiffs
LACY ATZIN and MARK ANDERSEN,
on behalf of themselves and all others
similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACY ATZIN; MARK ANDERSEN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHEM, INC.; ANTHEM UM SERVICES, INC.,<br><br>Defendants. | Case No.: 2:17-cv-6816 ODW (PLAx)<br>Assigned to Hon.: OTIS D. WRIGHT, II<br><br>**[PROPOSED] ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT** |

The Motion of Plaintiffs Lacy Atzin and Mark Andersen, on behalf of themselvers and the proposed Class, for preliminary approval of the proposed class action Settlement reached with Defendants Anthem, Inc. and Anthem UM Services, Inc. (collectively, "Anthem") in this lawsuit (the "Litigation"), came on for hearing before this Court on _____, 2021. Kenneth Smersfelt and Karen Braje appeared as attorneys for Anthem, and Robert S. Gianelli and Joshua S. Davis appeared as attorneys for Plaintiffsand the Class. After considering the Settlement Agreement, the moving papers, arguments of counsel, and all other matters presented to the Court, the Court finds that:

1. This class action, *Lacy Atzin; Mark Andersen v. Anthem, Inc. and Anthem UM Services, Inc.*, Case No. 2:17-cv-6816 ODW (PLAx), arises from a Complaint for Benefits, Determination of Rights and Breach of Fiduciary Duty Under ERISA, seeking declaratory and injunctive relief on behalf of the class pursuant to 29 U.S.C. section 1132(a)(1)(B) and 29 U.S.C. section 1132(a)(3).

2. The Complaint in this action was filed on September 15, 2017.

3. Anthem denies each and every claim and contention alleged or otherwise made or pursued against it by Plaintiffs in this Litigation. Anthem denies all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts, or omissions alleged, or that could have been alleged, in the Litigation.

4. The proposed Settlement was concluded only after Plaintiffs and Anthem conducted their own investigations and evaluations of the factual and legal issues raised by Plaintiffs' claims and Anthem's defenses.

5. Plaintiffs and Class Counsel have agreed to settle the Litigation after considering such factors as (a) the benefits to Plaintiff sand the Class provided by the Agreement; (b) the risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (c) the desirability of consummating the Agreement in order to provide relief to

Plaintiffs and the Class. Anthem has concluded that further litigation would be protracted and expensive, and considers it desirable to settle this Action for the purpose of avoiding the expense, burden, inconvenience, and inherent risk of litigation and the concomitant disruption of its business operations.

6. The Parties have entered into a Settlement Agreement ("the Settlement") previously filed with this Court.

7. The Court has reviewed the Settlement (and all of the attachments thereto) and determined the proposed Settlement to be fair, reasonable, adequate, and within the range of possible approval. The proposed Settlement does not improperly grant preferential treatment to the Plaintiff or any segment of the Class. The proposed Settlement is sufficient to warrant sending notice to the Class Members. The procedures for establishing and administering the benefits provided by the proposed Settlement and for notice of the proposed Settlement, exclusion from the proposed Settlement, and objections to the proposed Settlement are fair, reasonable, and in the best interests of the Class.

8. Based on Plaintiff's motion, the Memorandum of Points and Authorities, the Settlement, and all supporting exhibits and attachments, the Court preliminarily certifies for settlement purposes the Class, as defined at page 4 of the Settlement, paragraphs 13(b)-(d), pursuant to Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2).

9. The Court has reviewed the notice provisions of Paragraphs 29-34 of the Settlement and the form of the Notice of Proposed Settlement of Class Action and Final Approval Hearing attached to the Settlement as Exhibit A. The Court has determined that mailing the Notice to the last known addresses of the Class Members:

(a) constitutes the best practicable notice under the circumstances;

(b) is reasonably calculated to apprise Class Members of the pendency of the Litigation and of their right to object to or exclude themselves from

the proposed Settlement;

(c)     is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and

(d)     meets all applicable requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution, and its Amendments.

Accordingly, it is hereby **ORDERED AND DECREED AS FOLLOWS:**

1.     The Motion for Preliminary Approval is GRANTED. The Court preliminarily approves the proposed Settlement. All defined terms in the foregoing findings and this Order shall have the same meanings as in the Settlement Agreement.

2.     The Class, as defined at page 4 of the Settlement, paragraphs 13(b)-(d) is preliminarily certified for settlement purposes only.

3.     The Court appoints the law firms of Gianelli & Morris and Conal Doyle APC as Class Counsel.

4.     A hearing (the "Final Approval Hearing") will be held on _____, before the undersigned in the United States District Court for the Central District of California, Western Division, to consider the fairness, reasonableness, and adequacy of the proposed Settlement and whether it should be finally approved by the Court.

5.     The Court approves the proposed Notice and the plan for giving notice.

6.     Anthem and Class Counsel are authorized to:

(a)     establish the means necessary to administer the proposed Settlement, in accordance with the terms of the Agreement; and

(b)     retain a Settlement Administrator to help administer the proposed Settlement, including the Notice.

7.     The Court appoints _____ as the Settlement Administrator to implement the terms of the Settlement.

8.     The Settlement Administrator shall mail the Notice to each Class Member in the *Class* by first-class mail, postage prepaid, to his or her last known

4

address no later than 45 days after entry of this Order, as described in the Settlement.

9.      The Settlement Administrator shall file proof of the mailing of the Mailed Notices at or before the Final Approval Hearing.

10.      Class Counsel shall file their petition for approval of Class Counsel's fees, expenses, and class representative service award no later than 30 days after entry of this Order.

11.      Each Class Member who wishes to exclude himself or herself from the Class must submit an appropriate, timely written request for exclusion, postmarked no later than 80 calendar days from the date the after entry of this Order, that includes all of the following: (a) the name, address, and telephone number of the person requesting exclusion; and (b) a clear and unequivocal statement that the person wishes to be excluded from the Class.

12.      Any Class Member who does not submit a timely, written request for exclusion in the form set forth in this Order shall be bound by all proceedings, orders, and judgments in the Litigation.

13.      Each Class Member who wishes to object to the fairness, reasonableness, or adequacy of the Agreement, the proposed Settlement, or to the award of attorneys' fees and expenses shall send to the Administrator, no later than 80 calendar days from the date after entry of this Order, a written statement of the objections, as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence or other information the Class Member wishes to introduce in support of the objections. Class Members may object either on their own or through an attorney retained at their own expense. The written objection must also contain the Class Member's name, address, signature, and telephone number.

14.      Any Class Member who files and serves a written objection, as described in Paragraph 13 above, may appear at the Final Approval Hearing, either

in person or through counsel hired at the Class Member's expense, to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement. Class Members or their attorneys who intend to make an appearance at the Final Approval Hearing must deliver a notice of intention to appear to Class Counsel and to Anthem's Counsel, and file that notice with the Court, no later than 90 calendar days from the date after entry of this Order.

15.    Any Class Member who fails to file a timely objection in accordance with and containing the information required by this Order, will waive and forfeit any all rights he or she may have to appear separately and object, and will be bound by all the terms of this Agreement and by all proceedings, orders, and judgments, including but not limited to the Release, in the Litigation.

16.    Any Class Member who objects to the Settlement will be entitled to all of the benefits of the Settlement if it is approved, as long as the objecting Class Member complies with all requirements of the Agreement.

17.    The Settlement Administrator will scan and email copies of each request for exclusion in PDF format (or any other agreed format) to Anthem's Counsel and to Class Counsel not more than five (5) business days after the Settlement Administrator receives such a request.

18.    As part of the motion papers in support of Final Approval of the Settlement, the Settlement Administrator or Class Counsel will provide a list of all the persons who have requested exclusion from the Class.

19.    Any Class Member may retract a prior request for exclusion by providing to Class Counsel and to Anthem's Counsel a written notice stating his or her desire to retract the request for exclusion from the Class by 12:00 p.m., Pacific Standard Time, five calendar days before the Final Approval Hearing. Any written notice retracting the request for exclusion also must include a statement that the Class Member makes the retraction freely and of his or her own volition, without coercion by anyone. Any Class Member who validly retracts a request for exclusion

under this Paragraph will not be excluded from the Class, will be deemed to be an Class Member, and will be bound by the Settlement.

20.    All proceedings in the Litigation are stayed until further order of the Court, except as may be necessary to implement the proposed Settlement or to comply with the terms of the Agreement.

21.    This Order shall become null and void, and shall be without prejudice to the rights of the Parties, all of whom shall be restored to their respective positions existing immediately before this Court entered this Order, if: (a) the proposed Settlement is not finally approved by the Court, or does not become final, pursuant to the terms of the Agreement; or (b) the Settlement is terminated in accordance with the terms of Agreement.  In the event this occurs, the Settlement and Agreement shall become null and void and be of no further force and effect, and neither the Agreement nor this Order may be used in the Litigation or in any other proceeding for any purpose.

22.    In no event shall the Settlement or any of its provisions, or any negotiations, statements, or proceedings relating to it be offered as, received as, used as, or deemed to be evidence in the Litigation, any other action, or in any other proceeding, except in a proceeding to enforce the Agreement. Without limiting the foregoing, neither the Agreement nor any related negotiations, statements, or proceedings shall be offered as, used as, or deemed to be evidence or an admission or concession by any person of any matter, including but not limited to any liability or wrongdoing on the part of Anthem.

23.    The Court reserves the right to continue the Final Approval Hearing without further written notice to the Class, but will notify counsel for the Parties and any objectors or their counsel who have timely filed a notice of intention to appear in these proceedings. Unless the Court specifically orders otherwise, any such continuance shall not be interpreted to expand or change any deadlines contained in this Order or the Agreement.

IT IS SO ORDERED.

DATED: _____          By: _____
                                     Honorable Otis D. Wright
                                     United States District Court Judge

# [EXHIBIT D]

ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
550 South Hope Street, Suite 1645
Los Angeles, CA 90071
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

CONAL DOYLE, # 227554
STEPHEN BEKE, # 290972
DOYLE LAW
9401 Wilshire Blvd., Suite 608
Beverly Hills, CA 90212
Tel: (310) 385-0567; Fax (310) 943-1780
conal@conaldoylelaw.com
sbeke@conaldoylelaw.com

Attorneys for Plaintiffs
LACY ATZIN and MARK ANDERSEN,
on behalf of themselves and all others
similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACY ATZIN; MARK ANDERSEN, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>ANTHEM, INC.; ANTHEM UM SERVICES, INC.,<br><br>                    Defendants. | Case No.: 2:17-cv-6816 ODW (PLAx)<br>Assigned to Hon.: OTIS D. WRIGHT, II<br><br>**[PROPOSED] FINAL ORDER APPROVING CLASS ACTION SETTLEMENT AND JUDGMENT** |

The Motion of Plaintiffs Lacy Atzin and Mark Andersen ("Plaintiffs"), on behalf of themselves and the Class, for final approval of the class action Settlement reached with Defendants Anthem, Inc. and Anthem UM Services, Inc. (collectively, "Anthem") in this lawsuit (the "Litigation") came on for hearing before this Court on _____. Plaintiffs and Anthem are collectively referred to herein as the "Parties." Kenneth Smersfelt and Karen Braje appeared as attorneys for Anthem, and Robert S. Gianelli and Joshua S. Davis appeared as attorneys for Plaintiffs and the Class. After considering the Settlement, the moving papers, arguments of counsel, and all other matters presented to the Court, it is hereby ORDERED, ADJUDGED, AND DECREED, as follows:

1.     The Motion for Final Approval of Class Action Settlement is hereby GRANTED.

2.     This Final Order Approving Class Action Settlement and Judgment ("Final Order and Judgment") incorporates and makes part hereof: (a) the Parties' Settlement Agreement filed on _____, including Exhibits A to F [Dkt. No. _____] (collectively the "Agreement"); and (b) the Court's findings and conclusions contained in its Order Granting Motion for Preliminary Approval of Class Action Settlement [Dkt. No. _____] (the "Preliminary Approval Order"). All defined terms in this Final Order and Judgment shall have the same meanings as in the Agreement.

3.     All preliminary findings and conclusions in the Court's Preliminary Approval Order are hereby made final.

4.     The Court has personal jurisdiction over all members of the Class. The Court has subject matter jurisdiction over the claims asserted in this Litigation to approve the Settlement, and all exhibits attached thereto. Venue is proper. The Settlement is fair, reasonable and adequate, and consistent and in compliance with the applicable provisions of the United States Constitution, its Amendments, and the Federal Rules of Civil Procedure, as to, and in the best interests of, the Settlement Class. The Court also finds that the was concluded only after Plaintiff and Anthem

conducted their own investigations and evaluations of the factual and legal issues raised by Plaintiff's claims, as well as Anthem's defenses, and is the result of arms-length negotiations. [No objections have been made to the Settlement by any member of the Class] or [The Court has considered and denied all objections filed in this Litigation]. Accordingly, the Settlement is hereby finally approved.

5.      The Class, as defined at page 4 of the Settlement, paragraphs 13(b)-(d) is finally certified for settlement purposes.

6.      The Court hereby directs the Parties and their counsel to implement and consummate the Settlement according to its terms and provisions.

7.      Pursuant to the Court's Preliminary Approval Order, the notice requirement was satisfied in that the Class Administrator sent the Notices to each Class Member in the Class, no later than 45 days after entry of the Preliminary Approval Order, by first-class mail, postage prepaid, to each Class Member's last known address, and where necessary, further steps were taken in accordance with the Agreement to obtain updated addresses when the mail was returned as undelivered and to re-send the Notice. Class Members had the opportunity to object to the Settlement and the Agreement, or to exclude themselves from the Class, and they were informed of the date, time, and location of the Final Approval Hearing and had the opportunity to appear at the Final Approval Hearing. These procedures afforded protections to persons in the Class and provide the basis for the Court to make an informed decision on approval of the Settlement based on the responses of Class Members.

8.      The Notices and all other instruments provided to the Class Members:

(a)      constituted the best practicable notice under the circumstances;

(b)      constituted notice that was reasonably calculated to apprise Class Members of the pendency of the Litigation, their right to object to or exclude themselves from the proposed Settlement and to appear at the Final Approval Hearing;

(c)     were reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and

(d)     met all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution, and its Amendments, including the Due Process Clause.

9.     Class Counsel and Plaintiff adequately represented the Class for purposes of entering into and implementing the Settlement.

10.     [No Class Members have requested exclusion from the Class] or [The list of those Class Members who have requested exclusion from the Class in accordance with the terms of the Agreement and the Preliminary Approval Order has been filed with the Court, is attached to this Order, and is hereby approved. Those persons are hereby excluded from the Class. The Court finds that it is a complete list of all Class Members who have timely requested exclusion from the Class, and accordingly, such Class Members shall not be bound by this Final Order and Judgment or the Agreement.]

11.     Class Counsel are hereby awarded attorneys' fees and costs in the amount of $_____ ("Class Counsel Payment"). This amount covers any and all claims for attorneys' fees, expenses, and costs incurred by any and all Class Counsel in connection with the Settlement of the Litigation and the administration of such Settlement. Class Counsel Payment shall be provided by Anthem to Gianelli & Morris in accordance with Paragraph 27 of the Settlement.

12.     As an incentive award for participation as Class Representatives in the Action, the Court awards $15,000 to Plaintiff Lacy Atzin and $15,000 to Mark Andersen. Anthem shall pay the incentive award in addition to any relief that Plaintiffs are entitled to receive as Class Members. Anthem shall pay the incentive awards in accordance with Paragraph 27 of the Settlement.

13.     The release of claims set forth in Paragraphs 13(q) and 23-24 of the Settlement is incorporated herein and effective as of the date of this Final Order and

Judgment, and forever discharges the Released Parties from any claims or liabilities arising from or related to the Released Claims.

14.     Without affecting the finality of this Final Order and Judgment for purposes of appeal, the Court shall retain jurisdiction as to all matters relating to administration, consummation, enforcement, and interpretation of the Settlement and this Order, and for any other necessary purpose; *provided, however,* that nothing in this paragraph shall restrict the ability of the Parties to exercise their rights under Paragraphs 17, 18, and 19 of this Final Order and Judgment. The Parties submit to the jurisdiction of the Court for purposes of administration, construction, consummation, enforcement, and interpretation of the Settlement.

15.     The Settlement is binding on, and has *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and any other Class Members, as well as their Related Parties that allege Released Claims, as defined in the Settlement.

16.     Neither this Final Order and Judgment, nor the Settlement, nor any other document referred to herein or therein, nor any action taken to carry out this Final Order and Judgment or the Settlement is, may be construed as, or may be used as an admission or concession by or against Anthem of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever. Entering into or carrying out the Settlement, and any negotiations or proceedings relating to it, shall not in any event be construed as, or deemed evidence of, an admission or concession as to Plaintiff's claims or Anthem's denials or defenses, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the Settlement or to enforce the provisions of this Final Order and Judgment or the Settlement; provided, however, that this Final Order and Judgment and the Settlement may be filed in any action against or by Anthem or the Class Members to support a defense of *res judicata*, collateral estoppel, release, waiver,

good-faith Settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim to the extent allowed by law.

17.     The Parties are authorized, without further approval from the Court, to agree to and adopt such non-substantive amendments, modifications, or expansions of the Settlement and all exhibits attached thereto that are consistent with this Final Order and Judgment, and that do not limit the rights of persons in the Settlement Class. Any substantive amendments, modifications, or expansions of the Settlement and the exhibits attached thereto shall require prior approval by the Court.

18.     Any work product retained by Plaintiff or Class Counsel that is based on or incorporates information designated as Confidential Material pursuant to the terms of the Protective Order previously entered in this case and provided by Anthem shall be deemed Confidential Material pursuant to the terms of the Protective Order, and the disclosure or use of such materials shall be subject to the same restrictions as Confidential Materials pursuant to the terms of the Protective Order previously entered in this case.

19.     Each and every Class Member who has not been excluded from the Settlement, and their Related Parties, are forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting any of the Released Claims against any of the Released Parties, except for claims to enforce the Settlement.

20.     Section 1715(b) of the Class Action Fairness Act of 2005 requires a settling defendant to "serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official" a specified group of documents describing the settlement. Pursuant to section 1715(d), final approval cannot be issued earlier than 90 days after notice is given under section 1715(b). Anthem served the necessary documents upon the appropriate officials on ___. This

order is signed more than 90 days after Anthem served the documents. The Court therefore finds that Anthem is in full compliance with the Class Action Fairness Act, 28 U.S.C. section 1715.

21.    There being no just reason for delay, the Court, in the interests of justice, expressly directs the Clerk of the Court to enter this Final Order and Judgment, and hereby decrees that, upon entry, it be deemed a final judgment.


IT IS SO ORDERED.


DATED: _____          By: _____
                                        Honorable Otis D. Wright
                                        United States District Court Judge

# [EXHIBIT E]



**Medical Policy**

| | |
|---|---|
| **Subject:** | Microprocessor Controlled Lower Limb Prosthesis |

| | | | |
|---|---|---|---|
| **Document #:** | OR-PR.00003 | **Publish Date:** | 08/29/2019 |
| **Status:** | Revised | **Last Review Date:** | 08/22/2019 |

## Description/Scope

This document addresses the use of microprocessor controlled lower limb prostheses including, but not limited to, knee prostheses (such as the Otto-Bock C-Leg® device, the Genium™ Bionic Prosthetic System, the Genium™ X2® and X$_3$® devices, the Ossur Rheo Knee®, and the Endolite Intelligent Prosthesis®) and foot-ankle prostheses (such as the Proprio Foot®, the PowerFoot BiOM, and the Endolite élan foot).

**Note:** For additional information regarding lower limb prosthesis, please see:

- CG-DME-13 Lower Limb Prosthesis

## Position Statement

**Medically Necessary:**

The use of a microprocessor controlled lower limb prosthesis (for example, Otto-Bock C-Leg device, Otto-Bock Genium Bionic Prosthetic System, the Ossur Rheo Knee or the Endolite Intelligent Prosthesis) is considered **medically necessary** for transfemoral (above knee) and knee disarticulation amputees when *all* of the criteria set forth in (A) and (B) below have been met:

A. Selection criteria:
   1. Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology; **and**
   2. Individual has a functional K-Level 3 or above; **and**
   3. Individual has demonstrated a reasonable likelihood of better mobility or stability with the use of a microprocessor controlled knee instead of a mechanical knee as demonstrated by:
      a. Prior effective use of a microprocessor controlled knee prosthesis; **or**
      b. Use of a temporary device; **or**
      c. When unable to complete such a trial, the provider documents or attests that there is a reasonable likelihood of improved mobility or stability; **and**
   4. Either of the following:
      a. Individual has a documented need for daily long distance ambulation (generally 400 yards or greater cumulatively) at variable rates; **or**
      b. Individual has a demonstrated need for regular ambulation on uneven terrain or regular use on stairs.
B. Documentation and performance criteria:
   1. Complete multidisciplinary assessment of individual including an evaluation by a trained prosthetic clinician. The assessment must objectively document that all of the above selection criteria have been evaluated and met.

**Not Medically Necessary:**

The use of a microprocessor controlled lower limb prosthesis is considered **not medically necessary** in all other cases, including when the criteria above have not been met, including for individuals with a functional K-Level 2 or below.

**Investigational and Not Medically Necessary:**

The use of a microprocessor controlled foot-ankle prosthesis (for example, Proprio Foot or the PowerFoot BiOM) is considered **investigational and not medically necessary** for all indications.

Use of prosthetic devices that combine both a microprocessor controlled knee and foot-ankle prosthesis is considered **investigational and not medically necessary** for all indications.

| Rationale |
| --- |

At this time, the available peer-reviewed published literature addressing the clinical benefit of a microprocessor controlled lower limb prosthesis is mostly limited to nonrandomized controlled clinical trials, and case series of limited size. Additionally, the majority of these studies have involved highly selected subjects who were otherwise in good health.

*Microprocessor Controlled Knee Prosthesis*

Hafner and others (2007) reported the findings of a small, nonrandomized, cross-over controlled design study in which each subject was exposed to two different prosthetic limb conditions (mechanical and microprocessor controlled C-Leg) twice during the trial. This study included 21 subjects, each of whom used both a standard mechanical knee and lower limb prosthesis and the C-Leg microprocessor controlled prosthesis. Subjects were recruited for participation from a local amputee population. Seventeen subjects completed the study. Subjects were told at the time of enrollment that they would be allowed to keep the test prosthesis whether or not they completed the trial. The subjects began the trial with a 2-month period using their standard prosthesis followed by an activity assessment and functional, performance and subjective perception evaluation. Next, all subjects used the microprocessor controlled prosthesis until acclimation was demonstrated. This was then followed by a 2-month acclimation period with the microprocessor controlled prosthesis, ending with an activity assessment and functional, performance and subjective perception evaluation. Subjects were then reverted back to the standard prosthesis for 2 weeks and again an activity assessment and functional, performance and subjective perception evaluation was done. In the final stage of the trial, participants were allowed to use either one or both prosthetic devices over a 4-month period. Daily use and activity levels were measured for each device. The study concluded with a final activity assessment and functional performance and subjective perception evaluation with the microprocessor controlled device. A variety of objective and subjective outcome measures were reported. The authors reported no significant differences between the two prosthetic devices in terms of daily activity as measured by mean daily step frequency and mean estimated step distance, in performance on level or varied surfaces, or in cognitive demand during use of the devices. They did note a significant improvement with the C-Leg prosthesis in subjects' Stair Assessment Index (SAI) scores, time to descend scores, and a surveyed preference for the microprocessor controlled C-Leg as compared with a mechanical prosthetic knee. There was no difference noted in ascending stairs, but self-reported frequency of stumbles and falls was lower for the C-Leg prosthesis. Limitations of this study include its small size, lack of outcome comparisons to a group randomized to continued use of a standard prosthesis, and lack of control of the type of mechanical prosthesis used. In addition, the period of time allowed for the subject to revert back to a standard prosthesis (2 weeks) for a functional assessment prior to the 4-month combined use measures was quite limited.

An article by Williams and colleagues (2006) describes a randomized two-group cross-over design study of C-Leg versus a standard hydraulic knee prosthesis (Mauch SNS[®] knee). Subjects were given a 3-month acclimation period for each device prior to testing. This study was not blinded and was hampered by a significant drop-out rate (56%) that left only 8 participants in the evaluable study population. The findings concluded that in non-demanding walking conditions with experienced amputees, participants reported the C-Leg required less cognitive attention than the non-computerized knee. However, this subjective experience did not translate into improved performance on neuropsychologic screening instruments or walking speed.

In another report of the same trial (Orendurf, 2006), the authors report that they found no significant difference between the groups in either oxygen efficiency or gait efficiency. It is noted in the discussion section of this article that the programming of each C-Leg requires a high degree of tailoring to meet the needs of the user. The authors commented that the parameters used by each of the study participants varied widely, with some preferring their C-Leg to operate in a manner not too dissimilar to that of a standard non-computerized limb, and others preferring significantly different functional parameters. With this degree of variation, even within such a small study population, it would indicate that a much larger study population should be used in further studies of the C-Leg in order to control for this potential source of bias.

A nonrandomized cross-over study conducted by Kaufman and colleagues (2007) compared the C-Leg to the standard hydraulic prosthesis in gait and balance parameters. The study included 15 participants, who were allowed an average of 4.5 months of acclimation time with each device. The authors indicate that there was a significant (p<0.01)

improvement in objective, standardized measures of both gait (knee flexor movement) and balance (Sensory Organization Test) with the computerized prosthesis. The investigators point out that the study included a select group of healthy, highly effective ambulators with no additional musculoskeletal conditions. It is unclear what impact the use of computerized prosthetic knee devices may have on individuals with lower functional classifications.

Seymour and colleagues published a study comparing energy expenditure, obstacle course negotiation and quality of life (QOL) measures in 10 highly effective healthy ambulators who use both a C-Leg and a non-computerized prosthesis (2007). This study had a 23% drop-out rate. A subset of participants (10 of 13) in this study underwent an 8-minute energy consumption test on a treadmill using one of their prostheses, and then again using the other device after a 10-minute rest. They were then asked to undergo a walking obstacle course 8 times, 4 holding a laundry basket containing a 10 lb. weight, and 4 times unencumbered. Finally, they were asked to complete a standardized quality of life questionnaire (SF-36v2). The authors report a statistically significant lower energy consumption rate for participants when wearing their C-Leg devices at both typical and fast paces. On the obstacle course, statistical differences were noted in the number of steps taken, elapsed time, and the number of times participants stepped out of bounds during the unencumbered portion of the trial. During the encumbered trial, the elapsed time (11.5 sec vs. 15.5 sec) was shorter for the C-Leg prosthesis group (p=0.007). No stumbles or falls were reported in either group. The results of the QOL questionnaire associated with wearing the C-Leg indicated that the participants were at or above the normative data available for the general population.

A study by Kahle and colleagues (2008) investigated the impact of the C-Leg on several functional parameters, including stumbles, falls, performance in walking and stair descent and QOL. The study involved 21 (9 K-2 and 8 K-3) subjects, with 19 completing the study, and utilized a simple pre-test/post-test design. Participants in the study had a wide variation in physical status and health, but were all community ambulators. Some participants utilized assistive devices for ambulation. This is the first published study to include a mixed population. The authors report significant improvement in the number of stumbles (p=0.006), but no significant improvement in the number of falls. No statistical analysis was provided for either walking or stair descent performance. Finally, there was a significant improvement (20%, p=0.007) in QOL scores with the C-Leg prosthesis.

In 2009, Hafner and colleagues reported the results of a nonrandomized crossover study involving 17 subjects with unilateral transfemoral amputations. Subjects were classified as either Medicare Functional Classification Level-2 (MFCL-2, also known as K-2, n=8) or MFCL-3 (also known as K-3, n=9) and were microprocessor controlled prosthesis naive. The investigators began the study with all subjects using their standard prosthesis and underwent functional evaluations at 2 months, after which they underwent fitting, training, a 2-month acclimation period and another round of functional evaluations with the C-Leg prosthesis. Subjects were then transitioned back to their standard prosthesis for 2 weeks before another round of assessments was given. Once the assessments were completed, all subjects were sent home with both prostheses and told to use them as they desired, and return for additional assessments at 4, 8, and 12 months, using the prosthesis most used or preferred during the previous 4-month period. For both K-2 and K-3 subjects, significant performance benefits were reported for most assessments, including stair mobility (K-2, p=0.008; K-3 p=0.004), Hill mobility (K-2, p=0.008; K-3, p=0.09), Hill speed (K-2, p=0.002; K-3, p=0.017), obstacle course speed (K-2, p=0.02; K-3, p=0.007), and attention speeds (K-2, p=0.02; K-3, p=0.22). The reported relative increase in functional outcomes was reported to be greater in K-2 vs. K-3 subjects. When data for both groups were combined, significant improvements were noted for all assessments noted above (p<0.05). With regard to self-reported measures, only the K-3 subjects had significant improvements in satisfaction (p=0.002) and in a utility Prosthesis Evaluation Questionnaire [PEQ] (p=0.01). Self-reported relative frequency of stumbles was significantly better in both groups (p=0.05 and p=0.03, respectively), however, this was not mirrored in a significant decrease in reported stumbles. No significant differences in frequency of number of semi-controlled falls was reported for either group. Only the K-2 subjects experienced a significant improvement in the frequency (p=0.01 vs. p=0.1, respectively) and number of uncontrolled falls (p=0.01 vs. 0.28). At the completion of the study, reassessment of K-levels found that 50% of the K-2 subjects were reclassified as K-3 and 33.3% of K-3 subjects were reclassified as K-4. However, 2 K-3 subjects were reclassified as K-2. The authors concluded that the results suggest the C-leg improves function and reduces the frequency of adverse events in a population that is at risk for falls and may allow persons with amputation to expand their functional abilities.

Theeven and others (2011) conducted a small randomized controlled cross-over trial that was significantly different from the previously discussed studies in two respects. First, instead of including only highly selected healthy amputee subjects, their study only included K-2 subjects, which represents an intermediate capacity for physical functioning, commonly termed as "limited community ambulatory." Second, this study not only compared standard mechanical prosthetic devices to microprocessor controlled devices, but also compared two microprocessor controlled devices with one another. The study design called for each participant to wear a different prosthesis for sequential week-long periods, with testing at the end of each week. All participants wore their standard mechanical prosthesis for the first week, followed by the two microprocessor controlled prosthetic devices (either the Otto-Bock C-leg, or the Otto-Bock C-Leg Compact). A total of 41 subjects were randomized, but only 28 subjects (68%) completed the trial.

The authors further stratified study subjects into three groups ("High", "Intermediate", or "Low") based on expert opinion regarding functional levels within the MFCL category. Subject performance on the ADAPT testing circuit was further stratified by specific sections of the test. The ADAPT test circuit presents three separate sets of physical challenges, each addressing discrete subsets of skills or abilities that become increasingly challenging. Activity Subset 1 (AS1) focuses on activities that require adequate balance, Activity Subset 2 (AS2) focuses on actions that challenge muscle strength and weight distribution, and Activity Subset 3 (AS3) focuses on actions dependent upon prosthesis-related and cognitive skills. The authors reported a large variation in the functional performance level seen within the study's K-2 population, as well as between prosthetic devices. The Low functional level subjects demonstrated no benefit from a microprocessor controlled prosthesis at any level of the test. Both Intermediate and High group subjects were reported to have significant improvements in performance of AS2 activities, with the High group performing significantly better than the Intermediate group. For AS3 activities, only the High group demonstrated any benefit. Inter-device comparison found that the High group performed significantly better with both computerized prostheses in AS1, but none in AS2. In AS3, the High group had significantly better times only when subjects wore the C-Leg Compact Device, but not the standard C-Leg. In contrast, the intermediate group only had significant improvements in AS2 with the standard C-Leg, but not with the more advanced C-Leg compact device.

The authors conclude that there is a wide disparity in functional levels within the K-2 classification. They also note that despite the overall data showing benefit by functional levels, performance at the individual level was significantly variable across functional levels. Additionally, there was a significant variation in achieved benefit depending upon device type. In this study, the data are limited by the small study sample. Also, the authors note that the choice of break-in period may have a significant impact on the results, and longer acclimation times may significantly change the results. This is the first study looking at the use of microprocessor controlled knee prostheses in lower functioning subjects in a rigorous manner. The results showed significant variation in performance between individuals and unexpected results with regard to outcomes between device types. It highlights that there are still many questions left to address with regard to the benefits derived from these devices. Further research is warranted.

This group published another study involving 30 K-2 subjects using a randomized cross-over design (Theeven, 2012). Full datasets were available for only 19 subjects at the completion of the study, but all 30 were included in the intent-to-treat analysis. Subjects underwent three separate trial periods using three different knee joint prostheses, including one mechanical knee joint and two microprocessor controlled joints. The latter two prosthetic joints included one with microprocessor controlled stance and swing phase and another with only a microprocessor controlled stance phase. Subjects were assessed using each prosthesis for a 1-week period in the home and community setting. The perceived performance and satisfaction were measured using the PEQ. Subject activity levels were monitored via uniaxial accelerometer. The results indicated that the subjects' perceptions regarding ambulation, residual limb health, utility, and satisfaction were significantly higher when subjects used the microprocessor controlled devices vs. the mechanical knee devices. There were no significant differences between groups with regard to activity level. The authors conclude that K-2 amputees report benefitting in terms of their performance from using a microprocessor-controlled prosthetic knee (MPK); this is not reflected in their actual daily activity level after 1 week of using an MPK.

Another group published the results of testing in a group of K-2 subjects (Burnfield, 2012). This study investigated the sequential use of standard mechanical prostheses followed by the C-Leg device in 10 K-2 subjects who were asked to complete a series of tasks while measurements were taken on gait, stride, motion analysis, timed functional assessments along with questionnaires and EMG. The authors noted significantly better performance with the C-Leg with regard to ramp ascent and descent and intact limb function. Intact limb function improvements were used as a proxy measure for stability and user confidence since longer stride and a more regular gait are indicative of prosthetic confidence and comfort. EMG data was not of sufficient quality to allow proper analysis. The Timed Up and Go (TUG) test, which measures physical function during a specified series of tasks, showed significant improvement in the C-Leg group. The results of the Prosthetic Evaluation Questionnaire (PEQ), Activities-specific Balance Confidence Scale (ABC) and the Houghton Scale were mixed, with the PEQ and ABC demonstrating significant benefits with the C-Leg, but not on the Houghton Scale. This study supports some of the positive findings mentioned earlier in the Theeven trial, but further study is needed to fully understand the impact of microprocessor controlled knee prostheses in the K-2 population.

As discussed earlier in the Theeven study, the authors noted significant differences between specific microprocessor controlled knee prostheses. This question was further investigated by Bellmann and colleagues (2012), who compared performance parameters of the C-Leg vs. the Genium device. This study enrolled 11 K-3-4 C-Leg users who were put through a battery of tests while using their own C-Leg device. Subjects were then introduced to the Genium device, which was attached to their own socket and foot prosthesis. They were then given approximately 24 hours to accommodate to the new prosthesis before being given a battery of tests. The authors reported significant benefits of the Genium device over the C-Leg in many measures, including foot loading, sway, step symmetry, and knee flexion during a variety of activities. However, the very short acclimation time and very small sample size of this study do not

allow the results to be generalized to a wider population.

A small, nonrandomized controlled trial involving 15 K-3-4 ambulatory subjects was published by Highsmith in 2014. Each participant was subjected to a series of six balance tests with both a standard knee prosthesis and then with the C-Leg. The trials involved the use of the Sensory Organization Test (SOT) to assess sensory dependence. The six different tests involved evaluations under pre-specified conditions with varying balance challenges with their standard prosthesis, followed by an accommodation period with the C-leg and repeat testing. A significant 3% increase in reliance on somatosensory system input (p=0.047) was reported while using the C-Leg vs. a standard prosthesis. There was a statistically significant (33%) reduction in the number of falls when using the C-Leg (p=0.03). Standard prosthesis use resulted in 21 falls among 7 subjects (average, 1.4 ± 2.3 falls per person) compared with 14 falls among 4 subjects (average 0.9 ± 2.1 falls per person) while utilizing the C-Leg. No data representing real-life use of the prosthesis was reported.

Eberly (2014) reported on another nonrandomized controlled trial involving 10 K-2 ambulatory subjects with a mean age of 62 years. Investigators evaluated each subject for stride characteristics, kinematics, kinetics, and electromyographic activity on a 10 meter walkway with both their standard prosthesis and then with the C-Leg Compact, the latter after a 3-month acclimation period. Subjects were required to walk the 10 meter walkway at a self-selected customary comfortable walking pace and then at a self-selected customary fast walking pace. The results indicated approximately 20% improvement in walking speed with the C-leg vs. the control prosthesis in both the free walking phase (p=0.002) and the fast walking phase (p=0.000). This was attributed to increases in both stride length (12%-14%; p=0.003) and cadence (9%-10%; p=0.001). The peak external ankle dorsiflexion moment in late stance increased by more than 20% while walking with the C-Leg vs. the standard prosthesis during both free (p=0.001) and fast (p=0.008) walking. Walking with the C-Leg produced modestly higher tibialis anterior activity in the intact limb (6%-8% maximal voluntary contraction [MCV] increase) and moderately more intense lower gluteus maximus activity (19% MVC increase) in the prosthetic limb in both free and fast walking compared to walking with the standard prosthesis (p<0.05). There were no significant differences between the prostheses in mean EMG activity of the remaining muscles during free or fast walking.

Theeven and colleagues (2013) published a systematic review of the available literature addressing microprocessor controlled prosthetic knee joints. A total of 37 studies and 72 outcome measures were identified and included in the study. They reported that a majority (67%) of the outcome measures addressed the body functions component of the International Classification of Functioning, Disability and Health (ICF), which measures and describes the anatomy and physiology/psychology of the human body. This component is commonly used to quantify the level of impairment present. Measurement of how microprocessor controlled prosthetic knee joints affect an individual's actual performance in daily life was reported in only 31% of studies. Also noted was that the available research primarily focused on young, fit and active persons. Their findings conclude with the comment that scientifically valid evidence regarding the performance of persons with a microprocessor controlled prosthetic knee joint in everyday life is limited.

In 2015, Prinsen and others published the results of a randomized controlled cross-over study involving 10 subjects (n=2 K-2, 5 K-3, and 3 K-4) assigned to begin the study with either a standard knee prosthesis or the Rheo Knee II device. Following an 8-week acclimation period to their assigned device, subjects were given a battery of tests including the TUG test, Timed Up and Down Stairs Test, and Standardized Walking Obstacle Course. Following these measurements, subjects were crossed over to use the other device, acclimated for another 8 weeks, and then retested. The authors reported that significantly higher scores were found for the Rheo Knee group on the Residual Limb Health subscale of the Prosthesis Evaluation Questionnaire when compared to the standard device group (p=0.047). Interestingly, Rheo Knee subjects needed significantly more steps to complete an obstacle course compared to the non-microprocessor controlled prosthetic knee (p=0.041). On other outcome measures, no significant differences were found. The authors concluded that transition towards the Rheo Knee had little effect on the studied outcome measures.

Another study from 2015 by Wong involved 8 subjects over 40 years of age with peripheral arterial disease-related amputations. There were 2 K-1 subjects, 2 K-2 subjects, and 4 K-3 subjects. Unilateral amputations were noted in 6 subjects and 2 were bilateral amputations. All subjects were asked to undergo a battery of tests including the Berg Balance Scale and the TUG test with their standard prosthetic device and then, after an 8-week acclimation period, with either the C-Leg (n=5) or the C-Leg Compact (n=3) devices. After acclimation using the microprocessor controlled prosthesis, subjects demonstrated improvements in fear of falling, balance confidence, TUG time, and rate of falls (p<0.05 for all). Decreases in the number of falls correlated with faster TUG speed (p=0.76) and greater balance confidence (p=0.83). The authors concluded that individuals with peripheral artery disease and transfemoral amputations had fewer falls and improved balance confidence and walking performance when using a microprocessor controlled prosthesis.

Bell (2016) investigated the impact of the Otto Bock Genium X2 microprocessor controlled prosthetic knee in 21 K4 ambulators with transfemoral amputation and experience with prosthesis use on descending sloped surfaces. The X2 device is similar to the commercially available Genium prosthetic device but has been specifically designed for injured

U.S. military service members, with updated control software and sensor hardware to improve biomimetic timing. Participating subjects went through a trial of slope walking with their usual leg, (n=13 with C-Leg, 8 with the Mauch device), and then acclimated to the X2 devices prior to retrial. The trial involved the evaluation of descent technique and biomechanics as subjects descended an instrumented 10° slope at a self-selected walking velocity. The authors reported that the use of the X2 device in the subjects who usually used the Mauch device resulted in greater hill assessment scores (p=0.026). They attributed this finding primarily to decreased reliance on handrail use. The use of the X2 device in the C-Leg group increased prosthetic knee flexion to a median of 6.4° at initial contact (p=0.002) and 73.7° in swing (p=0.005). This contributed to longer prosthetic limb steps (p=0.024) and increased self-selected velocity (p=0.041). Additionally, the use of the X2 in the C-Leg group increased prosthetic limb impact peaks (p=0.004) and improved impact peak symmetry (p=0.004). The conclusion was that the decreased reliance on handrail use as Mauch device users descended in the X2 device indicates improved function and perhaps greater confidence in the device. The authors suggested that additional biomechanical improvements for existing C-Leg users suggest potential longer-term benefits with regard to intact limb health and overuse injuries. Further investigation is warranted into these aspects of X2 device use.

Prinsen and colleagues (2017) conducted a randomized crossover study comparing microprocessor controlled knee prosthesis (Rheo Knee II) to non-microprocessor controlled prosthetic knees (NMPK) across different walking speeds, in 9 subjects with a transfemoral amputation or knee disarticulation (n=2 K-2, 5 K-3, and 3 K-4). The authors compared knee kinematics, such as intact ankle vaulting and vertical acceleration of the pelvis, across groups. Measurements were performed at three walking speeds: preferred walking speed, 70% preferred walking speed and 115% preferred walking speed. The results indicated no differences between groups with regard to peak prosthetic knee flexion during swing or in peak vertical acceleration of the pelvis during initial and mid-swing of the prosthetic leg. At 70% preferred walking speed, they found that vaulting, described as premature ankle plantar flexion of the intact leg during mid-stance, was significantly decreased while walking with the Rheo Knee II compared to the NMPK (p=0.028). They concluded that there were limited differences in gait parameters while walking with the Rheo Knee II vs. NMPK across different walking speeds.

Hasenoehrl (2017) reported on a small sample of 5 elderly, low-active (K-2) transfemoral amputees. All subjects were fitted with a microprocessor controlled device specifically designed for older and low-active transfemoral amputees (Genium with Cenior-Leg ruleset microprocessor-controlled knee prosthesis) and re-evaluated after 4 to 6 weeks of familiarization. A third evaluation with only questionnaires was conducted after participants were refitted to their standard device another 4 weeks later. No specific training was provided to subjects. The authors reported that the questionnaires and functional tests showed an increase in the perception of safety. Moreover, gait analysis revealed more physiologic knee and hip extension/flexion patterns when using the microprocessor controlled device. They concluded that although the microprocessor device might help to improve several safety-related outcomes as well as gait biomechanics, the results of this study were hampered by lack of training and a sufficient acclimation period. Moreover, this study was limited by the small sample size, lack of blinding, and other methodological flaws.

In 2018, Kaufman described a prospective non-randomized cross-over trial involving 50 subjects assessed at K-2 (n=48) and K-3 (n=2) levels who were current users of a non-microprocessor controlled prosthesis. Subjects were randomly assigned to one of four different microprocessor controlled prostheses (OttoBock Compact, Ossur Rheo Knee 3, Endplate Orion 2, or Freedom Innovation Plié 3). The study began with all subjects being tested with their usual prosthesis, followed by a 3-month acclimation process with their assigned microprocessor controlled prosthesis and then tested. Afterwards, they were tested again with their usual prosthetic device. Testing included activity monitoring and subjective satisfaction and safety questionnaires. Self-reported data demonstrated a significant reduction in falls, with a median of 2 falls per person per month with the non-powered knee at baseline vs. 0 falls per person per month with the microprocessor controlled prosthesis (p=0.01). The number of falls rebounded to 3 falls per person per month after subjects were retested with their usual device. Time spent sitting decreased from 61% with the usual device to 52% with the microprocessor controlled prosthesis (p=0.01). As with falls, this increased when subjects returned to their usual device (64%). There was a significant increase in activity with the microprocessor controlled prosthesis as measured by the percentage of the day using the control prosthesis vs the microprocessor controlled prosthesis (16% vs 20%, p=0.02).

Wurdeman (2018) reported the results of a retrospective study of a convenience sample of 450 subjects with either below the knee amputation (n=150) or above the knee amputation who used a standard knee prosthesis (n=150) or a microprocessor controlled knee prosthesis (n=150). Subjects were matched for age and Functional Comorbidities Index (FCI) results, but not for height or weight. The results from the PLUS-M survey tool indicated that while subjects in the microprocessor knee group had significantly greater mobility than the standard knee prosthesis group (p<0.001), both groups had poorer mobility than the below the knee amputation group (p=0.003). The authors concluded that on the basis of the PLUS-M survey tool, the use of a microprocessor controlled knee prosthesis provided improved functional mobility to individuals with above the knee amputations.

Bellmann (2018) published the results of a crossover comparative trial involving 6 K3-4 subjects undergoing repeat trials comparing the Otto-Bock C-Leg 4 or the Ossur Rheo Knee XC on a 12 m instrumented walkway, on stairs, and up and down and 10° slope. A tripping simulation was also conducted. The authors concluded that when walking down stairs, on slopes or while recovering from a stumble, the C-Leg demonstrated a reliable prosthetic side load-bearing capacity resulting in reduced loading on the residual body. The Rheo Knee XC, in contrast, required increased compensatory movements of the remaining locomotor system in order to compensate for reduced load-bearing and safety reserves.

In 2019, Thiele and colleagues reported the results of a small crossover study involving 4 K3 subjects with above the knee amputations who underwent a series of 8 to 10 trials involving walking at self-selected and fast speeds down a 12 m instrumented walkway with each of three microprocessor controlled knee devices: 1) the Otto-Bock C-Leg 4, 2) the Freedom Plié, 3) the Ossur Rheo Knee 3. The authors reported significant differences between devices with regard to both self-selected and fast speed (p=0.03) and conscious stance phase flexion (p<0.001). The slope of the linear correlation between the maximum knee flexion angle and gait velocity was similar between the three devices ($R^2$=0.02). Mean slope of the swing flexion behavior of the prosthetic leg, when compared to the contralateral side showed decreasing correlation when evaluating at the Plié device ($R^2$=0.9), the Rheo Knee ($R^2$=0.52), and the C-Leg ($R^2$=0.26). No stumbles were reported in any group. The authors concluded that the biomechanical results showed that only if a knee joint adapts flexion and extension resistances by the microprocessor can all known advantages of MPKs become apparent, but not all users may benefit from the examined functions.

In 2019 Stevens and Wurdeman published recommendations for the selection of individuals with unilateral transfemoral amputations. In this document they proposed the following recommendations:

Recommendation 1. Fluid knee benefits and indications: Knees with hydraulic or pneumatic swing resistance are indicated for active walkers, permitting increased walking comfort, speed, and symmetry.
Recommendation 2. Microprocessor knee benefits: Compared with nonmicroprocessor knees: a) With respect to self-report indices and measures, microprocessor knees are indicated to reduce stumbles, falls, and associated frustrations as well as the cognitive demands of ambulation. b) With respect to self-report indices and measures, microprocessor knees are indicated to increase confidence while walking, self-reported mobility, satisfaction, well-being, and quality of life. c) With respect to physical performance indices and measures, microprocessor knees are indicated to increase self-selected walking speed, walking speed on uneven terrain, and metabolic efficiency during gait.
Recommendation 3. Microprocessor knee equivalence: Given the comparable values observed with the use of microprocessor and nonmicroprocessor knees with regard to daily step counts, temporal and spatial gait symmetry, self-reported general health, and total costs of prosthetic rehabilitation, these parameters may not be primary indications in prosthetic knee joint selection.
Recommendation 4. Microprocessor knees for limited community ambulators: Among limited community ambulators, microprocessor knees are indicated to enable increases in level ground walking speed and walking speed on uneven terrain while substantially reducing uncontrolled falls and increasing both measured and perceived balance.

With regard to Recommendation 4, it must be noted that the authors relied on a review article for their primary data. That publication cited studies noted above, including Burnfield (2012), Eberly (2014), Hafner (2007, 2009), and Kahle (2008).

Although the evidence continues to evolve, it is reasonable to consider microprocessor controlled lower limb prostheses appropriate for a select group of individuals meeting strict criteria for fitness, health and daily utilization expectations. However, these devices may not be appropriate for all potential users. The currently available scientific evidence demonstrates some limited benefits for individuals with a K-3 or K-4 functional level. Such individuals are capable of performing physical tasks requiring significant strength, coordination, aerobic fitness, and cognitive capacity. These tasks include ambulation at variable cadences and for extended distances or time periods (for example, 400 yards or more), or the ability to traverse challenging environmental barriers (for example, several flights of stairs). They may also be capable of participating in athletic activities involving high impact or aerobic needs. As such, the use of microprocessor controlled lower limb prostheses may be appropriate for users who have the physical capacity for such activities on a regular basis. Alternatively, the data does not show significant benefits of microprocessor controlled lower limb prostheses for individuals who do not have high-level physical needs, such as those with K-1 or K-2 functional levels, or those who do not have a demand for extensive physical activity. The benefits of the marginal improvements in functional capacity provided by microprocessor controlled lower limb devices, such as reduced oxygen consumption, improving walking speed, and safety when ambulating in more challenging environments, are not clear for individuals at lower function levels. Given lack of clear data, it is reasonable to consider the use of these devices not medically necessary in those individuals. Furthermore, for those individuals who do have K-3 or K-4 functional levels, but do not encounter a regular need to ambulate for long distances over significant environmental challenges, beyond what may be

encountered in the average home or workplace, there is little benefit provided from the use of microprocessor controlled lower limb devices.  In addition, these devices require substantial training to allow for faster than normal walking speed.  A user should have adequate cognitive learning ability to master the higher level technology.  The criteria set forth above assist in the identification of potential users for whom the device may provide an improvement in functional capacity.

The assessment of K-levels is usually conducted early in an individual's care and it is common for an individual to use a non-microprocessor controlled device during the functional assessment process.  Additionally, when assessing whether or not an individual will benefit from a microprocessor controlled device, such as assessing potential benefit in mobility and stability, a temporary microprocessor controlled device may be used during those evaluations.  When that is not possible, the judgement of the treating provider should be documented in the clinical record.

There is substantial uncertainty with regard to what clinically important factors may predict an individual's capability to utilize the functional benefits provided by an advanced hydraulic, microprocessor controlled knee device.  To address this issue, Hahn and others (2016) conducted a retrospective cross-sectional cohort analysis involving routine trial fitting data from 899 subjects with above knee amputations using the C-Leg device.  The outcomes involved prosthetist-rated performance indicators addressing the functional benefits of advanced maneuvering capabilities of the devices.  Additionally, subjects were asked to rate their perceptions as well.  The authors reported that the ability to vary gait speed, perform toileting, and ascend stairs were identified as the most sensitive performance predictors of successful microprocessor controlled knee device use.  Subjects with prior C-Leg experience demonstrated benefits during advanced maneuvering.  While the data reported that the variables indicated plausible and meaningful effects, they could not be demonstrated to have predictive power.  Mobility grade showed the largest effect, but also failed to be predictive, and other clinical parameters such as reason for amputation, age, and mobility grade, were shown to have no predictive potential.  Finally, they did note that daily walking distance may pose a threshold value.  As such, they suggested that it be considered as part of any proposed predictive instrument.

*Microprocessor Controlled Foot and Ankle Prosthesis*

There are currently several different models of microprocessor controlled foot-ankle prostheses, including the Proprio Foot, the PowerFoot BiOM, and the Endolite élan foot.

Published peer-reviewed evidence addressing the use of a microprocessor controlled foot-ankle prosthesis is comprised of small non-randomized studies.  One small study involved 12 subjects and measured socket pressures in individuals undergoing gait analysis during various locomotion tasks using the Proprio Foot (Ossur) for five walking conditions with and without the device's ankle adaptation mode (Wolf, 2009).  The study concluded that the adaptive ankle-foot prostheses favorably altered joint kinetics and stump pressures on stairs and ramps.

A second study involved 32 subjects, 16 healthy controls and 16 transtibial amputees using the Proprio Foot (Alimusaj, 2009).  The subjects underwent three-dimensional (3D) gait analysis on stairs.  Kinematics and kinetics of the lower limbs were compared during stair ascent and descent with the prosthetic foot set to a neutral ankle angle and then with an adapted dorsi-flexion ankle angle of 4 degrees.  Comparisons were also made between experimental group subjects and control subjects.  The study concluded that for both stair ascent and descent, the prosthesis resulted in an improvement in kinematic and kinetic measures of the knee with an increase of knee flexion and increase of the knee stability during stance.

Fradet and colleagues (2010) describe a nonrandomized controlled study involving 16 transtibial amputee subjects using the Proprio Foot and 16 healthy controls.  All participants underwent conventional 3D gait analysis while walking up and down a ramp.  The authors reported that subjects, when using the foot ankle prosthesis in adaptive mode, exhibited more physiologic kinematics and kinetics of the lower limbs during ramp ascent but not during ramp descent.  Additionally, subjects using the prosthesis in adaptive mode reported subjective feelings of being safer during ramp descent.

Herr and colleagues (2011) conducted a small study investigating the metabolic energy costs, preferred velocities, and biomechanical patterns in 7 unilateral transtibial amputees and 7 non-amputee controls.  The experimental group was tested using both a bionic prosthesis (PowerFoot BiOM) and their own passive-elastic prosthesis.  The authors reported that compared with the passive-elastic prosthesis, the bionic prosthesis decreased metabolic cost by 8%, increased trailing prosthetic leg mechanical work by 57% and decreased the leading biological leg mechanical work by 10%, on average, across walking velocities of 0.75-1.75 m s$^{-1}$.  Use of the bionic prosthesis also increased preferred walking velocity by 23%.  They concluded that the bionic prosthesis resulted in metabolic energy costs, preferred walking velocities and biomechanical patterns that were not significantly different from people without an amputation.  However, due to the small study size it is unclear whether or not these results would be seen in the general population.

In 2012, Gailey and colleagues published the results of a study involving 10 subjects with transtibial amputation.  All

subjects were tested at baseline and after receiving training with their existing prosthesis and with the study socket and four different prosthetic feet, including SACH (solid ankle cushion heel), SAFE (stationary attachment flexible endoskeletal), Talux, and Proprio Foot over 8 to 10 weeks. The authors reported that no differences were detected by the PEQ-13, Locomotor Capabilities Index (LCI), 6-minute walk test (6MWT), or step activity monitor. On the Amputee Mobility Predictor with a prosthesis (AMPPRO) tool, they did note a significant difference between the baseline measures with the subject's existing prosthesis and the Proprio Foot (p<0.05). Additionally, only the Proprio Foot demonstrated signinfcantly greater 6MWT in the subgroup of subjects without peripheral vascular disease (PVD, p<0.05).

Ferris (2012) reported on the results of a prospective study involving 11 subjects with transtibial amputations and 11 healthy controls. All subjects participated in a battery of tests including a 10-meter forward run, a 5-meter side-shuffle to right, a 10-meter side shuffle to left, a 5-meter side-shuffle to right, a 10-meter backward run, a Four Square Step Test, and hill and stair assessments. Subjects in the amputation group conducted the tests first with an energy-storing and returning (ESR) prosthesis and then with the BiOM prosthesis. The authors reported that the BiOM prosthesis ankle range of motion was significantly larger (approximately 30%) than that of the ESR limb. However, both devices demonstrated significantly less ankle range of motion than the intact limbs. The BiOM prosthesis was reported to have generated significantly greater peak ankle power than control (35%) and ESR (approximately 125%) limbs, resulting in the BiOM limb absorbing twice the peak knee power observed in the control and intact limbs. The BiOM's limb peak hip power generation was approximately 45% greater at preswing than that of the intact limb. No significant differences were reported in walking velocity between the ESR and BiOM groups. The authors concluded that use of the BiOM appeared to increase compensatory strategies at proximal joints. The clinical impact of these benefits is unclear.

Delussu (2013) described a study involving 10 subjects with transtibial amputation and K-2 and above functional levels who underwent trials with either a Proprio Foot or a dynamic carbon fiber foot. The objective of the study was to assess the energy cost of walking (ECW). Subjects were asked to walk at a self-selected speed on a regular floor surface and on a treadmill with -5%, 0% and 12% slopes while instrumented for various physical measures. The authors reported that ECW with the Proprio-Foot obtained in the final floor-walking test was significantly lower than ECW with the control foot (p=0.002). The authors reported no significant improvements in walking speed, Hill assessment index, timed up and go test, LCI-5, objective perceived mobility or walking ability.

Agrawal (2013) published a study involving 10 K-2 level and above subjects with transtibial amputation. Subjects were evaluated while wearing each of the following prostheses: SACH, SAFE, Talux, and the Proprio Foot in a random fashion. All subjects wore a custom-fit socket with each prosthesis. Following a 10- to 14-day accommodation and training period with each foot, subjects were asked to ascend and descend a set of stairs to assess movement proficiency and symmetry, ground reaction force and center of mass. Subjects were stratified by K-level (n=5 per group). The Proprio Foot demonstrated a significantly greater interlimb symmetry during ascent than the SACH and SAFE prostheses. The authors commented that the swing-phase dorsiflexion appeared to promote greater interlimb symmetry because it facilitated forward motion of the body, resulting in a heel-to-toe center of pressure trajectory.

Grabowski and others (2013) reported the results of a controlled trial involving 14 subjects, 7 with transtibial amputations and 7 healthy controls, subjected to level ground walking trials at 0.75, 1.00, 1.25, 1.50, and 1.75 m/s. The amputation subjects conducted their walking trials with their standard prosthesis and then with the BiOM prosthesis. The investigators were interested in how physical performance measures of the intact limb of the amputation group subjects were impacted by the use of the BiOM prosthesis compared to the standard device and healthy controls. They reported that the use of the BiOM significantly decreased intact limb peak resultant forces and first peak knee external adduction moments. Loading rates were not significantly different between prosthetic feet. They concluded that use of the BiOM prosthesis could reduce the risk of comorbidities such as knee osteoarthritis. However, no long term data have yet been published addressing that proposition.

In 2013 Gates reported a controlled study involving 11 subjects with transtibial amputation who were asked to participate in two data collection trials involving different walking speeds across a loose rock surface using their standard ESR prosthesis and then the BiOM device. Subjects using the BiOM had a 10% faster self-selected walking speed compared to when using the ESR device (1.16 m/s vs. 1.05 m/s; p=0.031). Ankle plantarflexion was also increased on their prosthetic limb throughout the gait cycle when wearing BiOM vs ESR devices, especially during push-off (p<0.001). A small (< 3°), but statistically significant decrease in knee flexion during early stance was noted with the BiOM device (p=0.045). No significant differences in kinematics of the knee and hip were reported, but subjects had decreased medial–lateral motion of their center of mass when wearing the BiOM prosthesis (p=0.020). The authors concluded that use of the BiOM did not significantly alter their proximal joint kinematics when used on an irregular surface.

In 2014, Darter reported the results of a small nonrandomized study involving 6 subjects who performed treadmill walking tests using their customary prosthesis, the Proprio Foot in its "on" setting (Pon), and lastly, the Proprio Foot in

the "off" setting (Poff). Through the study, the slope of the treadmill was changed to three different slopes, -5°, 0°, and +5°. The results included the observation that metabolic energy expenditure, energy cost for walking, and rating of walking difficulty were not statistically different between the Pon and Poff settings for all tested slopes. However, for slope descent, energy expenditure and energy cost for walking improved significantly with an average of 10%-14% for both the Pon and Poff compared to the customary limb. Walking difficulty also improved with slope descent for both the Pon and Poff compared to the customary device. An improvement with slope ascent was found for Pon compared to the customary limb only. The authors concluded that adaptive ankle motion provided no meaningful physiological benefit during slope walking but was less demanding than the customary device for slope descent.

Rosenblatt and others (2014) reported the results of a small study of 8 subjects using both a standard non-powered foot prosthesis and the Proprio Foot. All subjects underwent a treadmill-based evaluation using a motion capture system, first with their standard foot and then with the Proprio Foot. The goal of this study was to evaluate minimum toe clearance and calculate likelihood of tripping. The authors reported that there was a 70% increase in minimum toe clearance with the Proprio Foot device. Regression analysis found significant differences in average hip, knee, and ankle angles at time of minimum toe clearance between the two device types (p<0.05 for all). The authors concluded that the Proprio Foot device contributes significantly to an increased minimum toe clearance measurement which may provide a significant contribution to decreased likelihood of tripping. However, no actual real-life use results were reported regarding fall occurrence.

Agrawal (2015) published the results of a controlled study involving 10 K-2 to K-4 Level subjects who underwent six testing sessions with four different prostheses: (1) SACH foot, (2) SAFE foot, (3) Talux foot, and (4) the Proprio Foot. The initial testing session was conducted with all subjects using their usual foot prosthesis. This was followed by a 2-week period of training and acclimation to a new standardized socket which was used in combination with their usual prosthesis, followed by another testing session. This process was then repeated with each of the four study prostheses. For the ramp ascent test, no significant differences were reported between prosthesis groups. For the stair descent test, the data indicated that there was a significant benefit in energy expenditure between the Proprio Foot and the basic SACH foot prosthesis (p<0.05). No significant differences were reported between the Talux foot and the Proprio Foot. This study seems to indicate little benefit to the use of the Proprio Foot compared to the non-microprocessor controlled Talux foot prosthesis.

In 2018 Gardinier reported the results of a controlled trial involving 10 subjects with transtibial amputations and 10 healthy subjects. Testing included an 8-meter walk test at self-selected speeds and an 8-minute treadmill test. Walking speed was measured during the former and metabolic rate during the latter. Amputation group subjects were randomly assigned to undergo testing first with either the BiOM or their standard prosthetic device. The authors reported no significant differences between either of the prosthetic groups with regard to walking speeds or metabolic costs. This study did not demonstrate significant benefits with the use of the BiOM.

At this time, further study is needed to establish a meaningful clinical outcome benefit of the Proprio Foot over the conventional ankle-foot prosthesis.

Currently, there is no peer-reviewed published evidence addressing the clinical efficacy of the PowerFoot BiOM or the Endolite élan microprocessor controlled foot-ankle prostheses. Such information is necessary to properly evaluate the impact of this device.

## Background/Overview

Prostheses are devices that are used to replace or compensate for the absence of a body part. Such absence may be present at birth or due to amputation as the result of illness or trauma. Prosthetic devices have been used to replace body parts from individual fingers to entire limbs. Additionally, prostheses may include replacements for other body parts including breasts, eyes, and teeth. There are a wide variety of prostheses for the replacement of limbs made from various materials using a wide range of technologies.

The functional ability level of individuals with missing lower limbs is commonly rated via the use of the Medicare Functional Classification Level (MFCL), also known as K-Levels or Functional Levels (Centers for Medicare & Medicaid Services, 2017). The system is used to stratify individuals based on their ability to ambulate and function in various conditions. Additionally, K-Levels are commonly used to guide the appropriateness of specific types of lower limb prostheses. Provided below are definitions of these levels. Please note that within the functional classification hierarchy, bilateral amputees often cannot be strictly bound by functional level classifications.

**Level 0:**   Does not have the ability or potential to ambulate or transfer safely with or without assistance and prosthesis does not enhance their quality of life or mobility.

**Level 1:**    Has the ability or potential to use prosthesis for transfers or ambulation on level surfaces at fixed cadence. Typical of the limited and unlimited household ambulator.

**Level 2:**    Has the ability or potential for ambulation with the ability to traverse low-level environmental barriers such as curbs, stairs or uneven surfaces. Typical of the limited community ambulator.

**Level 3:**    Has the ability or potential for ambulation with variable cadence. Typical of the community ambulator who has the ability to traverse most environmental barriers and may have vocational, therapeutic, or exercise activity that demands prosthetic utilization beyond simple locomotion.

**Level 4:**    Has the ability or potential for prosthetic ambulation that exceeds basic ambulation skills, exhibiting high impact, stress, or energy levels. Typical of the prosthetic demands of the child, active adult, or athlete.

For prostheses used to replace lower limbs where the leg is missing from the knee or above, there is a need for a device to replace the normal function of the knee.  In people with intact legs, the knee naturally and automatically adjusts its action to the speed and stride of the person.  Conventional prosthetic legs use a pneumatic or hydraulic return mechanism to mimic the natural pendulum action of the knee.  This mechanism is usually set by a prosthetist to work at the individual's normal walking speed and does not allow any room for variation in speed.  Changes in an individual's walking speed require the individual to compensate for any delay in knee action through a variety of means including altering stride length and body position, among others.  Such maneuvers lead to an abnormal gait and require extra effort and concentration for what is normally an unconscious act.

Microprocessor controlled lower limb prostheses for the transfemoral amputee use computer-controlled mechanisms to detect step time and alter prosthetic function such as knee extension level to suit walking speed or angle of the terrain.  More advanced models, such as the Otto-Bock C-Leg, have multiple sensors that gather and calculate data on various parameters such as the amount of vertical load, ankle movement, and knee joint movement in an attempt to mimic more natural leg function to provide stability and gait fluidity as needed on uneven terrains and/or during sports activities.  The claimed advantages of a computerized leg prosthesis include a decreased level of effort in walking, improved symmetry of movement between legs leading to more natural movement, and the avoidance of falls.

For individuals who have lost a limb below the knee, there is a need for a device to replace the function of the ankle and foot.  Stair ambulation is limited in the transtibial amputee due to the neutral and fixed ankle position which exists in traditional prosthetic ankles.  Under study are newer prosthetic ankles which adjust the foot-ankle angle during the swing phase using sensor and microprocessor technologies to identify sloping gradients and the ascent or descent of stairs after the first step.  Users can place the foot fully on a step when climbing or descending stairs and it will automatically adapt the ankle position to enable the next step.  On ramp ascent and descent, adaptation begins on the second step and the device makes small adjustments until it reaches the degree of slope of the ramp.  The Proprio Foot is one such "quasi-passive" device.  The device is passive since no power is generated through the ankle in stance.  The device is also said to be designed to dorsiflex, or bring the toes closer to the shin, during the swing phase to improve ground clearance, improve gait symmetry and reduce the likelihood of falls.  Other claims include the device's ability to assist in standing from a seated position and plantar (bottom of the foot) flexion when kneeling, sitting and lying down.  Early pilot studies suggest that both during stair ascent and descent, the Proprio Foot improves knee flexion kinematics.  The weight of the Proprio Foot device is more than twice the weight of a conventional ankle-foot prosthetic such as the LP Vari-Flex (995g versus 405g).  Concern has been raised that because of its weight, the Proprio Foot might not benefit amputees with limited endurance and knee musculature.

Also under study are active prosthetic ankle prostheses which do generate power during the ankle stance.  Early results are said to be promising, but these devices are bulky and of considerable weight due to the motor and batteries needed to generate power.

Another type of microprocessor controlled foot-ankle prosthetic device, the PowerFoot BiOM, is proposed to simulate the natural function of the foot by simulating the action of the ankle, Achilles tendon and calf muscles to move the individual forward when they step.  These devices utilize various sensors in the ankle and foot to detect foot position, direction, and force of movement.  This data is analyzed by several microcomputers that translate it into instructions for a motor-activated spring device in the sole of the prosthesis. The loaded spring device is released as the sensor detects that the user is taking a step forward, forcing the ball of the foot downwards and propelling the foot forward. The spring mechanism reloads itself in-between steps. This device uses batteries to operate this system and requires daily recharging.

The FDA classified the Proprio Foot as a Class I device and the PowerFoot as a class II device, both exempt from requirements for pre-market notification by submission and FDA review of a 510(k) clearance.  This is based on the level of active assistance provided and the perceived risk associated with these devices.

| Definitions |
| --- |

Computerized leg prosthesis: A prosthetic device for individuals with some degree of leg amputation which uses a computer microprocessor to adapt prosthetic function to environmental conditions that impact locomotion.

Kinematics: A study of motion without regard to the forces present; mathematical methods to describe motion.

Prosthesis: For the purposes of this document, a device used to replace or compensate for the absence of a limb. Prostheses may be artificial replacements for a wide variety of body parts.

## Coding

*The following codes for treatments and procedures applicable to this document are included below for informational purposes. Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement policy. Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.*

**When services may be Medically Necessary when criteria are met:**

**HCPCS**

| | |
|---|---|
| L5856 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing and stance phase, includes electronic sensor(s), any type |
| L5857 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing phase only, includes electronic sensor(s), any type |
| L5858 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, stance phase only, includes electronic sensor(s), any type |
| L5859 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, powered and programmable flexion/extension assist control, includes any type motor(s) |

**ICD-10 Diagnosis**

| | |
|---|---|
| | All diagnoses, including, but not limited to, the following: |
| S78.111D, S78.111S | Complete traumatic amputation at level between right hip and knee, subsequent encounter or sequela |
| S78.112D, S78.112S | Complete traumatic amputation at level between left hip and knee, subsequent encounter or sequela |
| S78.119D, S78.119S | Complete traumatic amputation at level between hip and knee, unspecified side, subsequent encounter or sequela |
| S88.011D, S88.011S | Complete traumatic amputation at right knee level, subsequent encounter or sequela |
| S88.012D, S88.012S | Complete traumatic amputation at left knee level, subsequent encounter or sequela |
| S88.019D, S88.019S | Complete traumatic amputation at knee level, unspecified side, subsequent encounter or sequela |
| Z89.611 | Acquired absence of right leg above knee |
| Z89.612 | Acquired absence of left leg above knee |
| Z89.619 | Acquired absence of unspecified leg above knee |

**When services are Not Medically Necessary or Investigational and Not Medically Necessary:**
For the procedure codes listed above when criteria are not met, or when the code(s) describes a procedure indicated in the Position Statement section as not medically necessary or investigational and not medically necessary.

**When services are Investigational and Not Medically Necessary:**

**HCPCS**

| | |
|---|---|
| L5969 | Addition, endoskeletal ankle-foot or ankle system, power assist, includes any type motor(s) [when specified as addition to microprocessor controlled ankle-foot system] |
| L5973 | Endoskeletal ankle-foot system, microprocessor controlled feature, dorsiflexion and/or plantar flexion control, includes power source |

**ICD-10 Diagnosis**

All diagnoses

| References |
|---|

**Peer Reviewed Publications:**

1. Agrawal V, Gailey RS, Gaunaurd IA, et al. Comparison between microprocessor-controlled ankle/foot and conventional prosthetic feet during stair negotiation in people with unilateral transtibial amputation. J Rehabil Res Dev. 2013; 50(7):941-950.
2. Agrawal V, Gailey RS, Gaunaurd IA, et al. Comparison of four different categories of prosthetic feet during ramp ambulation in unilateral transtibial amputees. Prosthet Orthot Int. 2015; 39(5):380-389.
3. Alimusaj M, Fradet L, Braatz F, et al. Kinematics and kinetics with an adaptive ankle foot system during stair ambulation of transtibial amputees. Gait Posture. 2009; 30(3):356-363.
4. Bell EM, Pruziner AL, Wilken JM, Wolf EJ. Performance of conventional and X2® prosthetic knees during slope descent. Clin Biomech (Bristol, Avon). 2016; 33:26-31.
5. Bellmann M, Köhler TM, Schmalz T. Comparative biomechanical evaluation of two technologically different microprocessor-controlled prosthetic knee joints in safety-relevant daily-life situations. Biomed Tech (Berl). 2019; 64(4):407-420.
6. Bellmann M, Schmalz T, Ludwigs E, Blumentritt S. Immediate effects of a new microprocessor-controlled prosthetic knee joint: a comparative biomechanical evaluation. Arch Phys Med Rehabil. 2012; 93(3):541-549.
7. Burnfield JM, Eberly VJ, Gronely JK, et al. Impact of stance phase microprocessor-controlled knee prosthesis on ramp negotiation and community walking function in K2 level transfemoral amputees. Prosthet Orthot Int. 2012; 36(1):95-104.
8. Chin T, Machida K, Sawamura S, et al. Comparison of different microprocessor controlled knee joints on the energy consumption during walking in trans-femoral amputees: intelligent knee prosthesis (IP) versus C-leg. Prosthet Orthot Int. 2006; 30(1):73-80.
9. Chin T, Sawamura S, Shiba R, et al. Effect of an Intelligent Prosthesis (IP) on the walking ability of young transfemoral amputees: comparison of IP users with able-bodied people. Am J Phys Med Rehabil. 2003; 82(6):447-451.
10. Darter BJ, Wilken JM. Energetic consequences of using a prosthesis with adaptive ankle motion during slope walking in persons with a transtibial amputation. Prosthet Orthot Int. 2014; 38(1):5-11.
11. Datta D, Heller B, Howitt J. A comparative evaluation of oxygen consumption and gait pattern in amputees using Intelligent Prostheses and conventionally damped knee swing-phase control. Clin Rehabil. 2005; 19(4):398-403.
12. Delussu AS, Brunelli S, Paradisi F, et al. Assessment of the effects of carbon fiber and bionic foot during overground and treadmill walking in transtibial amputees. Gait Posture. 2013; 38(4):876-882.
13. Eberly VJ, Mulroy SJ, Gronley JK, et al. Impact of a stance phase microprocessor-controlled knee prosthesis on level walking in lower functioning individuals with a transfemoral amputation. Prosthet Orthot Int. 2014; 38(6):447-455.
14. Ferris AE, Aldridge JM, Rábago CA, Wilken JM. Evaluation of a powered ankle-foot prosthetic system during walking. Arch Phys Med Rehabil. 2012; 93(11):1911-1918.
15. Fradet L, Alimusaj M, Braatz F, Wolf SI. Biomechanical analysis of ramp ambulation of transtibial amputees with an adaptive ankle foot system. Gait Posture. 2010; 32(2):191-198.
16. Gailey RS, Gaunaurd I, Agrawal V, et al. Application of self-report and performance-based outcome measures to determine functional differences between four categories of prosthetic feet. J Rehabil Res Dev. 2012; 49(4):597-612.
17. Gardinier ES, Kelly BM, Wensman J, Gates DH. A controlled clinical trial of a clinically-tuned powered ankle prosthesis in people with transtibial amputation. Clin Rehabil. 2018; 32(3):319-329.

18. Gates DH, Aldridge JM, Wilken JM. Kinematic comparison of walking on uneven ground using powered and unpowered prostheses. Clin Biomech (Bristol, Avon). 2013; 28(4):467-472.

19. Grabowski AM1, D'Andrea S. Effects of a powered ankle-foot prosthesis on kinetic loading of the unaffected leg during level-ground walking. J Neuroeng Rehabil. 2013; 10:49.

20. Hafner BJ, Smith DG. Differences in function and safety between Medicare Functional Classification Level-2 and -3 transfemoral amputees and influence of prosthetic knee joint control. J Rehabil Res Dev. 2009; 46(3):417-433.

21. Hafner BJ, Willingham LL, Buell NC, et al. Evaluation of function, performance, and preference as transfemoral amputees transition from mechanical to microprocessor control of the prosthetic knee. Arch Phys Med Rehabil. 2007; 88(2):207-217.

22. Hahn A, Lang M, Stuckart C. Analysis of clinically important factors on the performance of advanced hydraulic, microprocessor-controlled exo-prosthetic knee joints based on 899 trial fittings. Medicine (Baltimore). 2016; 95(45):e5386.

23. Hasenoehrl T, Schmalz T, Windhager R, et al. Safety and function of a prototype microprocessor-controlled knee prosthesis for low active transfemoral amputees switching from a mechanic knee prosthesis: a pilot study Disabil Rehabil Assist Technol. 2018; 13(2):157-165.

24. Herr HM, Grabowski AM. Bionic ankle-foot prosthesis normalizes walking gait for persons with leg amputation. Proc Biol Sci. 2012; 279(1728):457-464.

25. Highsmith MJ, Kahle JT, Shepard NT, Kaufman KR. The effect of the C-Leg knee prosthesis on sensory dependency and falls during sensory organization testing. Technol Innov. 2014; 2013(4):343-347.

26. Johansson JL, Sherrill DM, Riley PO, et al. A clinical comparison of variable-damping and mechanically passive prosthetic knee devices. Am J Phys Med Rehabil. 2005; 84(8):563-575.

27. Kahle JT, Highsmith MJ, Hubbard SL. Comparison of nonmicroprocessor knee mechanism versus C-Leg on Prosthesis Evaluation Questionnaire, stumbles, falls, walking tests, descent, and knee preference. J Rehabil Res Dev. 2008; 45(1):1-14.

28. Kaufman KR, Levine JA, Brey RH, et al. Energy expenditure and activity of transfemoral amputees using mechanical and microprocessor-controlled prosthetic knees. Arch Phys Med Rehabil. 2008; 89(7):1380-1385.

29. Kaufman KR, Levine JA, Brey RH, et al. Gait and balance of transfemoral amputees using passive mechanical and microprocessor-controlled prosthetic knees. Gait Posture. 2007; 26(4):489-493.

30. Klute GK, Berge JS, Orendurff MS, et al. Prosthetic intervention effects on activity of lower-extremity amputees. Arch Phys Med Rehabil. 2006; 87(5):717-722.

31. Orendurff MS, Segal AD, Klute GK, et al. Gait efficiency using the C-leg. J Rehabil Res Dev. 2006; 43(2):239-246.

32. Prinsen EC, Nederhand MJ, Olsman J, Rietman JS. Influence of a user-adaptive prosthetic knee on quality of life, balance confidence, and measures of mobility: a randomised cross-over trial. Clin Rehabil. 2015; 29(6):581-591.

33. Prinsen EC, Nederhand MJ, Sveinsdóttir HS, et al. The influence of a user-adaptive prosthetic knee across varying walking speeds: a randomized cross-over trial. Gait Posture. 2017; 51:254-260.

34. Rosenblatt NJ, Bauer A, Rotter D, Grabiner MD. Active dorsiflexing prostheses may reduce trip-related fall risk in people with transtibial amputation. J Rehabil Res Dev. 2014; 51(8):1229-1242.

35. Schmalz T, Blumentritt S, Jarasch R. Energy expenditure and biomechanical characteristics of lower limb amputee gait: the influence of prosthetic alignment and different prosthetic components. Gait Posture. 2002; 16(3):255-263.

36. Segal AD, Orendurff MS, Klute GK, et al. Kinematic and kinetic comparisons of transfemoral amputee gait using C-Leg and Mauch SNS prosthetic knees. J Rehabil Res Dev. 2006; 43(7):857-870.

37. Seymour R, Engbretson B, Kott K, et al. Comparison between the C-leg microprocessor-controlled prosthetic knee and non-microprocessor control prosthetic knees: a preliminary study of energy expenditure, obstacle course performance, and quality of life survey. Prosthet Orthot Int. 2007; 31(1):51-61.

38. Taylor MB, Clark E, Offord EA, Baxter C. A comparison of energy expenditure by a high level trans-femoral amputee using the Intelligent Prosthesis and conventionally damped prosthetic limbs. Prosthet Orthot Int. 1996; 20(2):116-121.

39. Theeven PJ, Hemmen B, Brink PR, et al. Measures and procedures utilized to determine the added value of microprocessor-controlled prosthetic knee joints: a systematic review. BMC Musculoskelet Disord. 2013; 14: 333.

40. Theeven PJ, Hemmen B, Geers RP, et al. Influence of advanced prosthetic knee joints on perceived performance and everyday life activity level of low-functional persons with a transfemoral amputation or knee disarticulation. J Rehabil Med. 2012; 44(5):454-461.

41. Theeven P, Hemmen B, Rings F, et al. Functional added value of microprocessor-controlled knee joints in daily life performance of Medicare Functional Classification Level-2 amputees. J Rehabil Med. 2011; 43(10):906-915.

42. Thiele J, Schöllig C, Bellmann M, Kraft M. Designs and performance of three new microprocessor-controlled knee joints. Biomed Tech (Berl). 2019; 64(1):119-126.

43. Williams RM, Turner AP, Orendurff M, et al. Does having a computerized prosthetic knee influence cognitive performance during amputee walking? Arch Phys Med Rehabil. 2006; 87(7):989-994.

OR-PR.00003 Microprocessor Controlled Lower Limb Prosthesis                                                                  12/23/19, 9:53 AM

44. Wolf SI, Alimusaj M, Fradet L, et al. Pressure characteristics at the stump/socket interface in transtibial amputees using an adaptive prosthetic foot. Clin Biomech (Bristol, Avon). 2009; 24(10):860-865.
45. Wong CK, Rheinstein J, Stern MA. Benefits for adults with transfemoral amputations and peripheral artery disease using microprocessor compared with nonmicroprocessor prosthetic knees. Am J Phys Med Rehabil. 2015; 94(10):804-810.
46. Wurdeman SR, Stevens PM, Campbell JH. Mobility analysis of amputees (MAAT 3): Matching individuals based on comorbid health reveals improved function for above-knee prosthesis users with microprocessor knee technology. Assist Technol. 2019; 13;6:205566831882078.

**Government Agency, Medical Society, and Other Authoritative Publications:**

1. Centers for Medicare & Medicaid Services. Health technology assessment: lower limb prosthetic workgroup consensus document. September 2017. Available at: https://www.cms.gov/Medicare/Coverage/DeterminationProcess/downloads/LLP_Consensus_Document.pdf. Accessed on August 21, 2019.
2. Otto-Bock. What are K Levels? Available at: https://www.ottobockus.com/therapy/resources-for-prosthetics/what-are-k-levels.html. Accessed on August 21, 2019.
3. Stevens PM, Wurdeman SR. Prosthetic knee selection for individuals with unilateral transfemoral amputation: a clinical practice guideline. J Prosthet Orthot. 2019; 31(1):2-8.
4. Washington State Health Care Authority, Health Technology Assessment Program. Microprocessor-controlled lower limb prosthetics. October 12, 2011. Available at: http://www.hca.wa.gov/assets/program/mc_lower_prosthetic_final_report%5B1%5D.pdf. Accessed on August 21, 2019.

| Index |
|---|

Above Knee Prosthetics
Adaptive Prosthesis
BiOM
BionX emPOWER
C-Leg Compact
Endolite élan foot
Endolite Intelligent Prosthesis®
Endolite Orion3
Endolite Smart Adaptive knee
Endolite SmartIP
Freedom Innovations Plie Knee
Genium™ Bionic Prosthetic System,
Genium™ X2® and X3®
Kinnex Microprocessor Ankle/Foot System
Ossur Rheo Knee®
Ossur Power Knee™
Ossur Symbionic Leg
Otto-Bock C-Leg Compact
Otto-Bock Meridium
Proprio Foot®
PowerFoot BiOM
Seattle Limb Systems Power Knee®
Triton smart ankle
Trulife Power Knee®
X2
X3

**The use of specific product names is illustrative only.  It is not intended to be a recommendation of one product over another, and is not intended to represent a complete listing of all products available.**

| Document History | | |
|---|---|---|
| **Status** | **Date** | **Action** |

| Revised | 08/22/2019 | Medical Policy & Technology Assessment Committee (MPTAC) review. Clarified MN position statement criteria 3 and 4. |
| Revised | 06/06/2019 | MPTAC review. Clarified and MN position statement criteria 2 through 4. Added INV and NMN statement addressing devices that combine both microprocessor controlled knee and foot-ankle prosthesis . Updated Rationale, Coding and References sections. |
| Revised | 01/24/2019 | MPTAC review. MN criteria related to mobility and stability benefit, ambulation (including distance and on uneven terrain or stairs) were clarified. NMN statement clarified.  Updated Rationale and References sections. |
|  | 06/21/2018 | Revised Rationale section for Herr, 2011 study to identify device used. |
| Reviewed | 05/03/2018 | MPTAC review. Updated Rationale and References sections. |
| Revised | 03/22/2018 | MPTAC review. Added functional K-Levels to clinical indications section. Updated Background, Rationale, References, and Index sections. |
| Reviewed | 01/25/2018 | MPTAC review. The document header wording updated from "Current Effective Date" to "Publish Date." Updated Rationale and References sections. |
| Revised | 02/02/2017 | MPTAC review. Clarified MN statement criteria regarding demonstrating ability to ambulate faster than baseline rate. Updated Description, Rationale, References and Index sections. |
| Reviewed | 11/03/2016 | MPTAC review. Updated Rationale and References sections. |
| Reviewed | 11/05/2015 | MPTAC review. Updated Rationale and Reference sections. Removed ICD-9 codes from Coding section. |
| Reviewed | 11/13/2014 | MPTAC review. Updated Rationale and Reference sections. |
| Reviewed | 11/14/2013 | MPTAC review. Updated Coding section with 01/01/2014 HCPCS changes. |
| Reviewed | 11/08/2012 | MPTAC review. Updated Rationale, Reference and Index sections. Updated Coding section with 01/01/2013 HCPCS changes. |
| Reviewed | 11/17/2011 | MPTAC review. Added the Genium Bionic Prosthetic System to existing medically necessary statement addressing microprocessor controlled lower limb prosthesis. Added PowerFoot BiOM device to existing investigational and not medically necessary statement addressing microprocessor controlled foot-ankle prosthesis. Updated Rationale, Background, and Reference and Index sections. |
| Reviewed | 02/17/2011 | MPTAC review. Updated Index section. |
| Revised | 02/25/2010 | MPTAC review. Added microprocessor controlled foot-ankle prosthesis (e.g., Proprio Foot) as investigational and not medically necessary for all indications. Updated Coding, Rationale and Reference sections. |
| Revised | 02/26/2009 | MPTAC review. Added medically necessary position and criteria for microprocessor controlled lower limbs. Updated Rationale, Coding and Reference sections. |
| Revised | 08/28/2008 | MPTAC review. Changed position statement from Investigational and Not Medically Necessary to Not Medically Necessary. Updated Rationale, Coding and Reference sections. |
| Reviewed | 05/15/2008 | MPTAC review. Updated Rationale and Reference sections |
|  | 02/21/2008 | The phrase "investigational/not medically necessary" was clarified to read "investigational and not medically necessary." This change was approved at the November 29, 2007 MPTAC meeting. |
| Reviewed | 05/17/2007 | MPTAC review. Updated Rationale and Reference sections. Coding updated; |

|          |            | removed HCPCS L5846 and L5847 deleted 12/31/2004, and K0670 deleted 12/31/2005. |
|----------|------------|--------------------------------------------------------------------------------|
| Reviewed | 06/08/2006 | MPTAC review. |
|          | 01/01/2006 | Updated Coding section with 01/01/2006 CPT/HCPCS changes |
| Revised  | 07/14/2005 | MPTAC review. Revision based on Pre-merger Anthem and Pre-merger WellPoint Harmonization. |

| Pre-Merger Organizations | Last Review Date | Document Number | Title |
|--------------------------|------------------|-----------------|-------|
| Anthem, Inc. | 09/19/2003 | OR-PR.0003 | Computerized Limbs |
| WellPoint Health Networks, Inc. | 06/24/2004 | 9.01.07 | Microprocessor Controlled Lower Limb Prosthesis (Above Knee Prosthetics) |

---

Applicable to Commercial HMO members in California: When a medical policy states a procedure or treatment is investigational, PMGs should not approve or deny the request. Instead, please fax the request to Anthem Blue Cross Grievance and Appeals at fax # 818-234-2767 or 818-234-3824. For questions, call G&A at 1-800-365-0609 and ask to speak with the Investigational Review Nurse.

Federal and State law, as well as contract language, including definitions and specific contract provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. The member's contract benefits in effect on the date that services are rendered must be used. Medical Policy, which addresses medical efficacy, should be considered before utilizing medical opinion in adjudication. Medical technology is constantly evolving, and we reserve the right to review and update Medical Policy periodically.

No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without permission from the health plan.

© CPT Only – American Medical Association

**[EXHIBIT F]**

Case 2:17-cv-06816-ODW-PLA    Document 97-1    Filed 10/20/21    Page 93 of 125    Page ID
#:1646



# Medical Policy

**Subject:** Microprocessor Controlled Lower Limb Prosthesis

**Document #:** OR-PR.00003

**Status:** Revised

**Publish Date:** 05/20/2021

**Last Review Date:**
05/13/2021

## Description/Scope

This document addresses the use of microprocessor controlled lower limb prostheses including, but not limited to, knee prostheses (such as the Otto-Bock C-Leg® device, the Genium™ Bionic Prosthetic System, the Genium™ X2® and X3® devices, the Ossur Rheo Knee®, and the Endolite Intelligent Prosthesis®) and foot-ankle prostheses (such as the Proprio Foot®, the PowerFoot BiOM, and the Endolite élan foot).

**Note**: For additional information regarding lower limb prosthesis, please see:

- [CG-DME-13 Lower Limb Prosthesis](#)

## Position Statement

**Medically Necessary:**

I. The use of a microprocessor controlled lower limb prosthesis (for example, Otto-Bock C-Leg device, Otto-Bock Genium Bionic Prosthetic System, the Ossur Rheo Knee or the Endolite Intelligent Prosthesis) is considered **medically necessary** for transfemoral (above knee) and knee disarticulation amputees when **all** of the criteria set forth in (A) and (B) below have been met:

    A. Selection criteria:

        1. Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology; **and**

        2. Individual has a functional K-Level 3 or above; **and**

        3. The provider has documented that there is a reasonable likelihood of better mobility or stability with the device instead of a mechanical knee prosthesis; **and**

        4. There is documented need for ambulation in situations where the device will provide benefit (for example, regular need to ascend/descend stairs, traverse uneven surfaces or ambulate for long distances [generally 400 yards or greater cumulatively]).

    B. Documentation and performance criteria:

        1. Complete multidisciplinary assessment of individual including an evaluation by a trained prosthetic clinician. The assessment must objectively document that all of the above selection criteria have been evaluated and met.

II. The use of a microprocessor controlled foot or ankle system (such as the Propio Foot or Endolite élan foot) is considered **medically necessary** for transtibial amputees when **all** of the criteria set forth in (A) and (B) below have been met:

    A. Selection criteria:

        1. Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology; **and**

        2. Individual has a functional K-Level 3 or above; **and**

        3. The provider has documented that there is a reasonable likelihood of better mobility or stability with the device instead of a mechanical foot or ankle prosthesis; **and**

        4. There is documented need for ambulation in situations where the device will provide benefit (for example, regular need to ascend/descend stairs, traverse uneven surfaces or ambulate for long distances [generally 400 yards or greater cumulatively]).

    B. Documentation and performance criteria:

**Feedback**

1. Complete multidisciplinary assessment of individual including an evaluation by a trained prosthetic clinician. The assessment must objectively document that all of the above selection criteria have been evaluated and met.

**Not Medically Necessary:**

The use of a microprocessor controlled lower limb (knee/foot/ankle) prosthesis is considered **not medically necessary** in all other cases, including when the criteria above have not been met, including for individuals with a functional K-Level 2 or below.

**Investigational and Not Medically Necessary:**

The use of a microprocessor controlled foot-ankle prosthesis with power assistance, which includes any type of motor, (for example, the PowerFoot BiOM) is considered **investigational and not medically necessary** for all indications.

Use of prosthetic devices that combine both a microprocessor controlled knee and foot-ankle prosthesis is considered **investigational and not medically necessary** for all indications.

## Rationale

*Microprocessor Controlled Knee Prosthesis*

Microprocessor controlled knee prosthesis have been clinically available and widely used for some time. While the studies addressing these devices are often relatively small and may not be randomized, the clinical benefits of the devices have been well established. Hafner (2007) reported the findings of a small, nonrandomized, cross-over controlled design study in which each subject was exposed to two different prosthetic limb conditions (mechanical and microprocessor controlled C-Leg) twice during the trial. This study included 21 subjects, each of whom used both a standard mechanical knee and lower limb prosthesis and the C-Leg microprocessor controlled prosthesis. While the authors reported no significant differences between the two prosthetic devices in terms of daily activity as measured by mean daily step frequency and mean estimated step distance, in performance on level or varied surfaces, or in cognitive demand during use of the devices, they did note a significant improvement with the C-Leg prosthesis in subjects' Stair Assessment Index (SAI) scores, time to descend scores, and a surveyed preference for the microprocessor controlled C-Leg as compared with a mechanical prosthetic knee. In addition, the self-reported frequency of stumbles and falls was lower for the C-Leg prosthesis. Williams (2006) describes a randomized two-group cross-over design study of C-Leg versus a standard hydraulic knee prosthesis (Mauch SNS[®] knee) and concluded that in non-demanding walking conditions with experienced amputees, participants reported the C-Leg required less cognitive attention than the non-computerized knee. Kaufman (2007) compared the C-Leg to the standard hydraulic prosthesis in gait and balance parameters in 15 participants and found a significant (p<0.01) improvement in objective, standardized measures of both gait (knee flexor movement) and balance (Sensory Organization Test) with the computerized prosthesis. Seymour (2007) compared energy expenditure, obstacle course negotiation and quality of life (QOL) measures in 10 individuals who used C-Leg and a non-computerized prosthesis and found statistically significant lower energy consumption rate for participants when wearing their C-Leg devices at both typical and fast paces, number of steps taken, elapsed time, and the number of times out of bounds through an obstacle course.

Hafner (2009) reported the results of a nonrandomized crossover study involving 17 subjects with unilateral transfemoral amputations. Subjects were classified as either Medicare Functional Classification Level-2 (MFCL-2, also known as K-2, n=8) or MFCL-3 (also known as K-3, n=9) and were microprocessor controlled prosthesis naive. The investigators began the study with all subjects using their standard prosthesis and underwent functional evaluations at 2 months, after which they underwent fitting, training, a 2-month acclimation period and another round of functional evaluations with the C-Leg prosthesis. Subjects were then transitioned back to their standard prosthesis for 2 weeks before another round of assessments was given. Once the assessments were completed, all subjects were sent home with both prostheses and told to use them as they desired, and return for additional assessments at 4, 8, and 12 months, using the prosthesis most used or preferred during the previous 4-month period. For both K-2 and K-3 subjects, significant performance benefits were reported for most assessments, including stair mobility (K-2, p=0.008; K-3 p=0.004), Hill mobility (K-2, p=0.008; K-3, p=0.09), Hill speed (K-2, p=0.002; K-3, p=0.017), obstacle course speed (K-2, p=0.02; K-3, p=0.007), and attention speeds (K-2, p=0.02; K-3, p=0.22). The reported relative increase in functional outcomes was reported to be greater in K-2 vs. K-3 subjects.

When data for both groups were combined, significant improvements were noted for all assessments noted above (p<0.05). With regard to self-reported measures, only the K-3 subjects had significant improvements in satisfaction (p=0.002) and in a utility Prosthesis Evaluation Questionnaire [PEQ] (p=0.01). Self-reported relative frequency of stumbles was significantly better in both groups (p=0.05 and p=0.03, respectively), however, this was not mirrored in a significant decrease in reported stumbles. No significant differences in frequency of number of semi-controlled falls was reported for either group. Only the K-2 subjects experienced a significant improvement in the frequency (p=0.01 vs. p=0.1, respectively) and number of uncontrolled falls (p=0.01 vs. 0.28). At the completion of the study, reassessment of K-levels found that 50% of the K-2 subjects were reclassified as K-3 and 33.3% of K-3 subjects were reclassified as K-4. However, 2 K-3 subjects were reclassified as K-2. The authors concluded that the results suggest the C-leg improves function and reduces the frequency of adverse events in a population that is at risk for falls and may allow persons with amputation to expand their functional abilities.

Theeven (2011) conducted a small randomized controlled cross-over trial that was significantly different from the previously discussed studies in two respects. First, instead of including only highly selected healthy amputee subjects, their study only included K-2 subjects, which represents an intermediate capacity for physical functioning, commonly termed as "limited community ambulatory." Second, this study not only compared standard mechanical prosthetic devices to microprocessor controlled devices, but also compared two microprocessor controlled devices with one another. The study design called for each participant to wear a different prosthesis for sequential week-long periods, with testing at the end of each week. All participants wore their standard mechanical prosthesis for the first week, followed by the two microprocessor controlled prosthetic devices (either the Otto-Bock C-leg, or the Otto-Bock C-Leg Compact). A total of 41 subjects were randomized, but only 28 subjects (68%) completed the trial. The authors further stratified study subjects into three groups ("High", "Intermediate", or "Low") based on expert opinion regarding functional levels within the MFCL category. Subject performance on the ADAPT testing circuit was further stratified by specific sections of the test. The ADAPT test circuit presents three separate sets of physical challenges, each addressing discrete subsets of skills or abilities that become increasingly challenging. Activity Subset 1 (AS1) focuses on activities that require adequate balance, Activity Subset 2 (AS2) focuses on actions that challenge muscle strength and weight distribution, and Activity Subset 3 (AS3) focuses on actions dependent upon prosthesis-related and cognitive skills. The authors reported a large variation in the functional performance level seen within the study's K-2 population, as well as between prosthetic devices. The Low functional level subjects demonstrated no benefit from a microprocessor controlled prosthesis at any level of the test. Both Intermediate and High group subjects were reported to have significant improvements in performance of AS2 activities, with the High group performing significantly better than the Intermediate group. For AS3 activities, only the High group demonstrated any benefit. Inter-device comparison found that the High group performed significantly better with both computerized prostheses in AS1, but none in AS2. In AS3, the High group had significantly better times only when subjects wore the C-Leg Compact Device, but not the standard C-Leg. In contrast, the intermediate group only had significant improvements in AS2 with the standard C-Leg, but not with the more advanced C-Leg compact device. The authors conclude that there is a wide disparity in functional levels within the K-2 classification. They also note that despite the overall data showing benefit by functional levels, performance at the individual level was significantly variable across functional levels. Additionally, there was a significant variation in achieved benefit depending upon device type. In this study, the data are limited by the small study sample. Also, the authors note that the choice of break-in period may have a significant impact on the results, and longer acclimation times may significantly change the results. This is the first study looking at the use of microprocessor controlled knee prostheses in lower functioning subjects in a rigorous manner. The results showed significant variation in performance between individuals and unexpected results with regard to outcomes between device types. It highlights that there are still many questions left to address with regard to the benefits derived from these devices, particularly in K-2 ambulators.

Theeven (2012) published on 30 K-2 subjects using a randomized cross-over design. Full datasets were available for only 19 subjects at the completion of the study, but all 30 were included in the intent-to-treat analysis. Subjects underwent three separate trial periods using three different knee joint prostheses, including one mechanical knee joint and two microprocessor controlled joints. The latter two prosthetic joints included one with microprocessor controlled stance and swing phase and another with only a microprocessor controlled stance phase. Subjects were assessed using each prosthesis for a 1-week period in the home and community setting. The perceived performance and satisfaction were measured using the PEQ. Subject activity levels were monitored via uniaxial accelerometer. The results indicated that the subjects' perceptions regarding ambulation, residual limb health, utility, and satisfaction were significantly higher when subjects used the microprocessor controlled devices vs. the mechanical knee devices. There were no significant differences between groups with regard to activity level. The

authors conclude that K-2 amputees report benefitting in terms of their performance from using a microprocessor-controlled prosthetic knee (MPK); this is not reflected in their actual daily activity level after 1 week of using an MPK.

Burnfield (2012) investigated the sequential use of standard mechanical prostheses followed by the C-Leg device in 10 K-2 subjects who were asked to complete a series of tasks while measurements were taken on gait, stride, motion analysis, timed functional assessments along with questionnaires and EMG. The authors noted significantly better performance with the C-Leg with regard to ramp ascent and descent and intact limb function. Intact limb function improvements were used as a proxy measure for stability and user confidence since longer stride and a more regular gait are indicative of prosthetic confidence and comfort. EMG data was not of sufficient quality to allow proper analysis. The Timed Up and Go (TUG) test, which measures physical function during a specified series of tasks, showed significant improvement in the C-Leg group. The results of the Prosthetic Evaluation Questionnaire (PEQ), Activities-specific Balance Confidence Scale (ABC) and the Houghton Scale were mixed, with the PEQ and ABC demonstrating significant benefits with the C-Leg, but not on the Houghton Scale. This study supports some of the positive findings mentioned earlier in the Theeven trial, but further study is needed to fully understand the impact of microprocessor controlled knee prostheses in the K-2 population.

Bellmann (2012) compared performance parameters of the C-Leg vs. the Genium device in 11 K-3-4 C-Leg users. The authors reported significant benefits of the Genium device over the C-Leg in many measures, including foot loading, sway, step symmetry, and knee flexion during a variety of activities. However, the very short acclimation time and very small sample size of this study do not allow the results to be generalized to a wider population.

Theeven (2013) published a systematic review of the available literature addressing microprocessor controlled prosthetic knee joints. A total of 37 studies and 72 outcome measures were identified and included in the study. They reported that a majority (67%) of the outcome measures addressed the body functions component of the International Classification of Functioning, Disability and Health (ICF), which measures and describes the anatomy and physiology/psychology of the human body. This component is commonly used to quantify the level of impairment present. Measurement of how microprocessor controlled knee joints affect an individual's actual performance in daily life was reported in only 31% of studies. Also noted was that the available research primarily focused on young, fit and active persons. The researchers concluded that "scientifically valid evidence regarding the performance of persons with an MPK in everyday life is limited. Future research should specifically focus on activities and participation to increase the understanding of the possible functional added value of MPKs."

Highsmith (2014) studied 15 K-3-4 ambulators on six balance tests with both a standard knee prosthesis and then with the C-Leg. The trials involved the use of the Sensory Organization Test (SOT) to assess sensory dependence. The six different tests involved evaluations under pre-specified conditions with varying balance challenges with their standard prosthesis, followed by an accommodation period with the C-leg and repeat testing. A significant 3% increase in reliance on somatosensory system input (p=0.047) was reported while using the C-Leg vs. a standard prosthesis. There was a statistically significant (33%) reduction in the number of falls when using the C-Leg (p=0.03). Standard prosthesis use resulted in 21 falls among 7 subjects (average, 1.4 ± 2.3 falls per person) compared with 14 falls among 4 subjects (average 0.9 ± 2.1 falls per person) while utilizing the C-Leg.

Eberly (2014) reported on stride characteristics, kinematics, kinetics, and electromyographic activity on a 10 meter walkway with both their standard prosthesis and then with the C-Leg Compact in 10 K-2 ambulatory subjects at self-selected comfortable and fast walking paces. The results indicated approximately 20% improvement in walking speed with the C-leg vs. the control prosthesis in both the free walking phase (p=0.002) and the fast walking phase (p=0.000). This was attributed to increases in both stride length (12%-14%; p=0.003) and cadence (9%-10%; p=0.001). The peak external ankle dorsiflexion moment in late stance increased by more than 20% while walking with the C-Leg vs. the standard prosthesis during both free (p=0.001) and fast (p=0.008) walking. Walking with the C-Leg produced modestly higher tibialis anterior activity in the intact limb (6%-8% maximal voluntary contraction [MCV] increase) and moderately more intense lower gluteus maximus activity (19% MVC increase) in the prosthetic limb in both free and fast walking compared to walking with the standard prosthesis (p<0.05). There were no significant differences between the prostheses in mean EMG activity of the remaining muscles during free or fast walking.

Prinsen (2015) published the results of a randomized controlled cross-over study involving 10 subjects (n=2 K-2, 5 K-3, and 3 K-4) assigned to begin the study with either a standard knee prosthesis or the Rheo Knee II device. Following an 8-week acclimation period to their assigned device, subjects were given a battery of tests including the TUG test, Timed Up and Down Stairs Test, and Standardized Walking Obstacle Course. Following these measurements, subjects were crossed over to use the other device, acclimated for another 8 weeks, and then

Case 2:17-cv-06816-ODW-PLA   Document 97-1   Filed 10/20/21   Page 97 of 125   Page ID
#:1650

retested. The authors reported that significantly higher scores were found for the Rheo Knee group on the Residual
Limb Health subscale of the Prosthesis Evaluation Questionnaire when compared to the standard device group
(p=0.047). Interestingly, Rheo Knee subjects needed significantly more steps to complete an obstacle course
compared to the non-microprocessor controlled prosthetic knee (p=0.041). On other outcome measures, no
significant differences were found. The authors concluded that transition towards the Rheo Knee had little effect on
the studied outcome measures.

Wong (2015) published on 8 subjects over 40 years of age with peripheral arterial disease-related amputations.
There were 2 K-1 subjects, 2 K-2 subjects, and 4 K-3 subjects. Unilateral amputations were noted in 6 subjects and
2 were bilateral amputations. All subjects were asked to undergo a battery of tests including the Berg Balance Scale
and the TUG test with their standard prosthetic device and then, after an 8-week acclimation period, with either the
C-Leg (n=5) or the C-Leg Compact (n=3) devices. After acclimation using the microprocessor controlled prosthesis,
subjects demonstrated improvements in fear of falling, balance confidence, TUG time, and rate of falls (p<0.05 for
all). Decreases in the number of falls correlated with faster TUG speed (p=0.76) and greater balance confidence
(p=0.83). The authors concluded that individuals with peripheral artery disease and transfemoral amputations had
fewer falls and improved balance confidence and walking performance when using a microprocessor controlled
prosthesis.

Bell (2016) investigated the impact of the Otto Bock Genium X2 microprocessor controlled prosthetic knee in 21 K4
ambulators with transfemoral amputation and experience with prosthesis use on descending sloped surfaces. The
X2 device is similar to the commercially available Genium prosthetic device but has been specifically designed for
injured U.S. military service members, with updated control software and sensor hardware to improve biomimetic
timing. Participating subjects went through a trial of slope walking with their usual leg, (n=13 with C-Leg, 8 with the
Mauch device), and then acclimated to the X2 devices prior to retrial. The trial involved the evaluation of descent
technique and biomechanics as subjects descended an instrumented 10° slope at a self-selected walking velocity.
The authors reported that the use of the X2 device in the subjects who usually used the Mauch device resulted in
greater hill assessment scores (p=0.026). They attributed this finding primarily to decreased reliance on handrail
use. The use of the X2 device in the C-Leg group increased prosthetic knee flexion to a median of 6.4° at initial
contact (p=0.002) and 73.7° in swing (p=0.005). This contributed to longer prosthetic limb steps (p=0.024) and
increased self-selected velocity (p=0.041). Additionally, the use of the X2 in the C-Leg group increased prosthetic
limb impact peaks (p=0.004) and improved impact peak symmetry (p=0.004). The conclusion was that the
decreased reliance on handrail use as Mauch device users descended in the X2 device indicates improved function
and perhaps greater confidence in the device. The authors suggested that additional biomechanical improvements
for existing C-Leg users suggest potential longer-term benefits with regard to intact limb health and overuse injuries.

Hahn (2016) conducted a retrospective cross-sectional cohort analysis involving routine trial fitting data from 899
subjects with above knee amputations using the C-Leg device. The outcomes involved prosthetist-rated
performance indicators addressing the functional benefits of advanced maneuvering capabilities of the devices.
Additionally, subjects were asked to rate their perceptions as well. The authors reported that the ability to vary gait
speed, perform toileting, and ascend stairs were identified as the most sensitive performance predictors of
successful microprocessor controlled knee device use. Subjects with prior C-Leg experience demonstrated benefits
during advanced maneuvering. Mobility grade showed the largest effect, but also failed to be predictive, and other
clinical parameters such as reason for amputation, age, and mobility grade, were shown to have no predictive
potential. Finally, they did note that daily walking distance may pose a threshold value. As such, they suggested that
it be considered as part of any proposed predictive instrument.

Prinsen (2017) conducted a randomized crossover study comparing microprocessor controlled knee prosthesis
(Rheo Knee II) to non-microprocessor controlled prosthetic knees (NMPK) across different walking speeds, in 9
subjects with a transfemoral amputation or knee disarticulation (n=2 K-2, 5 K-3, and 3 K-4). The authors compared
knee kinematics, such as intact ankle vaulting and vertical acceleration of the pelvis, across groups. Measurements
were performed at three walking speeds: preferred walking speed, 70% preferred walking speed and 115%
preferred walking speed. The results indicated no differences between groups with regard to peak prosthetic knee
flexion during swing or in peak vertical acceleration of the pelvis during initial and mid-swing of the prosthetic leg. At
70% preferred walking speed, they found that vaulting, described as premature ankle plantar flexion of the intact leg
during mid-stance, was significantly decreased while walking with the Rheo Knee II compared to the NMPK
(p=0.028). They concluded that there were limited differences in gait parameters while walking with the Rheo Knee
II vs. NMPK across different walking speeds.

Feedback

Hasenoehrl (2017) reported on a small sample of 5 elderly, low-active (K-2) transfemoral amputees. All subjects were fitted with a microprocessor controlled device specifically designed for older and low-active transfemoral amputees (Genium with Cenior-Leg ruleset microprocessor-controlled knee prosthesis) and re-evaluated after 4 to 6 weeks of familiarization. A third evaluation with only questionnaires was conducted after participants were refitted to their standard device another 4 weeks later. No specific training was provided to subjects. The authors reported that the questionnaires and functional tests showed an increase in the perception of safety. Moreover, gait analysis revealed more physiologic knee and hip extension/flexion patterns when using the microprocessor controlled device. They concluded that although the microprocessor device might help to improve several safety-related outcomes as well as gait biomechanics, the results of this study were hampered by lack of training and a sufficient acclimation period. Moreover, this study was limited by the small sample size, lack of blinding, and other methodological flaws.

According to the Veterans Affairs/Department of Defense (VA/DoD) Clinical Practice Guideline for Rehabilitation of Individuals with Lower Limb Amputation (2017), it is suggested that a microprocessor-controlled knee unit should be offered over a non-microprocessor knee unit for ambulation to reduce risk of falls and to maximize the satisfaction of the individual. The guideline also stated the following:

> Access to early weight-bearing prostheses has expanded through the introduction of several different prefabricated systems that are commercially available. More research is required to further delineate the risks and benefits associated with this intervention as well as to further determine the differences between articulated and non-articulated devices.

Kaufman (2018) published a prospective non-randomized cross-over trial involving 50 subjects assessed at K-2 (n=48) and K-3 (n=2) levels who were current users of a non-microprocessor controlled prosthesis. Subjects were randomly assigned to one of four different microprocessor controlled prostheses (OttoBock Compact, Ossur Rheo Knee 3, Endplate Orion 2, or Freedom Innovation Plié 3). The study began with all subjects being tested with their usual prosthesis, followed by a 3-month acclimation process with their assigned microprocessor controlled prosthesis and then tested. Afterwards, they were tested again with their usual prosthetic device. Testing included activity monitoring and subjective satisfaction and safety questionnaires. Self-reported data demonstrated a significant reduction in falls, with a median of 2 falls per person per month with the non-powered knee at baseline vs. 0 falls per person per month with the microprocessor controlled prosthesis (p=0.01). The number of falls rebounded to 3 falls per person per month after subjects were retested with their usual device. Time spent sitting decreased from 61% with the usual device to 52% with the microprocessor controlled prosthesis (p=0.01). As with falls, this increased when subjects returned to their usual device (64%). There was a significant increase in activity with the microprocessor controlled prosthesis as measured by the percentage of the day using the control prosthesis vs the microprocessor controlled prosthesis (16% vs 20%, p=0.02).

Wurdeman (2018) reported the results of a retrospective study of a convenience sample of 450 subjects with either below the knee amputation (n=150) or above the knee amputation who used a standard knee prosthesis (n=150) or a microprocessor controlled knee prosthesis (n=150). Subjects were matched for age and Functional Comorbidities Index (FCI) results, but not for height or weight. The results from the PLUS-M survey tool indicated that while subjects in the microprocessor knee group had significantly greater mobility than the standard knee prosthesis group (p<0.001), both groups had poorer mobility than the below the knee amputation group (p=0.003). The authors concluded that on the basis of the PLUS-M survey tool, the use of a microprocessor controlled knee prosthesis provided improved functional mobility to individuals with above the knee amputations.

Bellmann (2018) published the results of a crossover comparative trial involving 6 K3-4 subjects undergoing repeat trials comparing the Otto-Bock C-Leg 4 or the Ossur Rheo Knee XC on a 12 m instrumented walkway, on stairs, and up and down and 10$^o$ slope. A tripping simulation was also conducted. The authors concluded that when walking down stairs, on slopes or while recovering from a stumble, the C-Leg demonstrated a reliable prosthetic side load-bearing capacity resulting in reduced loading on the residual body. The Rheo Knee XC, in contrast, required increased compensatory movements of the remaining locomotor system in order to compensate for reduced load-bearing and safety reserves.

Thiele (2019) reported the results of a small crossover study involving 4 K3 subjects with above the knee amputations who underwent a series of 8 to 10 trials involving walking at self-selected and fast speeds down a 12 m instrumented walkway with each of three microprocessor controlled knee devices: 1) the Otto-Bock C-Leg 4, 2) the Freedom Plié, 3) the Ossur Rheo Knee 3. The authors reported significant differences between devices with regard to both self-selected and fast speed (p=0.03) and conscious stance phase flexion (p<0.001). The slope of the linear

correlation between the maximum knee flexion angle and gait velocity was similar between the three devices ($R^2$=0.02). Mean slope of the swing flexion behavior of the prosthetic leg, when compared to the contralateral side showed decreasing correlation when evaluating at the Plié device ($R^2$=0.9), the Rheo Knee ($R^2$=0.52), and the C-Leg ($R^2$=0.26). No stumbles were reported in any group. The authors concluded that the biomechanical results showed that only if a knee joint adapts flexion and extension resistances by the microprocessor can all known advantages of MPKs become apparent, but not all users may benefit from the examined functions.

Stevens and Wurdeman (2019) published recommendations for the selection of individuals with unilateral transfemoral amputations. In this document they proposed the following recommendations:

> Recommendation 1. Fluid knee benefits and indications: Knees with hydraulic or pneumatic swing resistance are indicated for active walkers, permitting increased walking comfort, speed, and symmetry.
> Recommendation 2. Microprocessor knee benefits: Compared with nonmicroprocessor knees: a) With respect to self-report indices and measures, microprocessor knees are indicated to reduce stumbles, falls, and associated frustrations as well as the cognitive demands of ambulation. b) With respect to self-report indices and measures, microprocessor knees are indicated to increase confidence while walking, self-reported mobility, satisfaction, well-being, and quality of life. c) With respect to physical performance indices and measures, microprocessor knees are indicated to increase self-selected walking speed, walking speed on uneven terrain, and metabolic efficiency during gait.
> Recommendation 3. Microprocessor knee equivalence: Given the comparable values observed with the use of microprocessor and nonmicroprocessor knees with regard to daily step counts, temporal and spatial gait symmetry, self-reported general health, and total costs of prosthetic rehabilitation, these parameters may not be primary indications in prosthetic knee joint selection.
> Recommendation 4. Microprocessor knees for limited community ambulators: Among limited community ambulators, microprocessor knees are indicated to enable increases in level ground walking speed and walking speed on uneven terrain while substantially reducing uncontrolled falls and increasing both measured and perceived balance.

Microprocessor controlled lower limb prostheses are appropriate for individuals who meet criteria for fitness, health and daily utilization expectations. The currently available scientific evidence demonstrates benefits for individuals with a K-3 or K-4 functional level. Such individuals are capable of performing physical tasks requiring significant strength, coordination, aerobic fitness, and cognitive capacity. These tasks include ambulation at variable cadences and for extended distances or time periods (for example, 400 yards or more), or the ability to traverse challenging environmental barriers (for example, stairs). They may also be capable of participating in athletic activities involving high impact or aerobic needs. As such, the use of microprocessor controlled lower limb prostheses may be appropriate for users who have the physical capacity for such activities on a regular basis. Alternatively, the data does not show significant benefits of microprocessor controlled lower limb prostheses for individuals who do not have high-level physical needs, such as those with K-1 or K-2 functional levels, or those who do not have a demand for extensive physical activity. The benefits of the marginal improvements in functional capacity provided by microprocessor controlled lower limb devices, such as reduced oxygen consumption, improving walking speed, and safety when ambulating in more challenging environments, are not clear for individuals at lower function levels. Furthermore, for those individuals who do have K-3 or K-4 functional levels, but do not encounter a regular need to ambulate for long distances over significant environmental challenges beyond what may be encountered in the average home or workplace, there is little benefit provided from the use of microprocessor controlled lower limb devices. In addition, these devices require substantial training to allow for faster than normal walking speed. A user should have adequate cognitive learning ability to master the higher level technology.

The evidence-based literature reviewed for the microprocessor controlled lower limb prosthesis evaluated actual and functional outcomes. The evidence includes a number of subject comparisons of the microprocessor controlled knee versus non-microprocessor controlled knee joints. Many of the studies reflect an objective improvement in function in regard to some outcome measures when the microprocessor controlled knee is used as compared to a more traditional non-microprocessor controlled knee. In addition, some of the literature reviewed revealed the microprocessor controlled knee prosthesis demonstrated a significant improvement with individuals in such areas of SAI scores, time to descend scores and improvement in function. Improvement of the individual's performance within these areas can potentially reduce adverse events. The choice of the most appropriate prosthetic design will be impacted by the individual's underlying activity level, improved functional mobility and other factors that would improve walking performance.

Feedback

Microprocessor controlled foot and ankle prosthesis are devices that involve the use of microprocessors to control the position and action of the prosthetic ankle joint to mimic natural joint resistance and motion. This process has been proposed to result in more natural joint stability while standing and walking. Currently, two types of microprocessor-controlled foot-ankle prosthetic devices are discussed in the peer-reviewed literature, those without powered propulsion push-off at the end of the Stance Phase of the gait cycle and those with powered propulsion push-off at the end of the Stance Phase of the gait cycle. Examples of the former are the Proprio Foot and Endolite élan foot devices, while the latter includes the PowerFoot BiOM and emPOWER Ankle devices.

The VA/DOD Clinical Practice Guideline for Rehabilitation of individuals with Lower Limb Amputation (2017) suggest there are inconclusive studies regarding differences in socket design, prosthetic foot categories as well as advantages and disadvantages of various types of suspensions and interfaces. The guideline reports that each component of a prosthetic prescription should be carefully selected based on the capabilities and anticipated compliance of the user as well as the integrity and shape of the residual limb. The individual's desired outcome, goals, and the compatibility of the entire prosthetic system should also be a consideration when prescribing prosthetic components.

*Foot-Ankle Prosthesis Without Powered Propulsion*

These types of prostheses do not use electric power to augment push-off at the end of the Stance Phase of the gait cycle. It uses an inter-step accommodation strategy which mean that it only makes adjustments to the ankle when the foot is in the Swing Phase of the gait cycle. Furthermore, it does not make these adjustments on each step but instead requires multiple steps to adjust, depending on the terrain.

Wolf (2009) published a study of 12 subjects using the Proprio Foot (Ossur) which measured socket pressures in individuals undergoing gait analysis during various locomotion tasks for five walking conditions with and without the device's ankle adaptation mode. The study concluded that the adaptive ankle-foot prostheses favorably altered joint kinetics and stump pressures on stairs and ramps.

Alimusaj (2009) published a study of three-dimensional (3D) gait analysis on stairs of 16 healthy controls and 16 transtibial amputees using the Proprio Foot. Kinematics and kinetics of the lower limbs were compared during stair ascent and descent with the prosthetic foot set to a neutral ankle angle and then with an adapted dorsi-flexion ankle angle of 4 degrees. The study concluded that for both stair ascent and descent, the prosthesis resulted in an improvement in kinematic and kinetic measures of the knee with an increase of knee flexion and increase of the knee stability during stance.

Fradet (2010) described a nonrandomized controlled study involving 16 transtibial amputee subjects using the Proprio Foot and 16 healthy controls. All participants underwent conventional 3D gait analysis while walking up and down a ramp. The authors reported that subjects, when using the foot ankle prosthesis in adaptive mode, exhibited more physiologic kinematics and kinetics of the lower limbs during ramp ascent but not during ramp descent. Additionally, subjects using the prosthesis in adaptive mode reported subjective feelings of being safer during ramp descent.

Gailey (2012) published the results of a study involving 10 subjects with transtibial amputation. All subjects were tested at baseline and after receiving training with their existing prosthesis and with the study socket and four different prosthetic feet, including SACH (solid ankle cushion heel), SAFE (stationary attachment flexible endoskeletal), Talux, and Proprio Foot over 8 to 10 weeks. The authors reported that no differences were detected by the PEQ-13, Locomotor Capabilities Index (LCI), 6-minute walk test (6MWT), or step activity monitor. On the Amputee Mobility Predictor with a prosthesis (AMPPRO) tool, they did note a significant difference between the baseline measures with the subject's existing prosthesis and the Proprio Foot (p<0.05). Additionally, only the Proprio Foot demonstrated signifncantly greater 6MWT in the subgroup of subjects without peripheral vascular disease (PVD, p<0.05).

Delussu (2013) described a study involving 10 subjects with transtibial amputation and K-2 and above functional levels who underwent trials with either a Proprio Foot or a dynamic carbon fiber foot. The objective of the study was to assess the energy cost of walking (ECW). Subjects were asked to walk at a self-selected speed on a regular floor surface and on a treadmill with -5%, 0% and 12% slopes while instrumented for various physical measures. The authors reported that ECW with the Proprio-Foot obtained in the final floor-walking test was significantly lower than

ECW with the control foot (p=0.002). The authors reported no significant improvements in walking speed, Hill assessment index, timed up and go test, LCI-5, objective perceived mobility or walking ability.

Agrawal (2013) published a study involving 10 K-2 level and above subjects with transtibial amputation. Subjects were evaluated while wearing each of the following prostheses: SACH, SAFE, Talux, and the Proprio Foot in a random fashion. All subjects wore a custom-fit socket with each prosthesis. Following a 10- to 14-day accommodation and training period with each foot, subjects were asked to ascend and descend a set of stairs to assess movement proficiency and symmetry, ground reaction force and center of mass. Subjects were stratified by K-level (n=5 per group). The Proprio Foot demonstrated a significantly greater interlimb symmetry during ascent than the SACH and SAFE prostheses. The authors commented that the swing-phase dorsiflexion appeared to promote greater interlimb symmetry because it facilitated forward motion of the body, resulting in a heel-to-toe center of pressure trajectory.

Darter (2014) reported the results of a small nonrandomized study involving 6 subjects who performed treadmill walking tests using their customary prosthesis, the Proprio Foot in its "on" setting (Pon), and lastly, the Proprio Foot in the "off" setting (Poff). Through the study, the slope of the treadmill was changed to three different slopes, -5$^{\circ}$, 0$^{\circ}$, and +5$^{\circ}$. The results included the observation that metabolic energy expenditure, energy cost for walking, and rating of walking difficulty were not statistically different between the Pon and Poff settings for all tested slopes. However, for slope descent, energy expenditure and energy cost for walking improved significantly by an average of 10%-14% for both the Pon and Poff compared to the customary limb. Walking difficulty also improved with slope descent for both the Pon and Poff compared to the customary device. An improvement with slope ascent was found for Pon compared to the customary limb only. The authors concluded that adaptive ankle motion provided no meaningful physiological benefit during slope walking but was less demanding than the customary device for slope descent.

Rosenblatt (2014) reported the results of a small study of 8 subjects using both a standard non-powered foot prosthesis and the Proprio Foot. All subjects underwent a treadmill-based evaluation using a motion capture system, first with their standard foot and then with the Proprio Foot. The goal of this study was to evaluate minimum toe clearance and calculate likelihood of tripping. The authors reported that there was a 70% increase in minimum toe clearance with the Proprio Foot device. Regression analysis found significant differences in average hip, knee, and ankle angles at time of minimum toe clearance between the two device types (p<0.05 for all). The authors concluded that the Proprio Foot device contributes significantly to an increased minimum toe clearance measurement which may provide a significant contribution to decreased likelihood of tripping. However, no actual real-life use results were reported regarding fall occurrence.

Agrawal (2015) published the results of a controlled study involving 10 K-2 to K-4 Level subjects who underwent six testing sessions with four different prostheses: (1) SACH foot, (2) SAFE foot, (3) Talux foot, and (4) the Proprio Foot. The initial testing session was conducted with all subjects using their usual foot prosthesis. This was followed by a 2-week period of training and acclimation to a new standardized socket which was used in combination with their usual prosthesis, followed by another testing session. This process was then repeated with each of the four study prostheses. For the ramp ascent test, no significant differences were reported between prosthesis groups. For the stair descent test, the data indicated that there was a significant benefit in energy expenditure between the Proprio Foot and the basic SACH foot prosthesis (p<0.05). No significant differences were reported between the Talux foot and the Proprio Foot. This study seems to indicate little benefit to the use of the Proprio Foot compared to the non-microprocessor controlled Talux foot prosthesis.

*Foot-Ankle Prosthesis With Powered Propulsion*

These types of prosthetic devices offer powered propulsion of the foot by emulating the function and power of missing muscles and tendons of the ankle and foot. In addition, these devices automatically adjusts foot stiffness in the heel strike portion of the Stance Phase which has been proposed to optimize shock absorption and foot loading.

In 2007, the VA Office of Research and Development collaborated with researchers at MIT and Brown University to introduce a powered ankle-foot prosthesis that uses tendon-like springs and an electric motor to move users forward. According to the VA, studies have shown that individuals using the powered ankle-foot expend less energy while walking, have better balance, and walk 15 percent faster. The device originally sold as the BiOM Ankle and is now marketed as the emPOWER Ankle.

Herr (2011) conducted a small study investigating the metabolic energy costs, preferred velocities, and biomechanical patterns in 7 unilateral transtibial amputees and 7 non-amputee controls. The experimental group was tested using a BiOM and their own passive-elastic prosthesis. The authors reported that compared with the passive-elastic prosthesis, the bionic prosthesis decreased metabolic cost by 8%, increased trailing prosthetic leg mechanical work by 57% and decreased the leading biological leg mechanical work by 10%, on average, across walking velocities of 0.75-1.75 m s$^{-1}$. Use of the bionic prosthesis also increased preferred walking velocity by 23%. They concluded that the bionic prosthesis resulted in metabolic energy costs, preferred walking velocities and biomechanical patterns that were not significantly different from people without an amputation. However, due to the small study size it is unclear whether or not these results would be seen in the general population.

Ferris (2012) reported on the results of a prospective study involving 11 subjects with transtibial amputations and 11 healthy controls. All subjects participated in a battery of tests including a 10-meter forward run, a 5-meter side-shuffle to right, a 10-meter side shuffle to left, a 5-meter side-shuffle to right, a 10-meter backward run, a Four Square Step Test, and hill and stair assessments. Subjects in the amputation group conducted the tests first with an energy-storing and returning (ESR) prosthesis and then with the BiOM prosthesis. The authors reported that the BiOM prosthesis ankle range of motion was significantly larger (approximately 30%) than that of the ESR limb. However, both devices demonstrated significantly less ankle range of motion than the intact limbs. The BiOM prosthesis was reported to have generated significantly greater peak ankle power than control (35%) and ESR (approximately 125%) limbs, resulting in the BiOM limb absorbing twice the peak knee power observed in the control and intact limbs. The BiOM's limb peak hip power generation was approximately 45% greater at preswing than that of the intact limb. No significant differences were reported in walking velocity between the ESR and BiOM groups. The authors concluded that use of the BiOM appeared to increase compensatory strategies at proximal joints. The clinical impact of these benefits is unclear.

Gates (2013) reported a controlled study involving 11 subjects with transtibial amputation who were asked to participate in two data collection trials involving different walking speeds across a loose rock surface using their standard ESR prosthesis and then the BiOM device. Subjects using the BiOM had a 10% faster self-selected walking speed compared to when using the ESR device (1.16 m/s vs. 1.05 m/s; p=0.031). Ankle plantarflexion was also increased on their prosthetic limb throughout the gait cycle when wearing BiOM vs ESR devices, especially during push-off (p<0.001). A small (< 3°), but statistically significant decrease in knee flexion during early stance was noted with the BiOM device (p=0.045). No significant differences in kinematics of the knee and hip were reported, but subjects had decreased medial–lateral motion of their center of mass when wearing the BiOM prosthesis (p=0.020). The authors concluded that use of the BiOM did not significantly alter their proximal joint kinematics when used on an irregular surface.

Grabowski (2013) reported the results of a controlled trial involving 14 subjects, 7 with transtibial amputations and 7 healthy controls, subjected to level ground walking trials at 0.75, 1.00, 1.25, 1.50, and 1.75 m/s. The amputation subjects conducted their walking trials with their standard prosthesis and then with the BiOM prosthesis. The investigators were interested in how physical performance measures of the intact limb of the amputation group subjects were impacted by the use of the BiOM prosthesis compared to the standard device and healthy controls. They reported that the use of the BiOM significantly decreased intact limb peak resultant forces and first peak knee external adduction moments. Loading rates were not significantly different between prosthetic feet. They concluded that use of the BiOM prosthesis could reduce the risk of comorbidities such as knee osteoarthritis. However, no long term data have yet been published addressing that proposition.

Gardinier (2018) reported the results of a controlled trial involving 10 subjects with transtibial amputations and 10 healthy subjects. Testing included an 8-meter walk test at self-selected speeds and an 8-minute treadmill test. Walking speed was measured during the former and metabolic rate during the latter. Amputation group subjects were randomly assigned to undergo testing first with either the BiOM or their standard prosthetic device. The authors reported no significant differences between either of the prosthetic groups with regard to walking speeds or metabolic costs. This study did not demonstrate significant benefits with the use of the BiOM.

Evidence in the published peer-reviewed literature for the use of a microprocessor controlled foot or ankle prosthesis is comprised of small non-randomized studies, which do not fully address functional or quality of life benefits for individuals with a functional K-3 level or above. However, consideration of clinical input and other relevant factors supports that use of these devices without powered propulsion in individuals with functional K-3 level or above is consistent with generally accepted standards of medical practice. Additional evidence is needed to better evaluate devices with a power propulsion to fully evaluate whether there are clinical presentations where that functionality improves outcomes over other devices.

## Background/Overview

Prostheses are devices that are used to replace or compensate for the absence of a body part. Such absence may be present at birth or due to amputation as the result of illness or trauma. Prosthetic devices have been used to replace body parts from individual fingers to entire limbs. Additionally, prostheses may include replacements for other body parts including breasts, eyes, and teeth. There are a wide variety of prostheses for the replacement of limbs made from various materials using a wide range of technologies.

The functional ability level of individuals with missing lower limbs is commonly rated via the use of the Medicare Functional Classification Level (MFCL), also known as K-Levels or Functional Levels (Centers for Medicare & Medicaid Services, 2017). The system is used to stratify individuals based on their ability to ambulate and function in various conditions. Additionally, K-Levels are commonly used to guide the appropriateness of specific types of lower limb prostheses. Provided below are definitions of these levels. Please note that within the functional classification hierarchy, bilateral amputees often cannot be strictly bound by functional level classifications.

**Level 0:**     Does not have the ability or potential to ambulate or transfer safely with or without assistance and prosthesis does not enhance their quality of life or mobility.
**Level 1:**     Has the ability or potential to use prosthesis for transfers or ambulation on level surfaces at fixed cadence. Typical of the limited and unlimited household ambulator.
**Level 2:**     Has the ability or potential for ambulation with the ability to traverse low-level environmental barriers such as curbs, stairs or uneven surfaces. Typical of the limited community ambulator.
**Level 3:**     Has the ability or potential for ambulation with variable cadence. Typical of the community ambulator who has the ability to traverse most environmental barriers and may have vocational, therapeutic, or exercise activity that demands prosthetic utilization beyond simple locomotion.
**Level 4:**     Has the ability or potential for prosthetic ambulation that exceeds basic ambulation skills, exhibiting high impact, stress, or energy levels. Typical of the prosthetic demands of the child, active adult, or athlete.

For prostheses used to replace lower limbs where the leg is missing from the knee or above, there is a need for a device to replace the normal function of the knee. In people with intact legs, the knee naturally and automatically adjusts its action to the speed and stride of the person. Conventional prosthetic legs use a pneumatic or hydraulic return mechanism to mimic the natural pendulum action of the knee. This mechanism is usually set by a prosthetist to work at the individual's normal walking speed and does not allow any room for variation in speed. Changes in an individual's walking speed require the individual to compensate for any delay in knee action through a variety of means including altering stride length and body position, among others. Such maneuvers lead to an abnormal gait and require extra effort and concentration for what is normally an unconscious act.

Microprocessor controlled lower limb prostheses for the transfemoral amputee use computer-controlled mechanisms to detect step time and alter prosthetic function such as knee extension level to suit walking speed or angle of the terrain. More advanced models, such as the Otto-Bock C-Leg, have multiple sensors that gather and calculate data on various parameters such as the amount of vertical load, ankle movement, and knee joint movement in an attempt to mimic more natural leg function to provide stability and gait fluidity as needed on uneven terrains and/or during sports activities. The claimed advantages of a computerized leg prosthesis include a decreased level of effort in walking, improved symmetry of movement between legs leading to more natural movement, and the avoidance of falls.

For individuals who have lost a limb below the knee, there is a need for a device to replace the function of the ankle and foot. Stair ambulation is limited in the transtibial amputee due to the neutral and fixed ankle position which exists in traditional prosthetic ankles. Under study are newer prosthetic ankles which adjust the foot-ankle angle during the swing phase using sensor and microprocessor technologies to identify sloping gradients and the ascent or descent of stairs after the first step. Users can place the foot fully on a step when climbing or descending stairs and it will automatically adapt the ankle position to enable the next step. On ramp ascent and descent, adaptation begins on the second step and the device makes small adjustments until it reaches the degree of slope of the ramp. The Proprio Foot is one such "quasi-passive" device. The device is passive since no power is generated through the ankle in stance. The device is also said to be designed to dorsiflex, or bring the toes closer to the shin, during the swing phase to improve ground clearance, improve gait symmetry and reduce the likelihood of falls. Other claims include the device's ability to assist in standing from a seated position and plantar (bottom of the foot) flexion when kneeling, sitting and lying down. Early pilot studies suggest that both during stair ascent and descent, the Proprio Foot improves knee flexion kinematics. The weight of the Proprio Foot device is more than twice the weight of a

Feedback

conventional ankle-foot prosthetic such as the LP Vari-Flex (995g versus 405g). Concern has been raised that because of its weight, the Proprio Foot might not benefit amputees with limited endurance and knee musculature.

Also under study are active prosthetic ankle prostheses which do generate power during the ankle stance. Early results are said to be promising, but these devices are bulky and of considerable weight due to the motor and batteries needed to generate power.

Another type of microprocessor controlled foot-ankle prosthetic device, the BiOM, is proposed to simulate the natural function of the foot by simulating the action of the ankle, Achilles tendon and calf muscles to move the individual forward when they step. These devices utilize various sensors in the ankle and foot to detect foot position, direction, and force of movement. This data is analyzed by several microcomputers that translate it into instructions for a motor-activated spring device in the sole of the prosthesis. The loaded spring device is released as the sensor detects that the user is taking a step forward, forcing the ball of the foot downwards and propelling the foot forward. The spring mechanism reloads itself in-between steps. This device uses batteries to operate this system and requires daily recharging.

The FDA classified the Proprio Foot as a Class I device and the PowerFoot as a class II device, both exempt from requirements for pre-market notification by submission and FDA review of a 510(k) clearance. This is based on the level of active assistance provided and the perceived risk associated with these devices.

## Definitions

Computerized leg prosthesis: A prosthetic device for individuals with some degree of leg amputation which uses a computer microprocessor to adapt prosthetic function to environmental conditions that impact locomotion.

Foot-Ankle Prosthesis Without Powered Propulsion: A prosthetic device that does not use electric power to augment push-off at the end of the Stance Phase of the gait cycle.

Foot-Ankle Prosthesis With Powered Propulsion: A prosthetic device that offers a powered push-off feature by emulating the function and power of lost muscles and tendons. The device automatically adjusts its foot stiffness in the heel strike portion of the Stance Phase which ensures optimum shock absorption and foot loading.

Kinematics: A study of motion without regard to the forces present; mathematical methods to describe motion.

Prosthesis: For the purposes of this document, a device used to replace or compensate for the absence of a limb. Prostheses may be artificial replacements for a wide variety of body parts.

## Coding

*The following codes for treatments and procedures applicable to this document are included below for informational purposes. Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement policy. Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.*

*Knee prostheses*
**When services may be Medically Necessary when criteria are met:**

**HCPCS**

| | |
|---|---|
| K1014 | Addition, endoskeletal knee-shin system, 4 bar linkage or multiaxial, fluid swing and stance phase control |
| L5856 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing and stance phase, includes electronic sensor(s), any type |
| L5857 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing phase only, includes electronic sensor(s), any type |
| L5858 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, stance phase only, includes electronic sensor(s), any type |
| L5859 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, powered and programmable flexion/extension assist control, includes any type motor(s) |

**ICD-10 Diagnosis**

Feedback

All diagnoses, including, but not limited to, the following:

| | |
|---|---|
| S78.111D, S78.111S | Complete traumatic amputation at level between right hip and knee, subsequent encounter or sequela |
| S78.112D, S78.112S | Complete traumatic amputation at level between left hip and knee, subsequent encounter or sequela |
| S78.119D, S78.119S | Complete traumatic amputation at level between hip and knee, unspecified side, subsequent encounter or sequela |
| S88.011D, S88.011S | Complete traumatic amputation at right knee level, subsequent encounter or sequela |
| S88.012D, S88.012S | Complete traumatic amputation at left knee level, subsequent encounter or sequela |
| S88.019D, S88.019S | Complete traumatic amputation at knee level, unspecified side, subsequent encounter or sequela |
| Z89.611 | Acquired absence of right leg above knee |
| Z89.612 | Acquired absence of left leg above knee |
| Z89.619 | Acquired absence of unspecified leg above knee |

**When services are Not Medically Necessary or Investigational and Not Medically Necessary:**
For the procedure codes listed above when criteria are not met, or when the code(s) describes a procedure indicated in the Position Statement section as not medically necessary or investigational and not medically necessary.

*Ankle/Foot prostheses*
**When services may be Medically Necessary when criteria are met:**

**HCPCS**
| | |
|---|---|
| L5973 | Endoskeletal ankle-foot system, microprocessor controlled feature, dorsiflexion and/or plantar flexion control, includes power source |

**ICD-10 Diagnosis**

All diagnoses, including, but not limited to, the following:

| | |
|---|---|
| S88.111D, S88.111S | Complete traumatic amputation at level between knee and ankle, right lower leg, subsequent encounter or sequela |
| S88.112D, S88.112S | Complete traumatic amputation at level between knee and ankle, left lower leg, subsequent encounter or sequela |
| S88.119D, S88.119S | Complete traumatic amputation at level between knee and ankle, unspecified lower leg, subsequent encounter or sequela |
| Z89.511 | Acquired absence of right leg below knee |
| Z89.512 | Acquired absence of left leg below knee |
| Z89.519 | Acquired absence of unspecified leg below knee |

**When services are Not Medically Necessary or Investigational and Not Medically Necessary:**
For the procedure codes listed above when criteria are not met, or when the code(s) describes a procedure indicated in the Position Statement section as not medically necessary or investigational and not medically necessary.

**When services are Investigational and Not Medically Necessary:**

**HCPCS**
| | |
|---|---|
| L5969 | Addition, endoskeletal ankle-foot or ankle system, power assist, includes any type motor(s) [when specified as addition to microprocessor controlled ankle-foot system] |

**ICD-10 Diagnosis**

All diagnoses

## References

**Peer Reviewed Publications:**

1. Agrawal V, Gailey RS, Gaunaurd IA, et al. Comparison between microprocessor-controlled ankle/foot and conventional prosthetic feet during stair negotiation in people with unilateral transtibial amputation. J Rehabil Res Dev. 2013; 50(7):941-950.

Feedback

2. Agrawal V, Gailey RS, Gaunaurd IA, et al. Comparison of four different categories of prosthetic feet during ramp ambulation in unilateral transtibial amputees. Prosthet Orthot Int. 2015; 39(5):380-389.

3. Alimusaj M, Fradet L, Braatz F, et al. Kinematics and kinetics with an adaptive ankle foot system during stair ambulation of transtibial amputees. Gait Posture. 2009; 30(3):356-363.

4. Bell EM, Pruziner AL, Wilken JM, Wolf EJ. Performance of conventional and X2® prosthetic knees during slope descent. Clin Biomech (Bristol, Avon). 2016; 33:26-31.

5. Bellmann M, Köhler TM, Schmalz T. Comparative biomechanical evaluation of two technologically different microprocessor-controlled prosthetic knee joints in safety-relevant daily-life situations. Biomed Tech (Berl). 2019; 64(4):407-420.

6. Bellmann M, Schmalz T, Ludwigs E, Blumentritt S. Immediate effects of a new microprocessor-controlled prosthetic knee joint: a comparative biomechanical evaluation. Arch Phys Med Rehabil. 2012; 93(3):541-549.

7. Burnfield JM, Eberly VJ, Gronely JK, et al. Impact of stance phase microprocessor-controlled knee prosthesis on ramp negotiation and community walking function in K2 level transfemoral amputees. Prosthet Orthot Int. 2012; 36(1):95-104.

8. Chin T, Machida K, Sawamura S, et al. Comparison of different microprocessor controlled knee joints on the energy consumption during walking in trans-femoral amputees: intelligent knee prosthesis (IP) versus C-leg. Prosthet Orthot Int. 2006; 30(1):73-80.

9. Chin T, Sawamura S, Shiba R, et al. Effect of an Intelligent Prosthesis (IP) on the walking ability of young transfemoral amputees: comparison of IP users with able-bodied people. Am J Phys Med Rehabil. 2003; 82(6):447-451.

10. Darter BJ, Wilken JM. Energetic consequences of using a prosthesis with adaptive ankle motion during slope walking in persons with a transtibial amputation. Prosthet Orthot Int. 2014; 38(1):5-11.

11. Datta D, Heller B, Howitt J. A comparative evaluation of oxygen consumption and gait pattern in amputees using Intelligent Prostheses and conventionally damped knee swing-phase control. Clin Rehabil. 2005; 19(4):398-403.

12. Delussu AS, Brunelli S, Paradisi F, et al. Assessment of the effects of carbon fiber and bionic foot during overground and treadmill walking in transtibial amputees. Gait Posture. 2013; 38(4):876-882.

13. Eberly VJ, Mulroy SJ, Gronley JK, et al. Impact of a stance phase microprocessor-controlled knee prosthesis on level walking in lower functioning individuals with a transfemoral amputation. Prosthet Orthot Int. 2014; 38(6):447-455.

14. Ferris AE, Aldridge JM, Rábago CA, Wilken JM. Evaluation of a powered ankle-foot prosthetic system during walking. Arch Phys Med Rehabil. 2012; 93(11):1911-1918.

15. Fradet L, Alimusaj M, Braatz F, Wolf SI. Biomechanical analysis of ramp ambulation of transtibial amputees with an adaptive ankle foot system. Gait Posture. 2010; 32(2):191-198.

16. Gailey RS, Gaunaurd I, Agrawal V, et al. Application of self-report and performance-based outcome measures to determine functional differences between four categories of prosthetic feet. J Rehabil Res Dev. 2012; 49(4):597-612.

17. Gardinier ES, Kelly BM, Wensman J, Gates DH. A controlled clinical trial of a clinically-tuned powered ankle prosthesis in people with transtibial amputation. Clin Rehabil. 2018; 32(3):319-329.

18. Gates DH, Aldridge JM, Wilken JM. Kinematic comparison of walking on uneven ground using powered and unpowered prostheses. Clin Biomech (Bristol, Avon). 2013; 28(4):467-472.

19. Grabowski AM1, D'Andrea S. Effects of a powered ankle-foot prosthesis on kinetic loading of the unaffected leg during level-ground walking. J Neuroeng Rehabil. 2013; 10:49.

20. Hafner BJ, Smith DG. Differences in function and safety between Medicare Functional Classification Level-2 and -3 transfemoral amputees and influence of prosthetic knee joint control. J Rehabil Res Dev. 2009; 46(3):417-433.

21. Hafner BJ, Willingham LL, Buell NC, et al. Evaluation of function, performance, and preference as transfemoral amputees transition from mechanical to microprocessor control of the prosthetic knee. Arch Phys Med Rehabil. 2007; 88(2):207-217.

22. Hahn A, Lang M, Stuckart C. Analysis of clinically important factors on the performance of advanced hydraulic, microprocessor-controlled exo-prosthetic knee joints based on 899 trial fittings. Medicine (Baltimore). 2016; 95(45):e5386.

23. Hasenoehrl T, Schmalz T, Windhager R, et al. Safety and function of a prototype microprocessor-controlled knee prosthesis for low active transfemoral amputees switching from a mechanic knee prosthesis: a pilot study Disabil Rehabil Assist Technol. 2018; 13(2):157-165.

24. Herr HM, Grabowski AM. Bionic ankle-foot prosthesis normalizes walking gait for persons with leg amputation. Proc Biol Sci. 2012; 279(1728):457-464.

Feedback

25. Highsmith MJ, Kahle JT, Shepard NT, Kaufman KR. The effect of the C-Leg knee prosthesis on sensory dependency and falls during sensory organization testing. Technol Innov. 2014; 2013(4):343-347.

26. Johansson JL, Sherrill DM, Riley PO, et al. A clinical comparison of variable-damping and mechanically passive prosthetic knee devices. Am J Phys Med Rehabil. 2005; 84(8):563-575.

27. Kahle JT, Highsmith MJ, Hubbard SL. Comparison of nonmicroprocessor knee mechanism versus C-Leg on Prosthesis Evaluation Questionnaire, stumbles, falls, walking tests, descent, and knee preference. J Rehabil Res Dev. 2008; 45(1):1-14.

28. Kaufman KR, Levine JA, Brey RH, et al. Energy expenditure and activity of transfemoral amputees using mechanical and microprocessor-controlled prosthetic knees. Arch Phys Med Rehabil. 2008; 89(7):1380-1385.

29. Kaufman KR, Levine JA, Brey RH, et al. Gait and balance of transfemoral amputees using passive mechanical and microprocessor-controlled prosthetic knees. Gait Posture. 2007; 26(4):489-493.

30. Klute GK, Berge JS, Orendurff MS, et al. Prosthetic intervention effects on activity of lower-extremity amputees. Arch Phys Med Rehabil. 2006; 87(5):717-722.

31. Orendurff MS, Segal AD, Klute GK, et al. Gait efficiency using the C-leg. J Rehabil Res Dev. 2006; 43(2):239-246.

32. Prinsen EC, Nederhand MJ, Olsman J, Rietman JS. Influence of a user-adaptive prosthetic knee on quality of life, balance confidence, and measures of mobility: a randomised cross-over trial. Clin Rehabil. 2015; 29(6):581-591.

33. Prinsen EC, Nederhand MJ, Sveinsdóttir HS, et al. The influence of a user-adaptive prosthetic knee across varying walking speeds: a randomized cross-over trial. Gait Posture. 2017; 51:254-260.

34. Rosenblatt NJ, Bauer A, Rotter D, Grabiner MD. Active dorsiflexing prostheses may reduce trip-related fall risk in people with transtibial amputation. J Rehabil Res Dev. 2014; 51(8):1229-1242.

35. Schmalz T, Blumentritt S, Jarasch R. Energy expenditure and biomechanical characteristics of lower limb amputee gait: the influence of prosthetic alignment and different prosthetic components. Gait Posture. 2002; 16(3):255-263.

36. Segal AD, Orendurff MS, Klute GK, et al. Kinematic and kinetic comparisons of transfemoral amputee gait using C-Leg and Mauch SNS prosthetic knees. J Rehabil Res Dev. 2006; 43(7):857-870.

37. Seymour R, Engbretson B, Kott K, et al. Comparison between the C-leg microprocessor-controlled prosthetic knee and non-microprocessor control prosthetic knees: a preliminary study of energy expenditure, obstacle course performance, and quality of life survey. Prosthet Orthot Int. 2007; 31(1):51-61.

38. Taylor MB, Clark E, Offord EA, Baxter C. A comparison of energy expenditure by a high level trans-femoral amputee using the Intelligent Prosthesis and conventionally damped prosthetic limbs. Prosthet Orthot Int. 1996; 20(2):116-121.

39. Theeven PJ, Hemmen B, Brink PR, et al. Measures and procedures utilized to determine the added value of microprocessor-controlled prosthetic knee joints: a systematic review. BMC Musculoskelet Disord. 2013; 14: 333.

40. Theeven PJ, Hemmen B, Geers RP, et al. Influence of advanced prosthetic knee joints on perceived performance and everyday life activity level of low-functional persons with a transfemoral amputation or knee disarticulation. J Rehabil Med. 2012; 44(5):454-461.

41. Theeven P, Hemmen B, Rings F, et al. Functional added value of microprocessor-controlled knee joints in daily life performance of Medicare Functional Classification Level-2 amputees. J Rehabil Med. 2011; 43(10):906-915.

42. Thiele J, Schöllig C, Bellmann M, Kraft M. Designs and performance of three new microprocessor-controlled knee joints. Biomed Tech (Berl). 2019; 64(1):119-126.

43. Williams RM, Turner AP, Orendurff M, et al. Does having a computerized prosthetic knee influence cognitive performance during amputee walking? Arch Phys Med Rehabil. 2006; 87(7):989-994.

44. Wolf SI, Alimusaj M, Fradet L, et al. Pressure characteristics at the stump/socket interface in transtibial amputees using an adaptive prosthetic foot. Clin Biomech (Bristol, Avon). 2009; 24(10):860-865.

45. Wong CK, Rheinstein J, Stern MA. Benefits for adults with transfemoral amputations and peripheral artery disease using microprocessor compared with nonmicroprocessor prosthetic knees. Am J Phys Med Rehabil. 2015; 94(10):804-810.

46. Wurdeman SR, Stevens PM, Campbell JH. Mobility analysis of amputees (MAAT 3): matching individuals based on comorbid health reveals improved function for above-knee prosthesis users with microprocessor knee technology. Assist Technol. 2019; 13;6:205566831882078.

**Government Agency, Medical Society, and Other Authoritative Publications:**

1. Centers for Medicare & Medicaid Services. Health technology assessment: lower limb prosthetic workgroup consensus document. September 2017. Available at: https://federalpt.org/pdfs/LLP_Consensus_Document.pdf. Accessed on March 12, 2021.
2. Department of Veterans Affairs and the Department of Defense. VA/DoD clinical practice guideline for rehabilitation of individuals with lower limb amputation. September 2017. Available at: https://www.healthquality.va.gov/guidelines/Rehab/amp/VADoDLLACPG092817.pdf. Accessed on March 12, 2021.
3. Ossur. Proprio Foot/Ankle. Available at: https://bionicsforeveryone.com/ossur-propio-foot-ankle/#quick-look. Accessed on April 20, 2021.
4. Ottobock. Empower. Available at: https://www.ottobockus.com/products/empower-ankle/#:~:text=Empower%20is%20the%20only%20commercially,function%20that%20propels%20you%20forward. Accessed on April 20, 2021.
5. Ottobock. What are K Levels? Available at: https://www.ottobockus.com/therapy/resources-for-prosthetics/what-are-k-levels.html. Accessed on March 12, 2021.
6. Stevens PM, Wurdeman SR. Prosthetic knee selection for individuals with unilateral transfemoral amputation: a clinical practice guideline. J Prosthet Orthot. 2019; 31(1):2-8.
7. U.S. Department of Veterans Affairs. Office of Research & Development. VA research on prosthetic/limb loss. Last updated 1/15/21. Available at: https://www.research.va.gov/topics/prosthetics.cfm#research2. Accessed on March 12, 2021.
8. Washington State Health Care Authority, Health Technology Assessment Program. Microprocessor-controlled lower limb prosthetics. October 12, 2011. Available at: http://www.hca.wa.gov/assets/program/mc_lower_prosthetic_final_report%5B1%5D.pdf. Accessed on March 12, 2021.

## Index

Feedback

Above Knee Prosthetics
Adaptive Prosthesis
BiOM
BionX emPOWER
C-Leg Compact
Endolite élan foot
Endolite Intelligent Prosthesis®
Endolite Orion3
Endolite Smart Adaptive knee
Endolite SmartIP
Freedom Innovations Plie Knee
Genium™ Bionic Prosthetic System
Genium™ X2® and X3®
Kinnex Microprocessor Ankle/Foot System
Ossur Rheo Knee®
Ossur Power Knee™
Ossur Symbionic Leg
Otto-Bock C-Leg Compact
Otto-Bock Meridium
Proprio Foot®
PowerFoot BiOM
Seattle Limb Systems Power Knee®
Triton smart ankle
Trulife Power Knee®
X2
X3

**The use of specific product names is illustrative only. It is not intended to be a recommendation of one product over another, and is not intended to represent a complete listing of all products available.**

## Document History

| Status | Date | Action |
|--------|------|--------|
| Revised | 05/13/2021 | Medical Policy & Technology Assessment Committee (MPTAC) review. Modified MN criteria for microprocessor controlled lower limb and added MN criteria for microprocessor controlled foot-ankle prosthesis. Added the text "with power assistance, which includes any type motor" to the INV and NMN statement. Updated Rationale, Coding and References sections. |
| | 04/01/2021 | Updated Coding section with 04/01/2021 HCPCS changes; added K1014. |
| Reviewed | 08/13/2020 | MPTAC review. Updated References sections. |
| Revised | 08/22/2019 | MPTAC review. Clarified MN position statement criteria 3 and 4. |
| Revised | 06/06/2019 | MPTAC review. Clarified and MN position statement criteria 2 through 4. Added INV and NMN statement addressing devices that combine both microprocessor controlled knee and foot-ankle prosthesis . Updated Rationale, Coding and References sections. |
| Revised | 01/24/2019 | MPTAC review. MN criteria related to mobility and stability benefit, ambulation (including distance and on uneven terrain or stairs) were clarified. NMN statement clarified. Updated Rationale and References sections. |
| | 06/21/2018 | Revised Rationale section for Herr, 2011 study to identify device used. |
| Reviewed | 05/03/2018 | MPTAC review. Updated Rationale and References sections. |
| Revised | 03/22/2018 | MPTAC review. Added functional K-Levels to clinical indications section. Updated Background, Rationale, References, and Index sections. |
| Reviewed | 01/25/2018 | MPTAC review. The document header wording updated from "Current Effective Date" to "Publish Date." Updated Rationale and References sections. |
| Revised | 02/02/2017 | MPTAC review. Clarified MN statement criteria regarding ability to ambulate faster than baseline rate. Updated Description, Rationale, References and Index sections. |
| Reviewed | 11/03/2016 | MPTAC review. Updated Rationale and References sections. |
| Reviewed | 11/05/2015 | MPTAC review. Updated Rationale and Reference sections. Removed ICD-9 codes from Coding section. |
| Reviewed | 11/13/2014 | MPTAC review. Updated Rationale and Reference sections. |
| Reviewed | 11/14/2013 | MPTAC review. Updated Coding section with 01/01/2014 HCPCS changes. |
| Reviewed | 11/08/2012 | MPTAC review. Updated Rationale, Reference and Index sections. Updated Coding section with 01/01/2013 HCPCS changes. |
| Reviewed | 11/17/2011 | MPTAC review. Added the Genium Bionic Prosthetic System to existing medically necessary statement addressing microprocessor controlled lower limb prosthesis. Added PowerFoot BiOM device to existing investigational and not medically necessary statement addressing microprocessor controlled foot-ankle prosthesis. Updated Rationale, Background, and Reference and Index sections. |
| Reviewed | 02/17/2011 | MPTAC review. Updated Index section. |
| Revised | 02/25/2010 | MPTAC review. Added microprocessor controlled foot-ankle prosthesis (e.g., Proprio Foot) as investigational and not medically necessary for all indications. Updated Coding, Rationale and Reference sections. |
| Revised | 02/26/2009 | MPTAC review. Added medically necessary position and criteria for microprocessor controlled lower limbs. Updated Rationale, Coding and Reference sections. |
| Revised | 08/28/2008 | MPTAC review. Changed position statement from Investigational and Not Medically Necessary to Not Medically Necessary. Updated Rationale, Coding and Reference sections. |
| Reviewed | 05/15/2008 | MPTAC review. Updated Rationale and Reference sections |
| | 02/21/2008 | The phrase "investigational/not medically necessary" was clarified to read "investigational and not medically necessary." This change was approved at the November 29, 2007 MPTAC meeting. |
| Reviewed | 05/17/2007 | MPTAC review. Updated Rationale and Reference sections. Coding updated; removed HCPCS L5846 and L5847 deleted 12/31/2004, and K0670 deleted 12/31/2005. |
| Reviewed | 06/08/2006 | MPTAC review. |
| | 01/01/2006 | Updated Coding section with 01/01/2006 CPT/HCPCS changes |

| | | | |
|---|---|---|---|
| Revised | 07/14/2005 | MPTAC review. Revision based on Pre-merger Anthem and Pre-merger WellPoint Harmonization. | |

| Pre-Merger Organizations | Last Review Date | Document Number | Title |
|---|---|---|---|
| Anthem, Inc. | 09/19/2003 | OR-PR.00003 | Computerized Limbs |
| WellPoint Health Networks, Inc. | 06/24/2004 | 9.01.07 | Microprocessor Controlled Lower Limb Prosthesis (Above Knee Prosthetics) |

---

Applicable to Commercial HMO members in California: When a medical policy states a procedure or treatment is investigational, PMGs should not approve or deny the request. Instead, please fax the request to Anthem Blue Cross Grievance and Appeals at fax # 818-234-2767 or 818-234-3824. For questions, call G&A at 1-800-365-0609 and ask to speak with the Investigational Review Nurse.

Federal and State law, as well as contract language, including definitions and specific contract provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. The member's contract benefits in effect on the date that services are rendered must be used. Medical Policy, which addresses medical efficacy, should be considered before utilizing medical opinion in adjudication. Medical technology is constantly evolving, and we reserve the right to review and update Medical Policy periodically.

No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without permission from the health plan.

© CPT Only – American Medical Association

Feedback

# [EXHIBIT 02]

## Anthem.

# Medical Policy

**Subject:**   Microprocessor Controlled Lower Limb Prosthesis
**Document #:** OR-PR.00003H                      **Current Effective Date:**   01/01/2013
**Status:**   Reviewed (Historic as of 01/01/2014)   **Last Review Date:**   11/08/2012

---

### Description/Scope

---

This document addresses the use of microprocessor controlled lower limb prostheses including, but not limited to, the Otto-Bock C-Leg device®, the Genium™ Bionic Prosthetic System, the Ossur RheoKnee®, the Proprio Foot®, the Endolite Intelligent Prosthesis®, and the PowerFoot BiOM.

---

### Position Statement

---

**Medically Necessary:**

The use of a microprocessor controlled lower limb prosthesis (e.g., Otto-Bock C-Leg device®, Otto-Bock Genium™ Bionic Prosthetic System, the Ossur RheoKnee® or the Endolite Intelligent Prosthesis®), is considered **medically necessary** for transfemoral (above knee) and knee disarticulation amputees when *all* of the criteria set forth in (A) and (B) below have been met:

A) Selection criteria:

1. Individual has adequate cardiovascular reserve and cognitive learning ability to master the higher level technology and to allow for faster than normal walking speed; and
2. Individual has demonstrated the ability to ambulate faster than their baseline rate using a standard prosthetic application with a swing and stance control knee; and
3. Individual has a documented need for daily long distance ambulation (i.e., greater than 400 yards) at variable rates.  (In other words, use within the home or for basic community ambulation is not sufficient to justify the computerized limb over standard limb applications); and
4. Individual has a demonstrated need for regular ambulation on uneven terrain or regular use on stairs.  Use of limb for limited stair climbing in the home or place of employment is not sufficient to justify the computerized limb over standard limb applications.

B) Documentation and performance criteria:

1. Complete multidisciplinary assessment of individual including an evaluation by a trained prosthetic clinician.  The assessment must objectively document that all of the above selection criteria have been evaluated and met.

**Not Medically Necessary:**

The use of a microprocessor controlled leg prosthesis is considered **not medically necessary** in all other cases, including when the criteria above have not been met.

ANTHEM000765

### Investigational and Not Medically Necessary

The use of a microprocessor controlled foot-ankle prosthesis (e.g., Proprio Foot[®], PowerFoot BiOM) is considered **investigational and not medically necessary** for all indications.

| Rationale |
| --- |

At this time, the available peer-reviewed published literature addressing the clinical benefit of microprocessor controlled lower limb prostheses is mostly limited to non-randomized controlled clinical trials, and case series of limited size.  Additionally, the majority of these studies have involved highly selected subjects who were otherwise in good health.

One publication by Hafner and others (2007) reports the findings of a small, non-randomized, cross-over controlled design study in which each subject was exposed to two different prosthetic limb conditions (mechanical and microprocessor controlled C-Leg) twice during the trial.  This study included 21 subjects, each of whom used both a standard mechanical knee and lower limb prosthesis and the C-Leg microprocessor controlled prosthesis.  Subjects were recruited for participation from a local amputee population.  Seventeen subjects completed the study.  Subjects were told at the time of enrollment that they would be allowed to keep the test prosthesis whether or not they completed the trial.  The subjects began the trial with a two-month period using their standard prosthesis followed by an activity assessment and functional, performance and subjective perception evaluation.  Next, all subjects used the microprocessor controlled prosthesis until acclimation was demonstrated.  This was then followed by a two-month acclimation period with the microprocessor controlled prosthesis, ending with an activity assessment and functional, performance and subjective perception evaluation.  Subjects were then reverted back to the standard prosthesis for two weeks and again an activity assessment and functional, performance and subjective perception evaluation was done.  In the final stage of the trial, participants were allowed to use either one or both prosthetic devices over a four month period.  Daily use and activity levels were measured for each device.  The study concluded with a final activity assessment and functional performance and subjective perception evaluation with the microprocessor controlled device.  A variety of objective and subjective outcome measures were reported.  The authors reported no significant differences between the two prosthetic devices in terms of daily activity as measured by mean daily step frequency and mean estimated step distance, in performance on level or varied surfaces, or in cognitive demand during use of the devices.  They did note a significant improvement with the C-Leg prosthesis in subjects' Stair Assessment Index (SAI) scores, time to descend scores, and a surveyed preference for the microprocessor controlled C-Leg as compared with a mechanical prosthetic knee.  There was no difference noted in ascending stairs, but self reported frequency of stumbles and falls was lower for the C-Leg prosthesis.  Limitations of this study include its small size, lack of outcome comparisons to a group randomized to continued use of a standard prosthesis, and lack of control of the type of mechanical prosthesis used.  In addition, the period of time allowed for the subject to revert back to a standard prosthesis (two weeks) for a functional assessment prior to the 4-month combined use measures was quite limited.

An article by Williams and colleagues (2006) describes a randomized two-group crossover design study of C-Leg versus a standard hydraulic knee prosthesis (Mauch SNS[®] knee).  Subjects were given a 3 month acclimation period for each device prior to testing.  This study was not blinded and was

ANTHEM000766

hampered by a significant drop-out rate (56%) that left only 8 participants in the evaluable study population.  The findings concluded that in non-demanding walking conditions with experienced amputees, participants reported the C-Leg® required less cognitive attention than the non-computerized knee.  However, this subjective experience did not translate into improved performance on neuropsychologic screening instruments or walking speed.

In another report of the same trial (Orendurf, 2006) the authors report that they found no significant difference between the groups in either oxygen efficiency or gait efficiency.  It is noted in the discussion section of this article that the programming of each C-Leg requires a high degree of tailoring to meet the needs of the user.  The authors comment that the parameters that were used by each of the study participants varied widely, with some preferring their C-Leg to operate in a manner not too dissimilar to that of a standard non-computerized limb, and others preferring significantly different functional parameters.  With this degree of variation, even within such a small study population, it would indicate that a much larger study population should be used in further studies of the C-Leg in order to control for this potential source of bias.

A non-randomized cross over study conducted by Kaufman and colleagues (2007) compared the computerized prosthetic knee to the standard hydraulic prosthesis in gait and balance parameters.  The study included 15 participants, who were allowed an average of 4.5 months of acclimation time with each device.  The authors indicate that there was a significant (p< 0.01) improvement in objective, standardized measures of both gait (knee flexor movement) and balance (Sensory Organization test) with the computerized prosthesis.  The investigators point out that the study included a select group of healthy, highly effective ambulators with no additional musculoskeletal conditions.  It is unclear what impact the use of computerized prosthetic knee devices may have on individuals with lower functional classifications.

Seymour and colleagues published a study comparing energy expenditure, obstacle course negotiation and quality of life (QOL) measures in 10 highly effective healthy ambulators who use both a C-Leg and a non-computerized prosthesis (2007).  This study had a 23% drop out rate.  A subset of participants (10 of 13) in this study underwent an eight minute energy consumption test on a treadmill using one of their prostheses, and then again using the other device after a 10 minute rest.  They were then asked to undergo a walking obstacle course eight times, four holding a laundry basket containing a 10 lb weight, and four times unencumbered.  Finally, they were asked to complete a standardized quality of life questionnaire (SF-36v2).  The authors report a statistically significant lower energy consumption rate for participants when wearing their C-Leg devices at both typical and fast paces.  On the obstacle course, statistical differences were noted in the number of steps taken, elapsed time, and the number of times participants stepped out of bounds during the unencumbered portion of the trial.  During the encumbered trial, the elapsed time (11.5 sec vs. 15.5 sec) was shorter for the C-Leg prosthesis group (p=0.007).  No stumbles or falls were reported in either group.  The results of the QOL questionnaire associated with wearing the C-Leg indicated that the participants were at or above the normative data available for the general population.

A study by Kahle and colleagues (2008) investigated the impact of the C-Leg on several functional parameters, including stumbles, falls, performance in walking and stair descent and QOL.  The study involved 21 subjects, with 19 completing the study, and utilized a simple pre-test post-test design.

Participants in the study had a wide variation in physical status and health, but were all community ambulators.  Some participants utilized assistive devices for ambulation.  This is the first published study to include a mixed population.  The authors report significant improvement in the number of stumbles (p=0.006), but no significant improvement in the number of falls.  No statistical analysis was provided for either walking or stair descent performance.  Finally, there was a significant improvement (20%, p=0.007) in QOL scores with the C-Leg prosthesis.

Theeven and others (2011) conducted a small randomized controlled cross-over trial that was significantly different from the previously discussed studies in two respects.  First, instead of including only highly selected healthy amputee subjects, their study only included individuals who were classified as Medicare Functional Classification Level-2 (MFCL-2), which represents an intermediate capacity for physical functioning, commonly termed as "limited community ambulator".  Second, this study not only compared standard mechanical prosthetic devices to microprocessor controlled devices, but also compared two microprocessor controlled devices with one another.  The study design called for each participant to wear a different prosthesis for sequential week-long periods, with testing at the end of each week.  All participants wore their standard mechanical prosthesis for the first week, followed by the two microprocessor controlled prosthetic devices (either the Otto-Bock C-leg, or the Otto-Bock C-Leg Compact).  Forty one subjects were randomized, but only 28 subjects (68%) completed the trial.

The authors further stratified study subjects into three groups ("High", "Intermediate', or "Low") based on expert opinion regarding functional levels within the MFCL category.  Subject performance on the ADAPT testing circuit was further stratified by specific sections of the test.  The ADAPT test circuit presents three separate sets of physical challenges, each addressing discrete subsets of skills or abilities that become increasingly challenging.  Activity Subset 1 (AS1) focuses on activities that require adequate balance, Activity Subset 2 (AS2) focuses on actions that which challenge muscle strength and weight distribution, and Activity Subset 3 (AS3) focuses on actions dependent upon prosthesis-related and cognitive skills.  The authors reported a large variation in the functional performance level seen within the study's MFCL-2 population, as well as between prosthetic devices.  The Low functional level subjects demonstrated no benefit from a microprocessor controlled prosthesis at any level of the test.  Both Intermediate and High group subjects were reported to have significant improvements in performance of AS2 activities, with the High group performing significantly better than the Intermediate group.  For AS3 activities, only the High group demonstrated any benefit.  Inter-device comparison found that the High group performed significantly better with both computerized prostheses in AS1, but none in AS2.  In AS3, the High group had significantly better times only when subjects wore the C-Leg Compact Device, but not the standard C-leg.  In contrast, the intermediate group only had significant improvements in AS2 with the standard C-leg, but not with the more advanced C-Leg compact device.

The authors conclude that there is a wide disparity in functional levels within the MFCL-2 classification.  They also note that despite the overall data showing benefit by functional levels, performance at the individual level was significantly variable across functional levels.  Additionally, there was a significant variation in achieved benefit depending upon device type.  In this study, the data are limited by the small study sample.  Also, the authors note that the choice of break-in period may have a significant impact on the results, and longer acclimation times may significantly change the results.  This is the first study looking at the use of microprocessor controlled knee prostheses in lower functioning subjects in

a rigorous manner.  The results showed significant variation in performance between individuals and unexpected results with regard to outcomes between device types.  It highlights that there are still many questions left to address with regard to the benefits derived from these devices. Further research is warranted.

Another group published the results of testing in a group of MFCL-2 subjects (Burnfield, 2012).  This study investigated the sequential use of standard mechanical prostheses followed by the C-Leg device. Ten subjects were asked to complete a series of tasks while measurements were taken on gait, stride, motion analysis, timed functional assessments along with questionnaires and EMG.  The authors noted significantly better performance with the C-Leg with regard to ramp ascent and descent and intact limb function.  Intact limb function improvements were used as a proxy measure for stability and user confidence since longer stride and a more regular gait are indicative of prosthetic confidence and comfort.  EMG data was not of sufficient quality to allow proper analysis.  The Timed Up and Go (TUG) test, which measures physical function during a specified series of tasks, showed significant improvement in the C-Leg group.  The results of the Prosthetic Evaluation Questionnaire (PEQ), Activities-specific Balance Confidence Scale (ABC) and the Houghton Scale were mixed, with the PEQ and ABC demonstrating significant benefits with the C-Leg, but not on the Houghton Scale.  This study supports some of the positive findings mentioned earlier in the Theeven trial, but further study is needed to fully understand the impact of microprocessor controlled knee prostheses in the MFCL-2 population.

As discussed earlier in the Theeven study, the authors noted significant differences between specific microprocessor controlled knee prostheses.  This question was further investigated by Bellmann and colleagues, who compared performance parameters of the C-Leg vs. the Genium device (2012).  This study enrolled 11 MFCL-3-4 C-Leg users who were put through a battery of tests while using their own C-Leg device.  Subjects were then introduced to the Genium device, which was attached to their own socket and foot prosthesis.  They were then given approximately 24 hours to accommodate to the new prosthesis before being given a battery of tests.  The authors reported significant benefits of the Genium device over the C-Leg in many measures, including foot loading, sway, step symmetry, and knee flexion during a variety of activities.  However, the very short acclimation time and very small sample size of this study do not allow the results to be generalized to a wider population.

The U.S. Department of Veterans Affairs Technology Assessment Program (VATAP, 2000) completed a systematic review of computerized lower limb prostheses in March 2000 and concluded that the:

- Energy requirements of ambulation (compared to requirements when using conventional prostheses) are decreased at walking speeds slower or faster than the amputee's customary speed, but are not significantly different at customary speeds.
- Results on the potential to improve ambulation on uneven terrain, stairs, or inclines were mixed; a study of 22 subjects by Datta and Howitt found that 77% found no difference in ascending or descending stairs but 59% found it easier to walk on slopes.
- Subjects did have a favorable perception of computerized prostheses and the vast majority of study participants chose not to return to their conventional prostheses.

Although the evidence continues to evolve, it is reasonable to consider microprocessor controlled lower limb prostheses appropriate for a select group of individuals meeting strict criteria for fitness, health, and daily utilization expectations.  However, these devices may not be appropriate for all potential users.  Since the device produces definite but marginal improvements in functional capacity by reducing oxygen consumption and improving walking speed and safety when ambulating in more challenging environments (e.g., long distances, uneven terrain, regular use of stairs) the device is appropriate for users who face those challenges regularly.  In addition, the device requires substantial training to allow for faster than normal walking speed and a user should have adequate cognitive learning ability to master the higher level technology.  The criteria set forth above identify the potential users for whom the device may represent an improvement in functional capacity.

Published peer-reviewed evidence addressing the use of microprocessor controlled foot-ankle prosthesis is limited.  One small study involved 12 subjects and measured socket pressures in individuals undergoing gait analysis during various locomotion tasks using the Proprio Foot (Ossur) for five walking conditions with and without the device's ankle adaptation mode (Wolf, 2009).  The study concluded that the adaptive ankle-foot prostheses favorably altered joint kinetics and stump pressures on stairs and ramps.  A second study involved 32 subjects, 16 healthy controls and 16 transtibial amputees (Alimusaj, 2009). The subjects underwent 3-dimensional gait analysis on stairs. Kinematics and kinetics of the lower limbs were compared during stair ascent and descent with the prosthetic foot set to a neutral ankle angle and then with an adapted dorsi-flexion ankle angle of 4 degrees. Comparisons were also made between experimental group subjects and control subjects. The study concluded that for both stair ascent and descent, the prosthesis resulted in an improvement in kinematic and kinetic measures of the knee with an increase of knee flexion and increase of the knee stability during stance. Fradet and colleagues describe a nonrandomized controlled study involving 16 transtibial amputee subjects and 16 healthy controls (Fradet, 2010).  All participants underwent conventional 3D gait analysis while walking up and down a ramp. The authors reported that subjects, when using the foot ankle prosthesis in adaptive mode, exhibited more physiologic kinematics and kinetics of the lower limbs during ramp ascent but not during ramp descent. Additionally, subjects using the prosthesis in adaptive mode reported subjective feelings of being safer during ramp descent.  Herr and colleagues conducted a small study investigating the metabolic energy costs, preferred velocities, and biomechanical patterns in 7 unilateral transtibial amputees and 7 non-amputee controls.  The experimental group was tested using both a bionic prosthesis (PowerFoot BiOM) and their own passive-elastic prosthesis. The authors reported that compared with the passive-elastic prosthesis, the bionic prosthesis decreased metabolic cost by 8%, increased trailing prosthetic leg mechanical work by 57% and decreased the leading biological leg mechanical work by 10%, on average, across walking velocities of 0.75-1.75 m s(-1). Use of the bionic prosthesis also increased preferred walking velocity by 23 per cent. They concluded that the bionic prosthesis resulted in metabolic energy costs, preferred walking velocities and biomechanical patterns that were not significantly different from people without an amputation.  However, due to the small study size it is unclear whether or not these results would be seen in the general population.

At this time, further study is needed to establish a meaningful clinical outcome benefit of the Proprio Foot over the conventional ankle-foot prosthesis.

ANTHEM000770

Currently there is no peer-reviewed published evidence addressing the clinical efficacy of the PowerFoot BiOM microprocessor controlled foot-ankle prosthesis.  Such information is necessary to properly evaluate the impact of this device.

| Background/Overview |
| --- |

Prostheses are devices that are used to replace or compensate for the absence of a body part.  Such absence may be present at birth or due to amputation as the result of illness or trauma.  Prosthetic devices have been used to replace body parts from individual fingers to entire limbs.  Additionally, prostheses may include replacements for other body parts including breasts, eyes, and teeth.  There are a wide variety of prostheses for the replacement of limbs made from various materials using a wide range of technologies.

For prostheses used to replace lower limbs where the leg is missing from the knee or above, there is a need for a device to replace the normal function of the knee.  In people with intact legs, the knee naturally and automatically adjusts its action to the speed and stride of the person.  Conventional prosthetic legs use a pneumatic or hydraulic return mechanism to mimic the natural pendulum action of the knee.  This mechanism is usually set by a prosthetist to work at the individual's normal walking speed and does not allow any room for variation in speed.  Changes in an individual's walking speed require the individual to compensate for any delay in knee action through a variety of means including altering stride length and body position, among others.  Such maneuvers lead to an abnormal gait and require extra effort and concentration for what is normally an unconscious act.

Microprocessor controlled lower limb prostheses for the transfemoral amputee use computer-controlled mechanisms to detect step time and alter prosthetic function such as knee extension level to suit walking speed or angle of the terrain.  More advanced models, such as the Otto-Bock C-Leg® have multiple sensors that gather and calculate data on various parameters such as the amount of vertical load, ankle movement, and knee joint movement in an attempt to mimic more natural leg function to provide stability and gait fluidity as needed on uneven terrains and/or during sports activities.  The claimed advantages of computerized leg prosthesis include a decreased level of effort in walking, improved symmetry of movement between legs leading to more natural movement, and the avoidance of falls.

For individuals who have lost a limb below the knee, there is a need for a device to replace the function of the ankle and foot.  Stair ambulation is limited in the transtibial amputee due to the neutral and fixed ankle position which exists in traditional prosthetic ankles.  Under study are newer prosthetic ankles which adjust the foot-ankle angle during the swing phase using sensor and microprocessor technologies to identify sloping gradients and the ascent or descent of stairs after the first step.  Users can place the foot fully on a step when climbing or descending stairs and it will automatically adapt the ankle position to enable the next step.  On ramp ascent and descent, adaptation begins on the second step and the device makes small adjustments until it reaches the degree of slope of the ramp.  The Proprio Foot® is one such "quasi-passive" device.  The device is passive since no power is generated through the ankle in stance.  The device is also said to be designed to dorsiflex, or bring the toes closer to the shin, during the swing phase to improve ground clearance, improve gait symmetry and reduce the likelihood of falls.  Other claims include the device's ability to assist in standing from a seated

ANTHEM000771

position and plantar (bottom of the foot) flexion when kneeling, sitting and lying down.  Early pilot studies suggest that both during stair ascent and descent, the Proprio Foot improves knee flexion kinematics.  The weight of the Proprio Foot device is more than twice the weight of a conventional ankle-foot prosthetic such as the LP Vari-Flex (995g versus 405g).  Concern has been raised that because of its weight, the Proprio Foot might not benefit amputees with limited endurance and knee musculature.

Also, under study are active prosthetic ankle prostheses which do generate power during the ankle stance.  Early results are said to be promising, but these devices are bulky and of considerable weight due to the motor and batteries needed to generate power.

Another type of microprocessor-controlled foot-ankle prosthetic device, the PowerFoot BiOM, is proposed to simulate the natural function of the foot by simulating the action of the ankle, Achilles tendon and calf muscles to move the individual forward when they step.  These devices utilize various sensors in the ankle and foot to detect foot position, direction, and force of movement.  This data is analyzed by several microcomputers that translate it into instructions for a motor-activated spring device in the sole of the prosthesis. The loaded spring device is released as the sensor detects that the user is taking a step forward, forcing the ball of the foot downwards and propelling the foot forward. The spring mechanism reloads itself in-between steps. This device uses batteries to operate this system and requires daily recharging.

The FDA classified the Proprio Foot as a Class I device and the PowerFoot as a class II device, both exempt from requirements for pre-market notification by submission and FDA review of a 510(k) clearance.  This is based on the level of active assistance provided and the perceived risk associated with these devices.

| Definitions |
| --- |

Computerized leg prosthesis: A prosthetic device for individuals with some degree of leg amputation which uses a computer microprocessor to adapt prosthetic function to environmental conditions that impact locomotion.

Kinematics: A study of motion without regard to the forces present; mathematical methods to describe motion.

Prosthesis: For the purposes of this document, a device used to replace or compensate for the absence of a limb.   Prostheses may be artificial replacements for a wide variety of body parts.

| Coding |
| --- |

*The following codes for treatments and procedures applicable to this document are included below for informational purposes.  A draft of future ICD-10 Coding (effective 10/01/2014) related to this document, as it might look today, is included below for your reference.  Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement policy.  Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.*

ANTHEM000772

**When services may be Medically Necessary when criteria are met:**

**HCPCS**

| | |
|---|---|
| L5856 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing and stance phase, includes electronic sensor(s), any type |
| L5857 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, swing phase only, includes electronic sensor(s), any type |
| L5858 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, microprocessor control feature, stance phase only, includes electronic sensor(s), any type |
| L5859 | Addition to lower extremity prosthesis, endoskeletal knee-shin system, powered and programmable flexion/extension assist control, includes any type motor(s) |

**ICD-9 Diagnosis**

| | |
|---|---|
| | All diagnoses, including, but not limited to, the following: |
| 897.2 | Traumatic amputation of leg, unilateral, at or above knee, without mention of complication |
| 897.3 | Traumatic amputation of leg, unilateral, at or above knee, complicated |
| 897.6-897.7 | Traumatic amputation of leg, bilateral [when specified at or above knee] |
| V49.76 | Lower limb amputation status, above knee |

**ICD-10 Diagnosis**    *ICD-10-CM draft codes; effective 10/01/2014:*

| | |
|---|---|
| | All diagnoses, including, but not limited to, the following: |
| S78.111D | Complete traumatic amputation at level between right hip and knee, subsequent encounter |
| S78.111S | Complete traumatic amputation at level between right hip and knee, sequela |
| S78.112D | Complete traumatic amputation at level between left hip and knee, subsequent encounter |
| S78.112S | Complete traumatic amputation at level between left hip and knee, sequela |
| S78.119D | Complete traumatic amputation at level between hip and knee, unspecified side, subsequent encounter |
| S78.119S | |

ANTHEM000773

| | Complete traumatic amputation at level between right hip and knee, unspecified side, sequela |
|---|---|
| S88.011D | Complete traumatic amputation at right knee level, subsequent encounter |
| S88.011S | Complete traumatic amputation at right knee level, sequela |
| S88.012D | Complete traumatic amputation at left knee level, subsequent encounter |
| S88.012S | Complete traumatic amputation at left knee level, sequela |
| S88.019D | Complete traumatic amputation at knee level, unspecified side, subsequent encounter |
| S88.019S | Complete traumatic amputation at knee level, unspecified side, sequela |
| Z89.611 | Acquired absence of right leg above knee |
| Z89.612 | Acquired absence of left leg above knee |
| Z89.619 | Acquired absence of unspecified leg above knee |

**When services are Not Medically Necessary:**

For the procedure codes listed above when criteria are not met, or when the code(s) describes a procedure indicated in the Position Statement section as not medically necessary.

**When services are Investigational and Not Medically Necessary:**

**HCPCS**

| L5973 | Endoskeletal ankle-foot system, microprocessor controlled feature, dorsiflexion and/or plantar flexion control, includes power source |
|---|---|

**ICD-9 Diagnosis**

| | All diagnoses |
|---|---|

---

| **References** |
|---|

**Peer Reviewed Publications:**

1. Alimusaj M, Fradet L, Braatz F, et al. Kinematics and kinetics with an adaptive ankle foot system during stair ambulation of transtibial amputees. Gait Posture. 2009; 30(3):356-363.
2. Bellmann M, Schmalz T, Ludwigs E, Blumentritt S. Immediate effects of a new microprocessor-controlled prosthetic knee joint: a comparative biomechanical evaluation. Arch Phys Med Rehabil. 2012; 93(3):541-549.
3. Burnfield JM, Eberly VJ, Gronely JK, et al. Impact of stance phase microprocessor-controlled knee prosthesis on ramp negotiation and community walking function in K2 level transfemoral amputees. Prosthet Orthot Int. 2012; 36(1):95-104.

4. Chin T, Machida K, Sawamura S, et al.  Comparison of different microprocessor controlled knee joints on the energy consumption during walking in trans-femoral amputees: intelligent knee prosthesis (IP) versus C-leg.  Prosthet Orthot Int. 2006; 30(1):73-80.

5. Chin T, Sawamura S, Shiba R, et al. Effect of an Intelligent Prosthesis (IP) on the walking ability of young transfemoral amputees: comparison of IP users with able-bodied people. Am J Phys Med Rehabil. 2003; 82(6):447-451.

6. Datta D, Heller B, Howitt J. A comparative evaluation of oxygen consumption and gait pattern in amputees using Intelligent Prostheses and conventionally damped knee swing-phase control. Clin Rehabil. 2005; 19(4):398-403.

7. Fradet L, Alimusaj M, Braatz F, Wolf SI. Biomechanical analysis of ramp ambulation of transtibial amputees with an adaptive ankle foot system. Gait Posture. 2010; 32(2):191-198.

8. Hafner BJ, Willingham LL, Buell NC, et al. Evaluation of function, performance, and preference as transfemoral amputees transition from mechanical to microprocessor control of the prosthetic knee.  Arch Phys Med Rehabil. 2007; 88(2):207-217.

9. Herr HM, Grabowski AM. Bionic ankle-foot prosthesis normalizes walking gait for persons with leg amputation. Proc R Soc. 2012; 279(1728):457-464.

10. Johansson JL, Sherrill DM, Riley PO, et al.  A clinical comparison of variable-damping and mechanically passive prosthetic knee devices.  Am J Phys Med Rehabil. 2005; 84(8):563-575.

11. Kahle JT, Highsmith MJ, Hubbard SL. Comparison of nonmicroprocessor knee mechanism versus C-Leg on Prosthesis Evaluation Questionnaire, stumbles, falls, walking tests, stair descent, and knee preference. J Rehabil Res Dev. 2008; 45(1):1–14.

12. Kaufman KR, Levine JA, Brey RH, et al. Energy expenditure and activity of transfemoral amputees using mechanical and microprocessor-controlled prosthetic knees. Arch Phys Med Rehabil. 2008; 89(7):1380-1385.

13. Kaufman KR, Levine JA, Brey RH, et al. Gait and balance of transfemoral amputees using passive mechanical and microprocessor-controlled prosthetic knees. Gait Posture. 2007; 26(4):489-493.

14. Klute GK, Berge JS, Orendurff MS, et al.  Prosthetic intervention effects on activity of lower-extremity amputees. Arch Phys Med Rehabil. 2006; 87(5):717-722.

15. Orendurff MS, Segal AD, Klute GK, et al. Gait efficiency using the C-leg. J Rehabil Res Dev. 2006; 43 (2):239-246.

16. Schmalz T, Blumentritt S, Jarasch R. Energy expenditure and biomechanical characteristics of lower limb amputee gait: the influence of prosthetic alignment and different prosthetic components. Gait Posture. 2002; 16(3):255-263.

17. Segal AD, Orendurff MS, Klute GK, et al. Kinematic and kinetic comparisons of transfemoral amputee gait using C-Leg and Mauch SNS prosthetic knees. J Rehabil Res Dev. 2006; 43(7):857-870.

18. Seymour R, Engbretson B, Kott K, et al. Comparison between the C-leg microprocessor-controlled prosthetic knee and non-microprocessor control prosthetic knees: a preliminary study of energy expenditure, obstacle course performance, and quality of life survey. Prosthet Orthot Int. 2007; 31 (1):51-61.

19. Taylor MB, Clark E, Offord EA, Baxter C. A comparison of energy expenditure by a high level trans-femoral amputee using the Intelligent Prosthesis and conventionally damped prosthetic limbs. Prosthet Orthot Int. 1996; 20(2):116-121.

20. Theeven P, Hemmen B, Rings F, et al. Functional added value of microprocessor-controlled knee joints in daily life performance of Medicare Functional Classification Level-2 amputees. J Rehabil Med. 2011; 43(10):906-915.
21. Williams RM, Turner AP, Orendurff M, et al.  Does having a computerized prosthetic knee influence cognitive performance during amputee walking? Arch Phys Med Rehabil. 2006; 87(7):989-994.
22. Wolf SI, Alimusaj M, Fradet L, et al. Pressure characteristics at the stump/socket interface in transtibial amputees using an adaptive prosthetic foot. Clin Biomech (Bristol, Avon). 2009; 24 (10):860-865.

**Government Agency, Medical Society, and Other Authoritative Publications:**

1. U.S. Department of Veteran's Affairs Technology Assessment Program. Short Report – Computerized lower limb prostheses.  March 2000. Available at: http://www4.va.gov/VATAP/Publications.asp.  Accessed August 21, 2012.
2. Washington State Department of Labor and Industries, Office of the Medical Director. Microprocessor-controlled prosthetic knees. Technology Assessment. 2002.
3. Workers' Compensation Board of British Columbia, Evidence Based Practice Group. A Review of Microprocessor-Controlled Knee Prostheses. 2003.

| Index |
|---|

Above Knee Prosthetics
Adaptive Prosthesis
C-Leg® Compact
Endolite® Smart Adaptive knee
Ossur Power Knee™
Otto-Bock C-Leg® Compact
Seattle Limb Systems Power Knee®
Trulife Power Knee®

**The use of specific product names is illustrative only.  It is not intended to be a recommendation of one product over another, and is not intended to represent a complete listing of all products available.**

| Document History |
|---|

| Status | Date | Action |
|---|---|---|
| Historic | 01/01/2014 | Not to be used for dates of service on or after 01/01/2014. |
| Reviewed | 11/08/2012 | Medical Policy & Technology Assessment Committee (MPTAC) review. No change to position statement. Updated Rationale, Reference and Index sections. Updated Coding section with 01/01/2013 HCPCS changes. |
| Reviewed | 11/17/2011 | |

|            |            | MPTAC review. Added the Genium™ Bionic Prosthetic System to existing medically necessary statement addressing microprocessor controlled lower limb prosthesis. Added PowerFoot BiOM device to existing investigational and not medically necessary statement addressing microprocessor controlled foot-ankle prosthesis.  Updated Rationale, Background, and Reference and Index sections. |
| Reviewed   | 02/17/2011 | MPTAC review.  No change to position statement. Updated Index section. |
| Revised    | 02/25/2010 | MPTAC review. Added microprocessor controlled foot-ankle prosthesis (e.g., Proprio Foot) as investigational and not medically necessary for all indications. Updated Coding, Rationale and Reference sections. |
| Revised    | 02/26/2009 | MPTAC review. Added medically necessary position and criteria for microprocessor controlled lower limbs. Updated Rationale, Coding and Reference sections. |
| Revised    | 08/28/2008 | MPTAC review. Changed position statement from Investigational and Not Medically Necessary to Not Medically Necessary.  Updated Rationale, Coding and Reference sections. |
| Reviewed   | 05/15/2008 | MPTAC review. No change to position statement. Updated Rationale and Reference sections |
|            | 02/21/2008 | The phrase "investigational/not medically necessary" was clarified to read "investigational and not medically necessary." This change was approved at the November 29, 2007 MPTAC meeting. |
| Reviewed   | 05/17/2007 | MPTAC review. No change to position statement. Updated Rationale and Reference sections.  Coding updated; removed HCPCS L5846 and L5847 deleted 12/31/2004, and K0670 deleted 12/31/2005. |
| Reviewed   | 06/08/2006 | MPTAC review. No change to position; updated references. |
|            | 01/01/2006 | Updated Coding section with 01/01/2006 CPT/HCPCS changes |
| Revised    | 07/14/2005 | MPTAC review. Revision based on Pre-merger Anthem and Pre-merger WellPoint Harmonization. |

| Pre-Merger Organizations | Last Review Date | Document Number | Title |
|---|---|---|---|
| Anthem, Inc. | 09/19/2003 | OR-PR.00003 | Computerized Limbs |
|              | 06/24/2004 | 9.01.07 |  |

| WellPoint Health Networks, Inc. | Microprocessor Controlled Lower Limb Prosthesis (Above Knee Prosthetics) |

Federal and State law, as well as contract language, including definitions and specific contract provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. The member's contract benefits in effect on the date that services are rendered must be used. Medical Policy, which addresses medical efficacy, should be considered before utilizing medical opinion in adjudication. Medical technology is constantly evolving, and we reserve the right to review and update Medical Policy periodically.

No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without permission from the health plan.

© CPT Only – American Medical Association

ANTHEM000778